## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Danny Cavic, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )      Civ. A. No. 24-0654 (DLF) |
| MAVEN ENGINEERING CORPORATION,<br>KAVITA DAWSON, and<br>ROBINSON MFG., INC., | ) )      JURY TRIAL DEMANDED ) ) |
| Defendants. | ) ) ) |

## RELATOR DANNY CAVIC'S SECOND AMENDED COMPLAINT

1.      This action arises out of a widespread and deliberate scheme by Maven Engineering Corporation ("Maven"), its President, Kavita Dawson ("Dawson"), and its subcontractor, Robinson Manufacturing, Inc. ("Robinson" or "Robinson Manufacturing") (together, "Defendants") to defraud the United States Government.

2.      Defendants defrauded the Government by engaging in a parts laundering scheme. Defendants imported substandard parts from Turkey through Maven's subcontractor, Robinson. Defendants delivered substandard, nonconforming, foreign-made parts to the Department of Defense ("DoD") with false certifications and misrepresentations. Defendants falsely claimed that a U.S. small business manufactured the parts in the United States. By submitting false claims, Defendants received hundreds of awards intended for domestic small business manufacturers. Defendants knowingly and repeatedly violated their regulatory and contractual obligations under Maven's various procurement contracts with DoD.

3.      Plaintiff/Relator Danny Cavic ("Cavic" or "Relator") brings this action under the False Claims Act, 31 U.S.C. § 3729–3732, to recover damages and penalties on behalf of the United States for Defendants' fraudulent conduct.

**I.      Introduction to Case**

4.      Maven has a long-standing history of supplying complex machined parts to various industries, including the defense, heavy industry, marine, oil and gas, and railroad industries. Over the years, Maven has received thousands of contracts from DoD and over $100 million in total awards.

5.      From 2009 until April 2014, Maven retained Robinson Manufacturing as its subcontractor to purportedly "manufacture" spare parts for military trucks, planes, and tanks under Maven's contracts with DoD. Defendants hired Cavic as Robinson's Quality Manager in February 2014. Maven and Robinson repeatedly delivered nonconforming foreign parts for military use. In April 2014, the Government suspended Robinson due to persistent quality issues discovered during the inspection process across several contracts. Maven and Robinson fired Relator shortly after that.

6.      While at Robinson, Cavic discovered that Robinson, Maven, and Dawson perpetrated an elaborate parts laundering scheme while employed at Robinson. Robinson supplied Maven with substandard, foreign-made military parts imported from Turkey. Defendants supplied the Turkish-manufactured parts to DoD under various procurement contracts between Maven and DoD. Maven received many of those awards through small business set-asides, which required a U.S. small business to manufacture the parts in the United States. Relator learned that Maven retained Robinson to receive the imported Turkish parts to

deceive the Government into believing that Robinson manufactured the parts that DoD purchased from Maven at its manufacturing facility in Placentia, California.

7.    Government inspectors rejected Robinson's parts for failing to conform to contract specifications. Maven, Dawson, and Robinson began pressuring Cavic to find ways for the Government to accept the parts, even though they knew they failed to conform to the contractual requirements.

8.    Defendants knowingly violated the U.S. Small Business Association's ("SBA") Nonmanufacturer Rule and Maven's regulatory and contractual obligations. Maven received many awards from DoD through small business set-asides because Defendants falsely claimed that a U.S. small business (supposedly, Robinson) manufactured the parts. Maven and Robinson merely purchased the parts from a Turkish manufacturer, doing no more than occasionally adding a coat of paint.

9.    Defendants made false claims, false statements, and misrepresentations regarding the origin, quality, and compliance of the parts supplied to DoD, which were material to the Government's decision to pay for these parts. Defendants fraudulently induced DoD into buying foreign-made, substandard, nonconforming parts, compromising military effectiveness. Moreover, Defendants' fraud deprived legitimate domestic small business manufacturers of opportunities to secure government contracts, causing economic harm and undermining policies to support U.S. small businesses. Relator seeks justice on behalf of the United States and to hold Defendants accountable for their actions.

## II.    Jurisdiction and Venue

10.    This Court has subject-matter jurisdiction because Relator brings claims that arise under federal law under the False Claims Act, 31 U.S.C. § 3729–3733.

11.     The jurisdictional provision of the False Claims Act provides that:

Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred.

31 U.S.C. § 3732(a).

12.     Defendants are subject to general personal jurisdiction and specific personal jurisdiction of this Court because Defendants engage in business in the District of Columbia and because Relator brings this civil action under 31 U.S.C. § 3730 and seeks claims for relief on behalf of the United States for multiple violations of 31 U.S.C. §3729.

13.     Venue is proper in the District of Columbia under 31 U.S.C. § 3732(a) because Defendants transact business in the District of Columbia and because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Defendants, some of which occurred in the District of Columbia.

## III.   Original Source

14.     This action has no bars under 31 U.S.C. § 3730(e).

15.     To the extent that any allegations or transactions herein have been publicly disclosed, Relator voluntarily disclosed to the Government the information on which the allegations or transactions on which his claims are based before public disclosure.

16.     To the extent that any allegations or transactions herein have been publicly disclosed, Relator is an original source of information in this action as defined in 31 U.S.C. § 3730(e)(4)(B).

17.     Relator has knowledge independent of and materially adds to any publicly disclosed allegations or transactions. Relator voluntarily provided this information to the United

States in his voluntary Pre-Filing Disclosure Statement on August 21, 2018 ("Original

Disclosure"), before filing his Original Complaint on August 28, 2018.

18.     As required by 31 U.S.C. § 3730(b), Relator served the Attorney General of the

United States and the United States Attorney for the Central District of Illinois with a copy of the

Original Complaint and written disclosure of substantially all material evidence and information

in Relator's possession. In addition, Relator filed under seal a First Amended Complaint that

included new claims for relief and new allegations of fraud to provide the Government with an

opportunity to intervene.

## IV.    Parties

### A.    Relator Danny Cavic

19.     Danny (Dusko) Cavic is a resident of Placentia, California.

20.     During his career as a machine shop owner and parts manufacturer, Cavic became

familiar with federal rules, regulations, and contract requirements for manufacturing military

parts under Government contracts.

21.     Cavic was the long-time owner and manager of D.C. Precision Co., which

manufactures various parts. He started the company in 1979 in Santa Ana, California. Since the

1980s, D.C. Precision Co. has supplied parts for the aerospace, defense, medical, and

commercial industries.

22.     As the owner, Cavic acted as the president, estimator, quality control manager,

programmer, operator, tool designer, and engineer. In 2013, he was forced to sell the company

when he was diagnosed with throat cancer.

23.     In early February 2014, Cavic entered contract negotiations with Kavita Dawson,

the President of Maven, for the position of Quality Manager Inspector. Cavic also communicated

with Don Robinson, the President of Robinson Manufacturing, regarding this employment opportunity with Maven. Dawson and Don Robinson expressed interest in employing Cavic because Cavic had previous experience dealing with Defense Contract Management Agency ("DCMA") inspectors and the inspection process.

24.    On or about February 10, 2014, Maven and Robinson hired Cavic. They agreed to pay him $2,000 weekly, later modified to $1,200 plus sales-based commissions. In retrospect, the commissions were unusual for a quality control manager, apparently reflecting Maven's desire, as described below, that Cavic would influence the inspection process by altering certification paperwork.

25.    While Cavic initially believed that he was negotiating with Dawson and Don Robinson to work for Maven, on February 21, 2014, Cavic was presented with a revised written employment contract from Robinson. Relator signed the employment contract, along with Don Robinson, who signed on behalf of Robinson.

26.    Defendants gave Cavic the position of Quality Control Manager. He was responsible for Robinson's military business division, including quoting, planning, contract review, purchasing, and Quality Control/Inspection. During this time frame, Robinson's military business only had two customers: Maven and Conquest Machine, Inc.

27.    In April 2014, Robinson terminated Cavic after the Government suspended Robinson from performing under any Government contract. At the time of his firing, Relator handled the quality assurance for more than 50 supply contracts that Robinson had with Maven to supply military parts to the DoD. *See* Ex. A.[1]

---

[1]    The supply contracts referenced herein refer to the broad array of contracts that Maven had with DoD to supply various parts. These contracts came in Indefinite Delivery Contracts,

B.    **Defendants**

  *1.    Maven Engineering Corporation and Kavita Dawson*

  28.    Defendant Maven Engineering Corporation is incorporated in Maryland and has its corporate headquarters at 15944 Derwood Road, Rockville, MD 20855.

  29.    Maven supplies machined parts for the defense, railroad, automotive, industrial, and oil and gas industries. Founded in 1946, Maven has a 70-year history of supplying aftermarket and original equipment spare parts.

  30.    Maven has been a prominent supplier to the military since 1987. Maven's Defense Division was formerly known as Comptech Corporation. Maven and Comptech were both certified as small, disadvantaged businesses.

  31.    Kavita Dawson is the President of Maven. Dawson has been with Maven or its predecessor, Comptech, since 1992 and became President in 1992. Dawson is responsible for Maven's sales, business development, marketing, quality control, and operations. Under Maven's Articles of Incorporation, Dawson is the only member of Maven's board of directors.

  32.    Dawson owns and operates Maven and makes all important day-to-day decisions. As described below, Dawson directed Relator's work as Quality Control Manager for Robinson. Dawson directed or carried out all the conduct described below as Maven's.

  33.    Dawson's brother, Ajay Wadhwani ("Wadhwani"), is the Executive Vice President of Maven. Maven, or its predecessor, Comptech, has employed Wadhwani since 2001. Wadhwani's responsibilities for Maven include sales, manufacturing, and administration. Under Maven's Articles of Incorporation, Wadhwani also serves as Maven's Secretary.

---

Definitive Contracts, Purchase Orders, Delivery Orders, and other contractual agreements to deliver supplies, as explained in more detail below.

34.     Incorporated in 2005, Maven Engineering Corporation brought five

manufacturing and distribution companies together under one corporate umbrella. The former

companies that merged in 2005 to form Maven include:

a) Comptech Corporation, located in Rockville, Maryland, supplied the U.S. and foreign militaries. Comptech specialized in aircraft engine parts and structural aircraft components and later became Maven's Defense Division.

b) Kessler International Corporation, located in Rockville, Maryland, specialized in marketing and distributing locomotive and engine parts to the railroad industry. Kessler had offices in Mumbai, India, and Mexico City, Mexico. It later became part of Maven's Railroad Division.

c) Tilly Industries, Inc., in Montreal, Canada, was a supplier to the locomotive industry. Tilly Industries manufactured engine and turbocharger parts for the locomotive and marine industries. Tilly Industries later became part of Maven's Railroad Division.

d) Nekel LLC in Rockville, Maryland. Nekel LLC was a stocking distributor of railroad and industrial parts for sale in North America. Nekel's business became part of Maven in the 2005 merger.

e) Maven also acquired a manufacturing facility in Marshall, Michigan, from Eaton Corporation that manufactured heavy-duty hydraulic pumps.

35.     Maven, Dawson, and Wadhwami are also affiliated with other manufacturers

abroad, including:

a) Econify Infotech Private Limited ("Econify"), a manufacturer based in Mumbai, India.

b) New Kessler Engineering Private Limited ("New Kessler"), a manufacturer based in Mumbai, India.

Dawson and Wadhwani sit on the board of directors for Econify and New Kessler.

36.     Maven received numerous contracts with DoD to supply various military parts

and components. Maven supplies to the Government, among other items, the following:

a) Airframe parts for military planes and helicopters, including structural supports, panels, hinges, aircraft skins, flaps, fairing, and fittings;

b) MS, NAS, and AN military hardware and fasteners, including rivets, bolts, screws, gaskets, nuts, and several other types of hardware;

c)  Aircraft kits for repairing and overhauling aircraft engines, which are supplied to maintenance facilities;

d)  Missile components, including parts for the HAWK and PATRIOT missile systems;

e)  Naval structural components for repair and maintenance of navy vessels, such as launchers, lockers, cables, sensors, valves, insulation panels, fiberglass, and paint;

f)  Engine parts, including bearings, fuel injectors, gaskets, hydraulic hoses, pistons, radiators, and valves;

g)  Engine bearings for aircraft, tanks, and Navy vessels;

h)  Turbochargers;

i)  Avionics for a wide variety of U.S.-made military aircraft, including altimeters, airspeed indicators, automatic direction finders (ADF), circuit card assemblies, fiber optic cables, receivers, and transmitters;

j)  Electrical components, including adapters, cable assemblies, connectors, contactors, relays, generators, switches, and other electrical components;

k)  Ground support equipment, including hoists, slings, maintenance stands, bearing cup pullers, trailers, trolleys, and tow bars;

l)  Components for military weapons and training exercises, such as breech bolts, firing attachments, flash suppressors, cartridges, firing pins, and firing hammers;

m) Parts for Armed Personnel Carriers (i.e., tanks), such as clutches, control assemblies, gaskets, shock absorbers, speedometer adapters, and torsion bars.

37.    Maven either manufactures these parts, acts as an authorized distributor on behalf of other part makers and manufacturers, or outsources the manufacturing of these parts to other parts makers.

38.    While Maven claims in advertisements that it offers build-to-print manufacturing at its West Coast facility in Orange County, California, Maven has longstanding relationships with parts suppliers in Turkey and other countries under which it imports inexpensive foreign parts rather than manufacturing parts in-house.

39.    From Fiscal Year 2008 to the present, Maven received $108.5 million in federal awards from over 5,000 contracts and over 8,000 transactions. *See* Ex. I.[2] Maven received more than 99% of these awards from DoD. *See id.* at 2. Maven also received awards from the Department of Homeland Security, the Small Business Administration, and the Department of Commerce. *See id.*

40.    At the detailed transaction level, which includes modifications and amendments to contract awards, the "total dollars obligated" to Maven for all fiscal years as of April 6, 2024, was $130,689,368; the cumulative "base and exercised options value" of the awards was $108,388,388; the cumulative "current total value" of the awards was $132,973,920; and the cumulative "base and all options value" of the awards was $254,605,645.[3]

41.    Maven's contracts with the Government for the six years that preceded the filing of Relator's original complaint were valued at roughly $51 million. As depicted in the chart below, Maven received awards totaling $8.7 million from 565 transactions and 351 new awards

---

[2]    *See Spending by Prime Award*, USASPENDING.gov (active filter applied using the keyword: KVZ4SL8QTTF8; data retrieved as of April 6, 2024).

Maven Engineering Corporation in Maryland (Maven (MD)) was assigned the following Unique Entity Identifier (UEI) in the System for Award Management (SAM.gov): KVZ4SL8QTTF8. The UEI for an awardee or recipient is an alphanumeric code created in SAM.gov that uniquely identifies specific commercial, nonprofit, or business entities registered to do business with the Federal Government. Maven (MD) is affiliated with Maven Engineering Corporation in Anaheim, California (Maven (CA)) (UEI: KB22L5347JN6) and Comptech in Maryland (UEI: FVNNMRJ9H3N4), which also received federal contracts.

[3]    "Total dollars obligated" means the total value of all obligated or de-obligated funds on the contract or order. "Base and exercised options value" means the contract value for the base contract and any options that have been exercised. "Current total value of award" means the total amount obligated to date on a contract, including the base and exercised options. "Base and all options value" means the mutually agreed upon total contract or order value, including the base contract and all options (if any). For Indefinite Delivery Vehicles, the estimated value for all orders expected to be placed against the vehicle. For modifications, the change (positive or negative, if any) in the mutually agreed upon total contract value.

in Fiscal Year ("FY") 2012, $9.6 million from 659 transactions and 411 new awards in FY 2013,

$5.8 million from 597 transactions and 371 new awards in FY 2014, $8.3 million from 813

transactions and 437 new awards in FY 2015, $5.8 million from 642 transactions and 502 new

awards in FY 2016, $7.1 million from 589 transactions and 386 new awards in FY 2017, and

$4.7 million from 434 transactions and 365 new awards in FY 2018:



*See* USASPENDING.gov (Maven's recipient profile; transactions over time).

### 2. *Robinson MFG., Inc. (Robinson Manufacturing, Inc.)*

42.    Robinson Manufacturing, Inc. is incorporated in California as Robinson MFG.,

Inc. Robinson Manufacturing, Inc. is the company's dba or trade name.

43.    Robinson's corporate headquarters is at 1136 S. Richfield Road, Placentia, CA

92870. Don Robinson is the registered agent on file with the California Secretary of State.

44.    A default was entered against Robinson Manufacturing on December 13, 2023,

for failure to file a responsive pleading or defend the case. ECF No. 60. Robinson filed a

bankruptcy petition in the Central District of California on January 4, 2024. On January 22,

2024, the bankruptcy case was dismissed by Order of the Bankruptcy Court. *See* ECF No. 66.

## V.    Respondeat Superior and Vicarious Liability

45.    All acts alleged to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents who at all times acted on behalf of the Defendants within the course and scope of their employment or by corporate predecessors to whom successive liability applies.

## VI.    Statutory, Regulatory, and Contractual Background

### A.    Overview of DoD and DLA

46.    Most of Maven's contracts with DoD were funded by the Defense Logistics Agency ("DLA"). DLA is DoD's logistics combat support agency, headquartered in Fort Belvoir, Virginia. DLA provides worldwide logistics support to the military services, several civilian agencies, and foreign countries in peacetime and wartime.

47.    DoD, through DLA, sends Maven requests to purchase parts through either a "Purchase Order"[4] or a "Delivery Order" (when, for example, purchasing supplies under an existing indefinite-delivery contract).

48.    Maven must abide by the pertinent statutory, regulatory, and contractual requirements governing its supply contracts with DoD. The regulations that apply to Maven's DoD supply contracts are contained in the Federal Acquisition Regulations ("FAR"), the Defense Federal Acquisition Regulation Supplement ("DFARS"), and the Defense Logistic Acquisition Directive ("DLAD"), as explained in detail below.

---

[4]    The Government often uses DD Form 1155, "Order for Supplies or Services", as the purchase order.

**B.**     **Federal Regulations Governing the Acquisition of Supplies**

49.     The Federal Government issues regulations that govern federal agency-wide acquisitions of supplies and services in the Federal Acquisition Regulations ("FAR"). FAR 1.104. These regulations are codified in Title 48 of the Code of Federal Regulations. FAR 1.303. The FAR and CFR regulations are parallel in format, arrangement, and numbering. For example, FAR 25.100(b) is codified in the Code of Federal Regulations as 48 C.F.R. § 25.100(b).

50.     A federal agency may supplement and deviate from FAR regulations by promulgating agency-specific regulations. FAR 1.301; FAR 1.402.

51.     DoD implements and supplements FAR requirements—and in certain instances deviates from them—through regulations it promulgates in the Defense Federal Acquisition Regulation Supplement ("DFARS"). The DFARS contains:

a)  Requirements of law;

b)  DoD-wide policies;

c)  Delegations of FAR authorities;

d)  Deviations from FAR requirements; and

e)  Policies/procedures that have a significant effect beyond the internal operating procedures of DoD or a significant cost or administrative impact on contractors or offerors;

DFARS 201.301(a)(1). All of these apply to DoD contracts. *Id.*

52.     DLA implements and supplements FAR and DFARS requirements—and sometimes deviates from them—through regulations promulgated in the Defense Logistics Acquisition Directive ("DLAD"). DLAD 1.301. The DLAD contains:

a)  Clear requirements and procedures of law;

b)  Mandatory DLA-wide policy;

c) Deviations from higher level regulations;

d) Designations or delegations of contracting authority; and DLAD 1.301(a)(1). All of these apply to DLA contracts. *Id.*

## C.    Set-Aside Contracts for Small Businesses

53.    Congressional policy is that the federal government is to advance the interests of small businesses when practicable. *See* 15 U.S.C. § 631. Accordingly, both statute and regulation require that the government agencies place a "fair proportion" of their acquisitions, including contracts and subcontracts, with small business concerns, small, disadvantaged business concerns, women-owned small business concerns, and service-disabled veteran-owned small business concerns. 41 U.S.C. § 3104; 15 U.S.C. § 631(a); 50 U.S.C. Appx. 468(a); 15 U.S.C. § 644(g),(h) (rule on agency goals); FAR 19.201(a).

54.    The procurement statutes and regulations have procedures for small business set-aside awards to further the national goals regarding small businesses. A small business "set-aside" is the limiting of an acquisition exclusively for participation for eligible small business concerns. FAR 19.501(a).

55.    Set-aside contracts ensure that U.S. small businesses receive a proportion of government contracts. The small business set-asides help small businesses compete for and win federal contracts. Among other policy goals, set-aside contracts promote the growth and sustainability of small businesses, ensure a diverse supplier base, and enhance competition within the government procurement process.

56.    A "small business concern" is a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is competing on government contracts, and qualified as a small business under the criteria and size standards in the SBA's regulations in 13 C.F.R. Part 121.

57.     A small business set-aside is based partly on the value and quantity of the goods or services the government wants to purchase. If the contract value is below a certain threshold amount – i.e., the "Simplified Acquisition Procedures threshold" or "SAP threshold" – the contract is automatically and exclusively set aside for small businesses.

58.     To be eligible for an award as a small business, the offeror must represent in good faith (consistent with Request for Proposal standards) that it is a small business at the time of written self-certification, which certification will be derived from FAR 52.219-1 in Section K of the RFP. FAR 19.301.[5]

59.     A firm that misrepresents its status as a small business concern to obtain a contract to be awarded under a preference program of the Small Business Act may be subject to criminal conviction, administrative remedies (including suspension and debarment), and be ineligible for participation in programs conducted under the authority of the Act. 15 U.S.C. § 645(d).

60.     A Contracting Officer who plans to set an acquisition aside for small businesses must choose a North American Industrial Classification System ("NAICS") code, which determines the small business size standard. A Request for Proposal involving a set-aside will contain the NAICS code for determining whether a particular firm within that industry qualifies as a small business concern. *See* FAR 19.501(f). A small business concern competing for a contract in a NAICS Code-covered industry must meet the regulatory size standard for that industry.

---

[5]     *See* Part VII.B., *infra*, for details concerning Maven's annual certifications and representations concerning its small business status that it submitted to qualify for the many set-aside awards it received from 2012 through 2018.

D.      **Small Business Act – Nonmanufacturer Rule**[6]

61.    The SBA's Nonmanufacturer Rule allows small businesses to supply products they did not manufacture.[7] In order to qualify as a small business concern for set-aside supply contracts, the small business must either manufacture the product itself, supply a product manufactured by another small business (if it is a nonmanufacturer), or supply the product of any sized manufacturer if SBA has granted a waiver to the Nonmanufacturer Rule. 13 C.F.R. § 121.406 (2013).

62.    The FAR implemented the SBA's Nonmanufacturer Rule. *See* FAR 19.001 (citing 13 C.F.R. § 121.406) ("The Nonmanufacturer Rule means that a contractor under a small business set-aside or 8(a) contract shall be a small business under the applicable size standard and shall provide either its own produce or that of another domestic small business manufacturing or processing concern."); FAR 19.102 (outlining the criteria and conditions under which businesses are considered small for federal procurement, ensuring they meet specific size standards to qualify for small business set-asides).[8]

---

[6]    This section first provides an overview of the SBA's Nonmanufacturer Rule. More detailed information follows with citations to the FAR and DLAD provisions that implemented the SBA's Nonmanufacturer Rule that were in effect from 2012 through 2018 and which governed Maven's contracts with DOD.

[7]    15 U.S.C. § 637(a)(17); 13 C.F.R. § 121.406 (SBA's implementation of the Nonmanufacturer Rule); SBA, *Nonmanufacturer Rule*, https://www.sba.gov/partners/contracting-officials/small-business-procurement/nonmanufacturer-rule#id-regulations (last visited Mar. 29, 2014).

[8]    *See also* DLAD 19.102(f) (2012) ("The nonmanufacturer rule may be restated as follows. When an acquisition has been set aside for award to small business, and a small contractor proposes to furnish to the Government items made by an entity other than itself, both the offeror and the manufacturer/producer of the items must be small businesses, and the items must be produced in the United States.").

63.     To qualify for a small business set-aside, the offeror (a manufacturer or non-manufacturer, as defined below) must furnish an end product "manufactured or produced in the United States or its outlying areas." FAR 19.102(f)(1).[9]

64.     The FAR defined the "manufacturer" of the end product as "the concern that, with its own forces, transforms inorganic or organic substances, including raw materials and/or miscellaneous parts or components, into the end product." FAR 19.102(f) (2012).

65.     The FAR defined a "nonmanufacturer" as "any concern submitting a bid or offer in its own name, other than on a construction or service contract, that proposes to furnish an end product it did not manufacture."[10]

66.     Subject to some exceptions and additional details in other parts of the FAR, the Nonmanufacturer Rule applied when the Government bought products under acquisitions specifically set aside for small businesses. FAR 19.102(f) (2012).

67.     If a concern submitted a bid on a government contract to provide a product it did not manufacture, it could still be considered a small business if it met certain requirements. The concern could qualify as a nonmanufacturer if it had no more than 500 employees. FAR 19.102(f) (2012). However, to be eligible for the contract, the nonmanufacturer had to provide the product of a small business manufacturer or producer. *Id.* § 19.102(f)(1). In addition, the product must also have been manufactured or produced in the United States. *Id.*

---

[9]     The "United States and its outlying areas" (hereinafter, the "United States") includes the 50 states, the District of Columbia, and outlying areas. "Outlying areas" include Puerto Rico and U.S. territories and possessions. *See* FAR Subpart 2.1 (Definitions).

[10]     The term "nonmanufacturer" included a company that could make the product but chose not to. FAR 19.102(f). For size determination purposes, there could only be one manufacturer of the acquired product—the company that transformed the raw materials into the final product. *Id.*

### 1.    *The Simplified Acquisition Threshold*

68.    The Simplified Acquisition Procedures (or "SAPs"), detailed in FAR Subpart 13, are designed to streamline the federal procurement process for purchases falling within specific monetary thresholds. Specifically, for acquisitions exceeding $3,500 and up to $150,000, these procedures mandate that such purchases be set aside exclusively for small businesses, as outlined in FAR 13.003(b)(1). This set-aside requirement ensures that small businesses have a fair opportunity to compete for federal contracts within this dollar range, bolstering the small business sector and supporting economic growth.

69.    Contracting officers are encouraged to solicit from at least three sources to promote competition among small businesses. *See* FAR 13.104. Furthermore, FAR 13.106-1(b) emphasizes the importance of soliciting quotations from a reasonable number of qualified sources, which can vary depending on the procurement circumstances. These provisions simplify the acquisition process for contracts of relatively low dollar value while maximizing opportunities for small business participation and competition, ensuring a diverse and competitive supplier base for the government.

### 2.    *Exception to the Nonmanufacturer Rule for Certain Purchases That Cost Less Than $25,000*

70.    The FAR included an exception to the Nonmanufacturer Rule, which originated from SBA's regulations in Title 13. FAR 19.102(f)(7) (2012); *see also* 13 C.F.R. § 121.406(d) (2011; 2013). The exception, detailed in FAR 19.102(f)(7), applied only when the following four conditions were met:

- The Government purchased the product using the Simplified Acquisition Procedures outlined in FAR Part 13;

- The procurement was awarded through a small business set-aside;

- The cost of the purchase was not expected to exceed $25,000; and

- "The offeror supplies an end product that is manufactured or produced in the United States[.]"

FAR 19.102(f)(7).

71.    FAR 19.102(f)(7) thus exempted from the Nonmanufacturer Rule's requirements certain low-cost purchases under $25,000 that the Government purchased with small business set-asides using Simplified Acquisition Procedures. However, even for low-cost purchases below the $25,000 threshold, a contractor was still required to "suppl[y] an end product that is manufactured or produced in the United States" to qualify for a small business set-aside. FAR 19.102(f)(7). The scope of this exception did not change from 2012 through 2020.

72.    DLAD 19.102(f)(70) (2012) aligned with the FAR's provision by applying an exception to the Nonmanufacturer Rule for certain acquisitions under $25,000 using Simplified Acquisition Procedures, specifically for small business set-asides. Like the FAR, the DLAD exception mandated that, even in cases of simplified acquisitions valued at less than $25,000, the nonmanufacturer must supply products that are manufactured domestically:

> (7) An "exception" (rather than a waiver) to the nonmanufacturer rule applies when: the procurement is accomplished using the simplified procedures of Part 13; the buy is set aside for small business; and the anticipated dollar value will not exceed $25,000. **Even though the small business offering on this procurement is not obligated to provide the product of another small concern, the items themselves must have been manufactured or produced in the United States**.

> (90) In simplified acquisitions for supplies having a total value of less than $25,000, an exception to the nonmanufacturer rule takes precedence over a waiver of the rule. **Under these circumstances, a nonmanufacturer is expected to provide the end-product of a domestic producer**.

DLAD 19.102(f)(70) (2012) (emphasis added).

### 3. *Waivers to the Nonmanufacturer Rule*

73.    Section 8(a)(17)(b)(iv) of the Small Business Act, 15 U.S.C. § 637(a)(17)(b)(iv),
authorizes the SBA to waive the Nonmanufacturer Rule for a product or "class of products" after
determining there are no small business manufacturers available to participate in the federal
market.

74.    If the SBA determines that no small business manufacturers can supply a product,
it may waive the Nonmanufacturer Rule. The SBA may issue two types of waivers: class and
individual. *See* 13 C.F.R §§ 121.1201-1206 (detailed information concerning waivers of the
Nonmanufacturer Rule for classes of products and individual contracts).

75.    The relevant FAR provisions that correspond to the requirements from the SBA
regulations about the waiver of the Nonmanufacturer Rule are found in FAR 19.102(f)(4) and
(f)(5). These sections detail the circumstances under which the SBA may grant class or
individual waivers for the Nonmanufacturer Rule. A waiver allows small businesses to supply
products from non-small businesses without violating the Nonmanufacturer Rule.

76.    SBA may grant class waivers when it has determined that there are no small
business manufacturers or processors available in the federal market for a specific class of
products. FAR 19.102(f)(4); 13 C.F.R. §§ 121.406(b)(5)(ii), 121.1202; DLAD 19.102(f)(4).
SBA's granting a class waiver will allow nonmanufacturers to supply products from a non-small
business without violating the Nonmanufacturer Rule.

77.    Contracting officers may request individual (or contract-specific) waivers for
specific solicitations where no small business manufacturer or processor can meet the
requirements. FAR 19.102(f)(5); DLAD 19.102(f)(5). SBA may issue an individual waiver if
(1) the contracting officer determines that no small business manufacturer can likely offer a

product meeting the agency's specifications and (2) SBA agrees with that determination.

13 C.F.R. §§ 121.406(b)(5)(i), 121.1203. SBA's granting an individual waiver will allow a small

business to provide products manufactured by any size business for that particular procurement.

78.    The process for requesting individual and class waivers under the

Nonmanufacturer Rule is detailed in 13 C.F.R § 121.1204.

79.    For class waivers, interested parties or federal agencies can submit a request to the

SBA, which then determines if small business manufacturers are available. 13 C.F.R

§ 121.1204(a). If none are found after public notice and comment, a class waiver may be granted,

allowing small businesses to supply products from any manufacturer for federal contracts set

aside for small businesses. *Id.*

80.    The SBA defines "class of products" based on the Office of Management and

Budget's NAICS. The SBA publishes these class waivers online, listing them along with their

Federal Register citations. *Id.*; *see also* FAR 19.102(f)(4) ("For the most current listing of classes

for which SBA has granted a waiver, contact an SBA Office of Government Contracting. A

listing is also available on SBA's Internet Homepage[.]").[11]

81.    For individual waivers related to specific solicitations, contracting officers must

provide detailed information, including the items to be waived, the solicitation's specifics, and

justification for the waiver. 13 C.F.R § 121.1204(b). The SBA reviews this information,

conducts its own research, and may grant a one-time waiver if no small business manufacturers

---

[11]    *See also* SBA, *Non-Manufacturer Rule Class Waiver List*, https://www.sba.gov/
document/support-non-manufacturer-rule-class-waiver-list (last visited on April 6, 2024). As
explained on the SBA's website, a contractor must always consult the supporting Federal
Register for precise information on the exact items covered under a class waiver. *See id.*

or processors are identified. *Id.* These waivers are valid for one year, requiring contract award within this period or a request for extension if the contract is not awarded in time. *Id.*

**E.     Material Contractual Requirements**

82.     Maven's supply contracts incorporate various FAR, DFAR, and DLAD clauses by reference. The supply contracts list the FAR, DFAR, or DLAD regulation clause number and its caption in the contract but not the full text of the referenced regulation clause.

83.     Per federal regulations, the full text of the clause that the regulation number references is expressly made part of the contract (i.e., incorporated) and is binding upon contractors:

> CLAUSE INCORPORATED BY REFERENCE (FEB 1998)
>
> This contract incorporates one or more clauses by reference, with the same force and effects as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es): [*insert one or more internet addresses*]

48 C.F.R. § 52.252-2; FAR 52.252-2.

84.     Maven's supply contracts incorporate the following material contractual clauses, which also reference other material contractual clauses that Maven and its subcontractors must adhere to and comply with.

### *1.     Notice of Total Small Business Set-Aside*

85.     FAR 19.508(c) required a contracting officer to "insert the clause at FAR 52.219-6, Notice of Total Small Business Set-Aside, in solicitations and contracts involving total small business set-asides or reserves."

86.    The Notice of Total Small Business Set-Aside (Nov. 2011), FAR 52.219-6, stated

as follows:

**NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE (NOV 2011)**

(a)    Definition. "Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

(b)    Applicability. This clause applies only to—

(1)    Contracts that have been totally set aside or reserved for small business concerns; and

(2)    Orders set aside for small business concerns under multiple-award contracts as described in 8.405-5 and 16.505(b)(2)(i)(F).

(c)    General. (1) Offers are solicited only from small business concerns. Offers received from concerns that are not small business concerns shall be considered nonresponsive and will be rejected.

(2) Any award resulting from this solicitation will be made to a small business concern.

**(d)    Agreement. A small business concern submitting an offer in its own name shall furnish, in performing the contract, only end items manufactured or produced by small business concerns in the United States or its outlying areas. If this procurement is processed under simplified acquisition procedures and the total amount of this contract does not exceed $25,000, a small business concern may furnish the product of any domestic firm**. This paragraph does not apply to construction or service contracts.

FAR 52.219-6 (Nov. 2011) (emphasis added).

87.    Maven's contracts with DLA incorporated the Notice of Total Small Business

Set-Aside (Nov. 2011), FAR 52.219-6. *See* Ex. B at 19 (Award/Contract for DLA Contract

SPE4A713D0125); Ex. E at 8 (Award/Contract for DLA Contract SPE4A715D0053).

### 2.    *Inspection/Testing Protocols and Supply Specifications*

88.    Certain of Maven's supply contracts required that the supplies it furnished to the Government be subjected to the necessary testing to ensure that they comply with the specifications and terms of the contract:

PRODUCT VERIFICATION TESTING

***

(b) The Contractor is responsible for ensuring that supplies are manufactured, produced, and subjected to all tests required by applicable material specifications/drawings specified in the purchase description of the contract.

DLAD 52.246-9004(b) (Jan. 2013).

89.    As to the testing equipment that is to be used to confirm compliance, Maven's supply contracts required Maven to:

*** ensure that the gauges and other measuring and testing equipment, used in determining whether the supplies presented to the Government for acceptance under this contract fully conform to specified technical requirements, are calibrated in accordance with the International Organization for Standardization (ISO) 10012:2003 or American National Standards Institute (ANSI)/National Conferences of Standards Laboratories (NCSL) Z540.3 (R2013).

DLAD 52.246-9003 (Jan. 2014).

90.    Maven's supply contracts further contained strict requirements pertaining to the Government inspection process. *See* Ex. B at 14; Ex. E at 7. In pertinent part, Maven was required to submit to the Government for acceptance only those supplies that had been properly inspected in conformity with the contract requirements:

INSPECTION OF SUPPLIES—FIXED-PRICE (AUG 1996)

***

(a)    The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and **shall tender to the Government for acceptance only supplies that have been inspected in**

**accordance with contract requirements**. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contract performance and for as long as the contract requires.

\*\*\*

(i)      (1)      If this contract provides for the performance of Government quality assurance at source, and if requested by the Government, the Contractor shall furnish advance notification of the time—

        (i)      When Contractor inspection or tests will be performed in accordance with the terms and conditions of the contract; and

        (ii)      When the supplies will be ready for Government inspection.

(j)      **\*\*\* Government failure to inspect and accept or reject the supplies shall not relieve the Contractor from responsibility, nor impose liability on the Government, for nonconforming supplies**.

(k)      Inspections and tests by the Government **do not relieve the Contractor of responsibility for defects or other failures to meet contract requirements discovered before acceptance**. Acceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract.

48 C.F.R. § 52.246-2 (emphasis added); FAR 52.246-2 (Aug. 1996; Nov. 2014). Even if the Government fails to inspect the supplies, Maven must still ensure that the supplies meet the contractual specifications and requirements. 48 C.F.R. § 52.246-2(j); FAR 52.246-2(j).

91.      Even if the Government inspects and tests the supplies, Maven is responsible for any defects or other failures to meet the contractual requirements it discovers before acceptance. If Maven knows its supplies fail to meet contractual requirements, it must inform the Government and take responsibility for the nonconforming supplies. 48 C.F.R. § 52.246-2(k); FAR 52.246-2(k). Therefore, even if the Government accepts defective supplies after inspection and testing, Maven's fraud vitiates acceptance. *Id.*

92.     In some cases, Maven's contracts also contained a higher-level contract quality requirement, such as MIL-E-45208A or ISO 9001:2008. 48 C.F.R. § 52.246-11. *See* Ex. B at 14; Ex. E at 7.

### 3.     *Place of Inspection and Acceptance Requirements*

93.     FAR 46.401(a) states that "government contract quality assurance shall be performed at such times (including any stage of manufacture . . . ) and places (including subcontractors' plants) as may be necessary to determine that the supplies . . . conform to contract requirements." "Each contract shall designate the place or places where the Government reserves the right to perform quality assurance." FAR 46.401(b).

94.     FAR 46.402 outlines the conditions under which agencies must perform quality assurance, including inspection, at source. These include, for example, when "special required instruments, gauges, or facilities are available only at source." FAR 46.402(c).

95.     An inspection at "source" refers to the place of manufacture, i.e., the place of performance, which may include a subcontractor's plant. FAR 46.401(a); FAR 46.401(c).

96.     The FAR states that "[t]he Government shall perform quality assurance at the subcontract level when—(1) **The item is to be shipped from the subcontractor's plant to the using activity and inspection at source is required**; (2) The conditions for quality assurance at source are applicable (see 46.402); (3) The contract specifies that certain quality assurance functions, which can be performed only at the subcontractor's plant, are to be performed by the Government; or (4) It is otherwise required by the contract or determined to be in the Government's interest. FAR 46.405(b) (emphasis added).

97.     DLA's Directive from the relevant period stated, "When a contract provides for Government contract quality assurance at source, **the place of manufacture** (if different from

the prime contractor) will be designated for each contract line or subline item." DLAD 46.503(c) (Oct. 2012) (emphasis added).

98.     DLAD 52.246-9008 stated, "[a]s prescribed in 46.503, insert the following clause:

**INSPECTION AND ACCEPTANCE AT ORIGIN (NOV 2011)**

(a) Inspection and acceptance are at origin.

(b) The point of acceptance will be the point of last inspection before shipment unless otherwise indicated by the offeror.

(c) The Offeror shall indicate below the location where supplies will be inspected:

Supplies:

Plant: _____

Commercial and Government entity (CAGE) code:_____

Street: _____

City/State/Zip: _____

Applicable to contract line-item(s) (CLIN(s)): _____

(d) The Offeror shall indicate below the location where packaging will be inspected:

Packaging:

( ) Same as for supplies

99.     Maven's supply contracts incorporated DLAD 52.246-9008 (Nov. 2011) by reference. *See* Ex. B at 14; Ex. E at 7.

100.     For the DLA Contract ending in 0125, Maven claimed that Robinson was the source of the product and that the place of manufacture was Robinson's facility in Placentia, California. *See id.* Therefore, Maven elected for inspection—and acceptance—to take place at Robinson's facility at 1136 S Richfield Rd, Placentia, CA 92870. Ex. B at 14.

101.    Contract 0053 listed Maven's Maryland facility in Rockville, Maryland, as the origin and, thus, place of inspection. Yet, Maven separately acknowledged that it had issued a purchase order to Robinson (Purchase Order # 032335-0004C) to purchase the product that Maven supplied to DLA for Contract 0053. *See* Ex. A at 5 (eleventh entry under the page titled "Maven Engineering Corporation DCMA Contracts with Robinson as of July 20, 2015").

102.    Federal regulations explicitly provide that Government inspection and acceptance of subcontracted work "does not relieve the prime contractor of any responsibilities under the contract." 48 C.F.R. § 46.405; FAR 46.405.

### *4.    Certificate of Conformance*

103.    Certain of Maven's supply contracts required that Maven include a Certificate of Conformance when it ships supplies to the Government. *See* FAR 52.246-15(a). The Certificate of Conformance required Maven to certify the following:

> I certify that on [date], the [Maven Engineering Corporation] furnished the supplies or services called for by Contract No. *** in accordance with all applicable requirements. I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number), and are in the quantity shown on this or on the attached acceptance document.
>
> Date of Execution: _____
>
> Signature: _____
>
> Title:

48 C.F.R. § 52.246-15(a); FAR 52.246-15(a). The process of how Maven is required to submit this Certificate of Conformance is explained below.

### 5.     *Material Inspection Report and Receiving Report (WAWF RR)*

104.     Maven's supply contracts require Maven, at the time that it delivers supplies to the Government, to

> prepare and furnish to the Government a **material inspection and receiving report** in the manner and to the extent required by Appendix F, Material Inspection and Receiving Report, of the Defense FAR Supplement.

DFARS 252.246-7000(a) (emphasis added). *See* Ex. B at 14. This material inspection and receiving report is generally submitted electronically, as explained below.

105.     Appendix F to the DFARS "contains procedures and instructions for the use, preparation, and distribution of the Wide Area WorkFlow (WAWF) Receiving Report (RR)"— referred to commonly by its abbreviation "WAWF RR." DFARS, Appendix F, at F-1.

106.     The WAWF RR is an electronic form equivalent to the DD Form 250, the physical version of the Material Inspection and Receiving Report. DFARS, Appendix F, at F-1. Electronic submission of the WAWF RR fulfills the requirement of submitting the Material Inspection and Receiving Report (DD Form 250). DFARS 252.246- 7000(b).

107.     The WAWF RR is a multi-purpose report used—

a) To provide evidence of Government contract quality assurance at origin or destination;

b) To provide evidence of acceptance at origin, destination, or other;

c) For packing lists;

d) For receiving;

e) For shipping

f) As a contractor invoice . . . ; and

g) As commercial invoice support.

DFARS, Appendix F, Part 1, F-103(a), at F-1 to F-2.

108.    In completing the WAWF RR, Maven is required to

- enter the 13-position alpha-numeric basic Procurement Instrument Identifier (PIID) of the contract or the 13-character order number. DFARS, Appendix F, Part 3, F-301(b)(1), at F-7. While the contract number may be omitted; Maven may choose to enter the contract number in addition to the 13-character order number. *Id.*;

- include its Prime Contractor (Prime CAGE) Code number. DFARS, Appendix F, Part 3, F-301(b)(7), at F-9; and

- include the national stock number (NSN) or noncatalog number of the part that it is supplying in the Stock Part Number field. DFARS, Appendix F, Part 3, F-301(b)(15), at F-10.

109.    In the Contract Quality Assurance (CQA) field, the words "conform to contract" appear. DFARS, Appendix F, Part 3, F-301(b)(20)(i), at F-13 to F-14. If Maven takes any exception to this representation, Maven is required to "[e]nter notes taking exception in" the "Misc. Info Tab comment field or on attached supporting documents . . . ." *Id.*

110.    Maven is further required to electronically execute any Certificates of Conformance "by including the appropriate indicator in the electronic transaction rather than through the inclusion or attachment of the text or certificate." DFARS, Appendix F, F-301(20)(iii), at F-13 to F-14.

111.    Once Maven completes the WAWF RR, the Government representative responsible for acceptance must accept the supplies. Once the Government Representative has accepted the supplies, the Government representative's electronic signature will appear on the Receiving Report. DLAD 52.246-9019(a).

112.    In addition to creating the WAWF RR via the WAWF-RA, Maven must include hard copies of the Receiving Report (which includes an electronic signature of the Government representative responsible for acceptance if acceptance is at origin) in the exterior and interior shipping documentation.

DLAD 52.246-9019(b). Maven can also direct its subcontractors to prepare and submit the

WAWF RR on its behalf. DFARS, Appendix F, Part 3, F-301(a)(2), at F-7.

### 6.    Billing Requirements

113.    Maven's supply contracts require that Maven electronically submit payment

requests—"claims" in FCA parlance—to the Government using the WAWF system:

> ELECTRONIC SUBMISSION OF PAYMENT REQUESTS AND RECEIVING
> REPORTS
>
> ***
>
> (b)    Except as otherwise provided in paragraph (c) of this clause, the Contractor
> shall submit payment requests and receiving reports using WAWF . . . .

DFARS 252.232-7003(b); *see also* Ex. B at 14.

114.    "The WAWF system is the method to electronically process vendor **payment

requests and receiving reports**, as authorized by DFARS 252.232-7003." DFARS 252.232-

7006(b) (emphasis added).

115.    When submitting payment requests, Maven is required to include the "appropriate

contract line item and subline item descriptions of the . . . supplies delivered, unit price/cost per

unit, fee (if applicable), **and all relevant back-up documentation, as defined in DFARS

Appendix F (e.g. timesheets) in support of each payment request**. DFARS 252.232-

7006(f)(4) (emphasis added).

116.    As explained above, Appendix F requires Maven to electronically execute any

Certificates of Conformance "by including the appropriate indicator in the electronic transaction

rather than through the inclusion or attachment of the text or certificate." DFARS, Appendix F,

F-301 Preparation instructions, at F-13 to F-14. A signed Certificate of Conformance containing

Maven's signature must be "attached to or included on the top copy of the inspection or receiving report distributed to the payment office." FAR 52.246-15(b).

117.    Maven's payment requests accompany a Certificate of Conformance when billing the Government. Maven represents to the Government that it complies with all statutory, regulatory, and contractual requirements and that the supplies it delivers conform to the contract requirements and specifications. *See* 48 C.F.R. § 52.246-15(a); FAR 52.246-15(a).

## VII.    Defendants' Scheme to Defraud the U.S. Government

### A.    Maven's Subcontractor, Robinson, Did Not Manufacture the Military Parts That Maven Supplied to the U.S. Government.

118.    After initially negotiating with Kavita Dawson and Don Robinson to work for Maven, Robinson hired Relator in February 2014 as Quality Control Manager. Relator was responsible for quality control for Robinson's military business division.

119.    Robinson supplied military parts as Maven's subcontractor to fulfill Maven's supply contracts with the DoD.

120.    Based on his experience working in the industry, it became readily apparent to Relator as his employment with Robinson unfolded that Robinson did not have the capabilities to manufacture military parts that met DoD contract specifications and requirements. Relator learned that Robinson's primary experience was manufacturing commercial construction materials for homes and buildings—not military parts.

121.    In fact, at no time did Robinson manufacture any military parts. The vast majority of parts Robinson supplied to Maven were obtained in a finished stage, requiring no manufacturing. A tiny proportion of the parts that Robinson obtained were about 95% complete; all that was left was for Robinson to apply a coat of paint or do some anodizing or plating work for Robinson to claim that it had "manufactured" the part.

122.    When Relator arrived at Robinson, he discovered that Robinson did not possess a coordinate-measuring machine ("CMM") or other proper testing equipment necessary to determine whether parts met the pertinent dimensional requirements or other specifications required under Maven's various DoD contracts.

123.    This glaring omission raised Relator's alarm: he saw that Robinson had no intention of becoming a legitimate manufacturer or testing the parts it procured. As a result, Relator brought his own micrometer to test the parts. With this instrument, Relator determined that some parts failed the basic dimensional specifications in government contracts.

124.    Other specification failures discovered later were harder to detect, such as whether a part had sufficient hardness. The conformance issues often involved either the quality of the raw material or dimensional problems associated with the machining quality.

125.    Relator learned that Robinson did not, and could not, act alone. As it turned out, Maven and Kavita Dawson—whom Relator had first been in contact with to work for Maven— were responsible for Robinson's failures.

126.    Relator discovered that Defendants concocted an extensive scheme in which Turkish materials, parts, and components were imported by either Maven or Robinson and then delivered to the Government under Maven's supply contract with the DoD. Relator learned that at Maven's instruction, Robinson contracted with a Turkish other-than-small business, Faymer, to supply Robinson with materials, parts, and components.

127.    Maven received various awards from DoD/DLA through small business set-asides to supply materials, parts, and components (the "Set-Aside Awards"). In the six years preceding the filing of Relator's original complaint, Maven completed roughly 1,785 transactions with

DoD associated with Set-Aside Awards.[12] The estimated "base and all options value" of these Set-Aside Awards was roughly $42 million.[13] For at least 1,600 of these transactions, Maven identified the United States as the place of manufacture.

128.    Among the Set-Aside Awards that Maven received, DoD purchased some of those products using the Simplified Acquisition Procedures, meaning that the value of the contracts fell below the applicable SAP threshold. Out of the $42 million in Set-Aside Awards Maven received during the six years before the original complaint, DoD purchased about $17.3 million in supplies from Maven using SAPs. DoD purchased another $24.8 million in supplies using Full and Open Competition After Exclusion of Sources.[14]

129.    For many DLA Contracts that Maven subcontracted with Robinson, Maven did not meet any criteria to qualify for these Set-Aside Awards. Maven did not manufacture the products, supply a product manufactured by another domestic small business, or obtain a waiver from the SBA for the specific products. *See* 13 C.F.R. § 121.406; FAR 19.001; FAR 19.102(f); DLAD 19.102(f).

130.    For at least 70 unique Set-Aside Awards associated with at least 130 individual transactions during the six years preceding the original complaint, Maven identified Robinson's manufacturing facility in Placentia, California, as the "primary place of performance," i.e., the

---

[12]    DLA was the awarding sub-agency for most of the set-aside awards that Maven received during this period (roughly $41.8 out of $42.1 million).

[13]    The "current total value" of these same Set-Aside awards was roughly $20.5 million, and the "base and exercised options value" was roughly $17.4 million.

[14]    Full and Open Competition After Exclusion of Sources, in FAR Subpart 6.2, excludes one or more sources to ensure full and open competition. Agencies can limit competition to achieve various objectives, including supporting small business participation through small business set-asides. FAR 6.203 (2015). Acquisitions made under Subpart 6.2 require the use of competitive procedures prescribed in FAR 6.102. FAR 6.201 (2015).

place of manufacture. Yet, Maven knew that Robinson did not manufacture those parts and had imported them from a Turkish manufacturer.

131.    Maven also subcontracted with Robinson for other DoD contracts, but Maven did not identify Robinson's facility in Placentia as the primary place of performance. For example, Maven subcontracted with Robinson to supply Pipe, Tube, and Rigid Tubing (PSC 4710) in connection with SPE7M414V0693 ("DLA Contract 0693"). *See* Ex. A at Maven 00003.

132.    For DLA Contract 0693, Maven identified its facility in Rockville, Maryland, as the primary place of performance and the United States as the place of manufacture. However, Maven later admitted that the material it supplied to DoD for SPE7M414V0693 was imported from Turkey. *See* Ex. A at Maven 00004.

133.    Defendants submitted false claims to fraudulently induce DLA to award them DLA Contract 0693 and knowingly violated the Nonmanufacturer Rule. DLA's purchases did not qualify for an exclusion from the Nonmanufacturer Rule, and the SBA did not grant a waiver.[15]

**B.    Maven's Annual Certifications and Representations Concerning Its Small Business Status to Become Eligible for Set-Aside Awards**

134.    The FAR mandates that any company seeking to do business with the federal government by bidding on contracts must complete annual representations and certifications electronically through the System for Award Management (SAM) website, accessible at https://www.sam.gov. FAR 4.1201(a).

135.    All businesses registered on SAM must review and update their representations and certifications at least once annually to ensure the information remains current, accurate, and

---

[15]    Relator provides additional examples of false claims involving Nonmanufacturer Rule violations below in Part VII.D., *infra*.

complete. FAR 4.1201(b)(1). The representations and certifications are effective until one year

from submission or update to SAM. *Id.* A contractor's representations and certifications are

incorporated by reference into its contracts with the government. FAR 4.1201(d).

136.    Maven Engineering Corporation in Rockville, Maryland ("Maven-MD"),[16]

submitted representations and certifications electronically through the SAM.gov website as early

as 2012, at least once annually.

137.    Maven Engineering Corporation in Anaheim, California ("Maven-CA"),[17]

submitted representations and certifications electronically through the SAM.gov website as early

as 2014, at least once annually.

138.    Maven's Representations and Certifications, which Maven provided at least once

annually, included the following certification from Defendant Kavita Dawson on behalf of

Maven:

> I have read each of the FAR and DFARS provisions presented on this page. By submitting this certification, I, **Kavita Dawson**, am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to penalties if I misrepresent **MAVEN ENGINEERING CORPORATION** in any of these representations or certifications to the Government.

139.    Maven's Representations and Certifications, provided at least once annually,

included various "Small Business Program Representations" associated with FAR 52.219-1

(Apr. 2012).

---

[16]    Maven maintains an active registration with Unique Entity ID KVZ4SL8QTTF8. In SAM.gov, this Maven entity shows a physical address of 15946 Derwood Rd., Rockville, Maryland, 20855.

[17]    Maven maintains an active registration with Unique Entity ID KB22L5347JN6. In SAM.gov, this Maven entity shows a physical address of 2740 E Regal Park Dr., Anaheim, CA, 92806.

140.    For example, on December 17, 2012, Maven-MD represented as part of its offer, under FAR 52.219-1(b)(1), that it "**IS** a small business concern." Maven-MD further represented its small business status according to the size standards in effect at the time of the representation that corresponded to the North American Industry Classification System (NAICS) Codes assigned to the contracts.

141.    Every year between 2012 and 2018, Maven-MD represented and certified its small business status according to various NAICS codes assigned to Maven's government contracts. Specifically, Maven-MD completed Representations and Certifications on December 17, 2012, July 31, 2013, June 5, 2014, September 5, 2014, August 5, 2015, February 23, 2016, June 23, 2016, July 18, 2016, January 5, 2017, November 6, 2017, and July 24, 2018.

142.    Every year between 2014 and 2018, Maven-CA represented and certified its small business for the NAICS codes assigned to Maven's government contracts. Specifically, Maven-CA completed Representations and Certifications on November 6, 2014, December 10, 2015, February 23, 2016, February 24, 2016, January 24, 2017, and January 10, 2018.

    **C.**    **Defendants Falsely Claimed That a U.S. Small Business Concern Manufactured the Military Parts That Maven Supplied to DoD.**

143.    Defendants fraudulently induced the Government to purchase foreign-made parts that Maven falsely claimed were manufactured in the United States by a domestic small business.

144.    Maven bid on and entered Government contracts with DoD/DLA. In many instances, Maven falsely represented that a domestic small business manufactured the parts in the United States. However, Defendants imported nonconforming parts from Turkey from an other-than-small business to fulfill these contracts.

145.     Once Maven entered a supply contract with the Government, it issued a Purchase Order to Robinson as the subcontractor. Maven or Robinson then sent the Order to a Turkish manufacturer/dealer, such as Faymer, who could produce the finished items at a discounted price. Maven and Robinson then furnished the Turkish parts to the Government for acceptance.

146.     The extent to which these imported Turkish materials, parts, and components required "manufacturing" to render them into the finished spare parts to be delivered varied somewhat. However, the Turkish materials or components were generally in 99% finished condition out of the box. The only "manufacturing" necessary was to paint the materials or components to arrive at a manufactured part. Maven falsely claimed that a domestic small business concern manufactured these military parts in America.

**D.     Defendants Provided DoD with Turkish-Manufactured Parts That Maven Falsely Claimed Were U.S.-Manufactured**

147.     In July 2015, Maven identified a list of contracts as "Material Imported from Turkey for U.S. Government Contracts." of July 20, 2015." *See* Ex. A at Maven 00004-05, 00008-10. Maven produced this list of contracts in response to a subpoena from the California Labor Commissioner.[18]

148.     Relator worked on the purchase orders and corresponding government contracts that Maven identified on Exhibit A while employed at Robinson in early 2014. *See id.*

---

[18]     On April 26, 2014, Relator filed a Complaint with the Division of Labor Standards Enforcement ("DLSE") of the California Labor Commissioner's Office, Case No. 18- 91062 LM, for unpaid wages, commission, interest, and penalties.

On December 12, 2016, the DLSE conducted a hearing regarding Relator's claims. During the hearing, Don Robinson falsely represented to the Labor Commissioner hearing officer that Robinson did not deliver any parts to DLA under any Government contracts when Relator was employed with Robinson. On the same day, the hearing officer ruled in favor of Relator and ordered Robinson to pay Relator $3,120.

149.    Maven issued the purchase orders in the column on the left to Robinson. *See id.*

Those purchase orders from Maven to Robinson correspond with Maven's government contracts

with DoD in the column on the right. *See id.* For the purchase orders listed, Robinson did not

manufacture the parts itself. Instead, Robinson purchased the parts already manufactured by

Faymer—a Turkish manufacturer.

### 1.    Example No. 1 – DLA Contract 0125

150.    Among the DLA contracts that Maven identified as containing "material imported

from Turkey" was SPE4A7-13-D-0125 ("DLA Contract 0125"). *See* Ex. A at Maven 00005, 09;

Ex. B (Award/Contract for DLA Contract 0125). DLA Contract 0125 was associated with

Purchase Order 030487-01. Ex. A at Maven 00005, 09. DLA Contract 0125 was issued by DLA

Aviation in Richmond, VA, and administered by DCMA in Baltimore, MD. Ex. B at 1.

151.    DLA Contract 0125 was an Indefinite Delivery, Indefinite Quantity (IDIQ)

Contract with a total amount of $452,292.00.[19] *Id.* at 1. The contract was awarded on August 23,

2013, and became effective on September 3, 2013. *Id.* The contract's base period was from

September 3, 2013, through September 2, 2014. *Id.* at 2. "Delivery orders will be placed by DLA

Aviation for a base period of (1) 12-month period with an option to extend for four additional

12-month periods as described at DLA Aviation clause 52.217-9."

152.    DLA Contract 0125 incorporated by reference all terms and conditions of DLA's

solicitation for Notice ID SPE4A713R0916 and Maven's proposal. *Id.* at 2. DLA's solicitation

---

[19]    IDIQ contracts provide for an indefinite quantity, within stated limits, of supplies or
services during a fixed period. FAR 16.504(a). IDIQ contracts are a subset of indefinite delivery
contracts ("IDC contracts"). The FAR states that IDIQ contracts should only be used "when a
recurring need is anticipated." FAR 16.504(b).

stated, "[t]he proposed contract is 100% set aside for small business concerns." Ex. C at 2

(Solicitation Notice ID SPE4A713R0916).

153.    DLA Contract 0125 incorporated the Notice of Total Small Business Set-Aside,

FAR 52.219-06 (Nov. 2011). Ex. B at 19. Moreover, the contract incorporated the Post-Award

Small Business Program Representation, FAR 52.219-28 (Arp. 2012). *Id.* at 8. Under this FAR

provision, Maven, as the Contractor, "represents that it [X] is, [] is not a small business concern

under NAICS Code 336413 assigned to" DLA Contract 0125.

154.    The item description in the contract was "Hook Assembly, Ramp." Ex. B at 6.

During the base period, DLA purchased 342 items for $247.00 each, for $85,668.00. *Id.* at 9.

DLA exercised its option to extend the contract for four additional 12-month periods. *Id.* at 22-

29. Because the government extended the contract four times, the contract remained effective

through September 2, 2018. *Id.* at 29. The contract's base and exercised options value as of

November 8, 2013, was $69,654.00.

155.    DLA Contract 0125 was awarded to Maven as a Total Small Business Set Aside.

This was not a low-cost purchase below the SAP threshold. Instead, DLA purchased the products

using Full and Open Competition After Exclusion of Sources. No exemption to the

Nonmanufacturer Rule applied. *See* FAR 19.102(f)(7); DLAD 19.102(f)(7).

156.    Therefore, unless the SBA granted a waiver to the Nonmanufacturer Rule, Maven

was required to manufacture or supply the product of another domestic small business and

"suppl[y] an end product that is manufactured or produced in the United States." FAR 19.102(f);

*see also* DLAD 19.102(f). The SBA did not waive the Nonmanufacturing Rule for the products

Maven supplied under DLA Contract 0125.

157.    Under this contract, Maven supplied "Airframe Structural Components" under Product or Service Code ("PSC Code") 1560. Ex. B at 6. The following description for PSC Code 1560 appears in the Federal Procurement Data System Product and Service Codes Manual at 98-99 (FY 2021 Edition) ("PSC Manual"):[20]

| PSC Code | Description |
|----------|-------------|
| 1560 | **Airframe Structural Components**<br>**Notes**: This class includes fabricated system parts that are permanently attached or peculiar to the integral airframe of an aircraft, such as support structural components, spars, ribs, ailerons, stabilizers, bulkheads.<br>**Includes**: Flight Control Surfaces; Internal and External Auxiliary Fuel Tanks; Exhaust Systems; Pylons, Trim Tabs; Aircraft.<br>**Excludes**: Fitted Covers; Helicopter Rotor Brake System Components; Aircraft Loose Equipment and Alternate Mission Configuration Equipment stored on board the aircraft. |

158.    The Airframe Structural Components Maven supplied under DLA Contract 0125 were associated with NAICS Code 336413: Other Aircraft Parts and Auxiliary Equipment Manufacturing. Ex. B at 19.

159.    On June 23, 2008, the SBA granted a waiver for NAICS Code 336413. 73 Fed. Reg. 35433 (Ex. D). However, the waiver was expressly limited to Unmanned Aircraft and Drones within PSC Code 1550 and Aircraft Launching Equipment within PSC Code 1720. *Id.* at 2. The waiver for 336413 did not include the Airframe Structural Components under PSC Code 1560 that Maven supplied under DLA Contract 0125.

160.    DLA Contract 0125 incorporated DLAD 52.246.9008 (Nov. 2011), which required inspection and acceptance to occur at "origin." Ex. B at 14. Maven designated Robinson

---

[20]    The PSC Manual "provides codes to describe products, services, and research and development (R&D) purchased by the federal government. PSC Manual at 1, https://www.acquisition.gov/sites/default/files/manual/PSC_Manual_October_2020.pdf (last visited April 6, 2024). A PCS Code indicates "'WHAT' was bought for each contract action reported in the Federal Procurement Data System (FPDS)." *Id.* at 1.

Manufacturing's address at 1136 S. Richfield Road, Placentia, CA 92870, as the place of origin where the supplies would be inspected. *Id.* The Turkish-manufactured parts Maven and Robinson supplied to DLA under Contract 0125 failed to comply with the applicable statutory, regulatory, and contractual requirements.

161.    Defendants submitted false claims to the Government to fraudulently induce DLA to award Maven DLA Contract 0125. Defendants falsely claimed they complied with applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule and product quality, testing, and inspection requirements.

162.    Defendants falsely represented and certified that the products Maven supplied to DLA under Contract 0125 were manufactured by a domestic small business manufacturer in the United States. Defendants knew that the parts were manufactured in Turkey and imported into the United States through Robinson. Defendants knowingly violated the Nonmanufacturer Rule and falsely claimed a small business set-aside they were not entitled to receive.

### 2. *Example No. 2 – DLA Contract 0053*

163.    In Exhibit A, Maven identified a list of contracts as "DCMA Contracts with Robinson as of July 20, 2015." *See* Ex. A at Maven 00003.

164.    Among the contracts Maven identified as "DCMA Contracts with Robinson" on Exhibit A was SPE4A7-15-D-0053 ("DLA Contract 0053"). *See* Ex. A at Maven 00003; Ex. E (Award/Contract for DLA Contract 0053). DLA Contract 0053 was associated with Purchase Order 032335-0004C. Ex. A at Maven 00003.

165.    DLA Contract 0053 was issued by DLA Aviation in Richmond, VA, and administered by DCMA in Baltimore, MD. Ex. E at 1. DLA Contract 00053 was an Indefinite

Delivery, Indefinite Quantity (IDIQ) Contract. The contract was executed and became effective on November 7, 2014. Ex. E at 1.

166.    Maven supplied an item with the description "Fairing, Aircraft (Vapor Barrier Seal)." Ex. E. at 3. The contract included a base year and four additional option years. The pricing was $2,265.30 per item during the base year, but specific pricing for each option year was not set in the original contract. *Id.* The contract had a base year with a guaranteed quantity of 12 units and a maximum quantity of 72. *Id.* The contract estimated that DLA would purchase 48 items per year in the base year and each of the four additional options years. *Id.* The contract could be extended for up to four years in 12-month increments or until it reached its maximum value of $699,999.99. *Id.*

167.    From November 7, 2014, through October 18, 2018, DLA awarded Maven $357,011.22 under DLA Contract 0053. This included DLA's purchases under the base and year and the additional option years that DLA exercised. As of the last action date, that contract's base and exercised options value was $357,011.22.

168.    DLA Contract 0053 incorporated Maven's offer for Solicitation SPE4A714R2810. Ex. E at 2. DLA's solicitation classified the contract opportunity as a "Total Small Business Set-Aside (FAR 19.5)." Ex. F at 2 (Solicitation Notice ID SPE4A714R2810). The solicitation stated, "This is a critical application item that contains higher-level quality requirements."

169.    DLA Contract 0053 was awarded to Maven as a Total Small Business Set Aside. DLA Contract 0053 incorporated the Notice of Total Small Business Set-Aside, FAR 52.219-06 (Nov. 2011). Ex. E at 8.

170.    DLA competed Contract 0053 using Simplified Acquisition Procedures. No exception to the Nonmanufacturer Rule applied because the purchase cost was expected to exceed $25,000. *See* FAR 19.102(f)(7); DLAD 19.102(f)(7).

171.    Therefore, unless the SBA granted a waiver to the Nonmanufacturer Rule, Maven was required to manufacture the product or supply the product of another domestic small business. FAR 19.102(f)(1); DLAD 19.102(f)(7). In addition, Maven was required to "suppl[y] an end product that is manufactured or produced in the United States." FAR 19.102(f); *see also* DLAD 19.102(f).

172.    The SBA did not waive the Nonmanufacturing Rule for the products Maven supplied to DLA under DLA Contract 0053. Under this contract, Maven supplied "Airframe Structural Components" under Product or Service Code ("PSC Code") 1560. Ex. E at 3. These products were associated with NAICS Code 336413 (Other Aircraft Parts and Auxiliary Equipment Manufacturing). As explained above, the SBA did not waive the Nonmanufacturer Rule requirements for Maven's products.

173.    DLA Contract 0053 required inspection and acceptance to occur at the place of origin. Ex. E at 2. The contract incorporated DLAD 52.246.9008 (Nov. 2011), Inspection and Acceptance at Origin. Ex. E at 7. Maven designated its own address in Rockville, Maryland, as the place of origin where the inspection and acceptance would occur.

174.    As shown on Exhibit A, Maven subcontracted with Robinson for DLA Contract 0053. Yet, neither Maven nor Robinson manufactured the items. Instead, Maven and Robinson imported the items from Turkey through Robinson.[21] The Turkish-manufactured parts Maven

---

[21]    In addition, DLA Contract 0053 incorporated FAR 52.246-11, Higher-Level Contract Quality Requirement (Feb. 1999). *See* Ex. E at 7. Under this term, Maven was required to

and Robinson supplied to DLA under Contract 0053 failed to comply with the applicable statutory, regulatory, and contractual requirements.

175.    Defendants submitted false claims to the Government to fraudulently induce DLA to award Maven DLA Contract 0053. Defendants falsely claimed they complied with applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule and product quality, testing, and inspection requirements.

176.    Defendants falsely represented and falsely certified that the products Maven supplied to DLA under Contract 0053 were manufactured by a domestic small business manufacturer in the United States. Defendants knew that the parts were manufactured in Turkey and imported into the United States through Robinson. Defendants knowingly violated the Nonmanufacturer Rule and falsely claimed a small business set-aside they were not entitled to receive.

### 3.    Example No. 3 – DLA Contract 5028

177.    SPM4A612D5028 ("DLA Contract 5028") was also among the government contracts that Maven identified as containing "material imported from Turkey." Ex. A at Maven 00004.

178.    DLA Contract 5028 was an Indefinite Delivery, Indefinite Quantity (IDIQ) Contract. DLA awarded DLA Contract 5028 to Maven on November 8, 2011. When Maven received DLA Contract 5028 in 2011, the potential total value of the award was $467,208.00.

179.    Maven received nine delivery orders between December 28, 2011, and October 8, 2015. As of the last action date of October 8, 2015, the base and exercised options value of DLA

---

comply with a higher-level quality standard defined in the contract, namely, "ISO 9001:2008." ISO 9001:2008 specified requirements for a quality management system.

Contract 5028, reflecting DLA's purchases through the life of the contract, was $133,866.15. Maven performed on DLA Contract 5028 through April 25, 2016.

180.    DLA awarded Contract 5028 to Maven as a small business set aside. DLA competed Contract 5028 using Full and Open Competition After Exclusion of Sources. No exception to the Nonmanufacturer Rule applied for this set-aside award.

181.    Therefore, unless the SBA granted a waiver to the Nonmanufacturer Rule, Maven was required to manufacture the product or supply the product of another domestic small business. *See* FAR 19.102(f)(1); DLAD 19.102(f)(7). In addition, Maven was required to "suppl[y] an end product that is manufactured or produced in the United States." FAR 19.102(f); *see also* DLAD 19.102(f).

182.    For DLA Contract 5028, Maven supplied "AMMUNITION MAINTENANCE, REPAIR, AND CHECKOUT SPECIALIZED EQUIPMENT," PSC Code 4925, within NAICS Code 333414. The SBA did not waive the Nonmanufacturing Rule for these products.

183.    The Turkish-manufactured parts Maven and Robinson supplied to DLA under Contract 5028 failed to comply with the applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule.

184.    Defendants submitted false claims to the Government to fraudulently induce DLA to award Maven DLA Contract 5028. Defendants falsely claimed they complied with applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule and product quality, testing, and inspection requirements.

185.    Defendants falsely represented and falsely certified that the products Maven supplied to DLA under Contract 5028 were manufactured by a domestic small business manufacturer in the United States. Defendants knew that the parts were manufactured in Turkey

and imported into the United States through Robinson. Defendants knowingly violated the

Nonmanufacturer Rule and falsely claimed a small business set-aside they were not entitled to

receive.

### 4.    Example No. 4 – DLA Contract 9025

186.    PM7LX11D9025 ("DLA Contract 9025") was also among the government

contracts that Maven identified as "DCMA Contracts with Robinson As of July 20, 2015."

*See* Ex. A at Maven 00003. DLA Contract 9025 corresponded with Purchase Order "025517-

0006" from Maven to Robinson. *See id.* (second entry). Robinson did not manufacture the parts;

instead, Robinson imported the parts from Turkey.

187.    DLA Contract 9025 was an Indefinite Delivery, Indefinite Quantity Contract

("IDIQ Contract"). DLA awarded DLA Contract 9025 to Maven on April 28, 2011. When

Maven received DLA Contract 9025, the potential total value of the award was $1,939,200.80.

188.    Maven received approximately 40 delivery orders between July 2011 and August

2016. As of the last action date of August 12, 2016, the base and exercised options value of DLA

Contract 9025, reflecting DLA's purchases, was $166,630.13. Maven performed on DLA

Contract 9025 through August 2016.

189.    DLA awarded Contract 9025 to Maven as a small business set aside. DLA

competed Contract 9025 using Full and Open Competition After Exclusion of Sources. No

exception to the Nonmanufacturer Rule applied for this set-aside award.

190.    Therefore, unless the SBA granted a waiver to the Nonmanufacturer Rule, Maven

was required to supply the product of a domestic small business and "suppl[y] an end product

that is manufactured or produced in the United States." FAR 19.102(f); *see also* DLAD

19.102(f).

191. For DLA Contract 9025, Maven supplied DLA with products within NAICS Code 332994 (SMALL ARMS, ORDNANCE, AND ORDNANCE ACCESSORIES MANUFACTURING). Maven's products fell within the following three PSC Codes:

| NAICS Code | PSC Code | Product or Service Code Description |
|---|---|---|
| 332994 | 1005 | GUNS, THROUGH 30 MM |
| 332994 | 1055 | LAUNCHERS, ROCKET AND PYROTECHNIC |
| 332994 | 1075 | DEGAUSSING AND MINE SWEEPING EQUIPMENT |
| 332994 | 1095 | MISCELLANEOUS WEAPONS |

192. On July 2, 2003, the SBA established a waiver of the Nonmanufacturer Rule for Small Arms Manufacturing, NAICS Code 332994. 68 Fed. Reg. 39448 (Ex. G). On March 15, 2004, the SBA issued a notice of termination of the waiver of the Nonmanufacturer Rule for Small Arms Manufacturing, which became effective on March 30, 2004. 69 Fed. Reg. 12193 (Ex. H).

193. The SBA's March 15, 2004, Notice rescinding the waiver of the Nonmanufacturer Rule for Small Arms Manufacturing explained as follows:

> SBA granted a waiver of the Nonmanufacturer Rule for Small Arms Manufacturing, based on its determination that no small business manufacturers were available to participate in the Federal market for this class of products. It was recently brought to SBA's attention by small business manufacturers and a SBA Procurement Center Representative that small business manufacturers exist for items within the Small Arms Manufacturing class of products, identified under the NAICS 332994. In response, on October 29, 2003, SBA published in the Federal Register a notice of intent to terminate the waiver of the Nonmanufacturer Rule for Small Arms Manufacturing. SBA explained in the notice that it had discovered the existence of small business manufacturers of that class of products. SBA did not receive any comments in response to the published notice.
>
> Accordingly, based on the available information, SBA has determined that there are small business manufacturers of this class of products, and is therefore terminating the class waiver of the Nonmanufacturer Rule for Small Arms Manufacturing, NAICS 332994.

Ex. H.

194.    The Turkish-manufactured parts Maven and Robinson supplied to DLA under Contract 9025 failed to comply with the applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule.

195.    Defendants submitted false claims to the Government to fraudulently induce DLA to award Maven DLA Contract 9025. In connection with at least 25 separate, individual awards Maven received for supplying products under DLA Contract 9025, Defendants falsely claimed that they complied with applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule, and product quality, testing, and inspection requirements.

196.    Defendants falsely represented and falsely certified that the products Maven supplied to DLA under Contract 9025 were manufactured by a domestic small business manufacturer in the United States. Defendants knew that the parts were manufactured in Turkey and imported into the United States through Robinson. Defendants knowingly violated the Nonmanufacturer Rule and falsely claimed a small business set-aside they were not entitled to receive.

### 5.    *Example No. 5 – DLA Contract 0118*

197.    SPM4A611C0118 ("DLA Contract 0118") was also among the government contracts that Maven identified as "DCMA Contracts with Robinson As of July 20, 2015." *See* Ex. A at Maven 00003. DLA Contract 9025 corresponded with Purchase Order 25264. *See id.* (first entry). Robinson did not manufacture the parts; instead, Robinson imported the parts from Turkey.

198.    DLA Contract 0118 was a Definitive Contract.[22] DLA awarded Contract 0118 to Maven on or about March 25, 2011. The contract value was $251,253.60. As of the last action date of March 2, 2018, $251,253.60 was awarded to Maven.

199.    DLA awarded Contract 0118 to Maven as a small business set aside. DLA competed Contract 0118 using Full and Open Competition After Exclusion of Sources. No exception to the Nonmanufacturer Rule applied for this set-aside award.

200.    Unless the SBA granted a waiver to the Nonmanufacturer Rule, Maven was required to supply the product of a domestic small business and "suppl[y] an end product that is manufactured or produced in the United States." FAR 19.102(f); *see also* DLAD 19.102(f).

201.    For DLA Contract 0118, Maven supplied DLA with products within NAICS Code 336415 (GUIDED MISSILE AND SPACE VEHICLE PROPULSION UNIT AND PROPULSION UNIT PARTS MANUFACTURING). Maven's products were associated with PSC Code 1420, "GUIDED MISSILE COMPONENTS." SBA did not issue a waiver of the Nonmanufacturer Rule for NAICS Code 336415.

202.    The Turkish-manufactured parts Maven and Robinson supplied to DLA under Contract 0118 failed to comply with the applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule.

203.    Defendants submitted false claims to the Government to fraudulently induce DLA to award Maven DLA Contract 0118. In connection with at least 15 separate, individual awards Maven received for supplying products under DLA Contract 0118, Defendants falsely claimed

---

[22]    "Definitive Contract means any contract that must be reported to [the Federal Procurement Data System] other than an indefinite delivery vehicle." FAR 4.601. A Definitive Contract is a mutually binding agreement obligating the seller to furnish the supplies or services and the buyer to pay for them.

that they complied with applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule, and product quality, testing, and inspection requirements.

204.     Defendants falsely represented and falsely certified that the products Maven supplied to DLA under Contract 0118 were manufactured by a domestic small business manufacturer in the United States. Defendants knew that the parts were manufactured in Turkey and imported into the United States through Robinson. Defendants knowingly violated the Nonmanufacturer Rule and falsely claimed a small business set-aside they were not entitled to receive.

### 6.    *The Above Examples Are Only the Tip of the Iceberg*

205.     During the six years preceding the original complaint, Maven received more than 1,600 set-aside awards, including many definitive contracts, purchase orders, and delivery orders. During this period, the federal government awarded Maven more than $17 million in small business set-asides. Maven received hundreds of set-aside awards not excluded from the Nonmanufacturer Rule's requirements, for which the SBA had not granted a waiver.

206.     In addition to the above examples, Maven received many additional set-aside awards that Maven also identified as containing material imported from Turkey. These include the following contracts:

| | | |
|---|---|---|
| SPE4A714MA523 | SPE7M314M4763 | SPE7M414V0693 |
| SPE7MC15M1676 | SPM4A711MC766 | SPM4A712M7216 |
| SPM5L311M0354 | SPM5L311M1434 | SPM7L211M3021 |
| SPM7L211M5093 | SPM7L211M6418 | SPM7L212M5109 |
| SPM7L311M9540 | SPM7L511M1091 | SPM7L512M1125 |
| SPM7M312M6337 | SPM7M312M6771 | SPM7M512M2425 |
| SPM7MC12C0012 | | |

207.     In addition to the above examples, Maven received many additional set-aside awards for which Maven issued purchase orders to Robinson to supply the products, which are

also identifiable on Exhibit A as "DCMA Contracts with Robinson as of July 20, 2015." These include the following contracts:

| | | |
|---|---|---|
| SPE4A713MA582 | SPE4A715D0053 | SPE4A715M7111 |
| SPE7L314M1403 | SPE7M414V0693 | SPM4A712M4910 |
| SPM4A712M7621 | SPM7M313M3269 | SPM7MC11M6029 |

208. In addition to the contracts identified on Exhibit A as "DCMA Contracts with Robinson as of July 20, 2015," Maven identified Robinson Manufacturing's location in Placentia, California, as the primary place of performance in many other DLA contracts that Maven received through small business set-asides. These include the following contracts:

| | | |
|---|---|---|
| SPE4A417V6713 | SPE4A617PK168 | SPE4A617VF686 |
| SPE4A712M1535 | SPE4A717P7968 | SPE4A717P9110 |
| SPE4A717P9502 | SPE4A717PE301 | SPE4A717PE840 |
| SPE4A718P2347 | SPE4A718P2338 | SPE4A718P8862 |
| SPE4A719P1722 | SPE5E817V5233 | SPE5E818V1454 |
| SPE7L117V5639 | SPE7L118P0030 | SPE7L119V0362 |
| SPE7L217P0832 | SPE7L217P0998 | SPE7L317P4605 |
| SPE7L317P5292 | SPE7L317P5441 | SPE7L317P6275 |
| SPE7L317P6555 | SPE7L318P0098 | SPE7L318P3143 |
| SPE7L318P3172 | SPE7L417P1161 | SPE7L417P1727 |
| SPE7L417P1759 | SPE7L417P1957 | SPE7L417P2042 |
| SPE7L417P2052 | SPE7L418P0019 | SPE7L418P0230 |
| SPE7L418P0246 | SPE7L418P0987 | SPE7L418P1783 |
| SPE7L418P1826 | SPE7L518P0438 | SPE7M318P2636 |
| SPE8EF18CF006 | SPM4A611MDU76 | SPM4A612MKB35 |
| SPM4A712C0038 | SPM4A712M1049 | SPM4A712M3081 |
| SPM4A712M3490 | SPM4A712M4881 | SPM4A712M5515 |
| SPM4A712M5769 | SPM4A712M7477 | SPM7L212M1747 |
| SPM7L213M1211 | SPM7L213M1276 | SPM7L213M2388 |
| SPM7L213M5314 | SPM7L213M5316 | SPM7L213M5372 |
| SPM7L213M7265 | SPM7L213M7927 | SPM7L313M3720 |
| SPM7L313M4056 | SPM7L313M4238 | SPM7L413M0499 |
| SPM7L513M1631 | SPM7L513M2625 | SPM7M113M2954 |
| SPM7MC12C0012 | SPM7MC13M4913 | |

209. As in the above examples, Defendants submitted false claims to the Government to fraudulently induce DLA to award Maven the contracts listed in these tables. Defendants

falsely claimed they complied with applicable statutory, regulatory, and contractual requirements, including the Nonmanufacturer Rule and product quality, testing, and inspection requirements.

210.    Defendants falsely represented and falsely certified that the products Maven supplied to DLA in the contracts listed in these tables were manufactured by a domestic small business manufacturer (purportedly Robinson) in the United States. Defendants knew that the parts were manufactured in Turkey and imported into the United States through Robinson. Defendants knowingly violated the Nonmanufacturer Rule and falsely claimed many small business set-asides they were not entitled to receive.

**E.    Robinson's and Maven's Failure to Comply with the Nonmanufacturer Rule was Material to the Government's Decision to Pay Claims**

211.    "In order to qualify as a small business concern for a small business set-aside . . . an offeror must either: (1) Be the manufacturer or producer of the end item being procured (and the end item must be manufactured or produced in the United States)" or qualify as a nonmanufacturer. 13 C.F.R. § 121.406(a). In order to qualify as a nonmanufacturer, the offeror must "supply the end item of a small business manufacturer, processor or producer in the United States, or obtain[] a waiver[.]" 13 C.F.R. § 121.406(b)(1)(iv).

212.    The Nonmanufacturer Rule is material to the government's decision to pay claims. In *United States ex rel. Lardner v. Smith & Nephew, Inc.*, No. 17-cv-2013-JPM, 2018 WL 7050835 (W.D. Tenn. Sep. 17, 2018), the Relator alleged that a defendant did not qualify as a small business nonmanufacturer because it failed to comply with the Nonmanufacturer Rule criteria. The court denied the defendant's motion to dismiss, and the matter was ultimately settled on undisclosed terms.

213.    Circumventing small business set-aside requirements has also led to other successful False Claims Act cases, including a $48.5 million settlement with Trimark USA, LLC in 2022. In that case, Trimark and one of its executives

> admitted that their conduct caused federal agencies to award set-aside contracts to the small businesses in violation of federal regulations designed to encourage contract awards to legitimate small businesses and [service-disabled, veteran-owned small businesses]. TriMark and Rimsza further admitted that when set-aside contracts were awarded by federal agencies to the small businesses, it was typically TriMark Gill Marketing, rather than the small business, that performed substantially all the work, while the small business merely served as the face of the contract, billing the government for the work, and using its small business status to obtain the set-aside contracts.[23]

214.    Defendants' provision of non-U.S. products from a Turkish manufacturing company, and not from a United States small business, was a material violation of the nonmanufacturer rule.

### F.    Defendants Knowingly Provided DoD with Nonconforming Parts and Failed to Ensure that the Parts were Manufactured to Specifications.

215.    While employed at Robinson in 2014, Relator worked on at least 50 purchase orders that Maven issued to Robinson. These purchase orders were associated with government contracts between Maven and DoD.

216.    Maven's supply contracts with DoD contained, among other items, the manufacturing and technical specifications for the parts that DoD was purchasing. Maven issued purchase orders to Robinson, which, in turn, issued purchase orders to Faymer. After Robinson

---

[23]    U.S. Attorney's Office, Eastern District of Washington, *Press Release: Government Contractor Agrees to Pay Record $48.5 Million to Resolve Claims Related to Fraudulent Procurement of Small Business Contracts Intended for Service-Disabled Veterans* (Feb. 123, 2022), https://www.justice.gov/usao-edwa/pr/government-contractor-agrees-pay-record-485-million-resolve-claims-related-fraudulent (accessed Apr. 6, 2024).

received the parts from Faymer, Robinson provided them to DCMA for inspection to ensure quality and the correct dimensions.[24]

217.    In the military supply realm, certifications are prepared and presented to the Government to represent that a part meets dimensional, material, and quality specifications. Thus, these certifications indicate whether the parts meet contractual specifications.

218.    The parts typically had a complete set of Turkish certifications, claiming they met dimensional, material, and quality specifications as required by Maven's contract. Yet, as Robinson and Maven knew, these Turkish certifications were bought, paid for, and provided by private Turkish inspectors who, in Faymer's normal *modus operandus*—as Relator learned— did not concern themselves with accuracy. Quality issues plagued Faymer's parts, including materials and dimensional problems.

219.    Although the parts had Turkish certifications, Defendants remained responsible for ensuring that they met contractual specifications and were measured using properly calibrated instruments. *See* DLAD 52.246-9003; DLAD 52.246-9004(b).

220.    Section 9003 required that Maven and Robinson "ensure that the gauges and other measuring and testing equipment, used in determining whether the supplies presented to the Government for acceptance under this contract fully conform to specified technical requirements, are calibrated in accordance with International Organization for Standardization (ISO) 10012-1 or American National Standards Institute (ANSI)/NCLS Z540-1." DLAD 52.246-9003. Defendants knew that the imported Turkish parts did not conform to specified technical requirements and that Robinson did not possess the necessary measuring testing equipment.

---

[24]    The DCMA inspectors were concerned only with the quality of the parts being provided. They were not tasked with auditing whether Robinson and Maven were otherwise violating their representations, such as that the parts were manufactured by a United States small business.

221.    Under Section 9004(b), Maven and Robinson were "responsible for ensuring that supplies are manufactured, produced, and subjected to all tests required by applicable material specifications/drawings specified in the purchase description of the contract." DLAD 52.246-9004(b). Defendants failed to ensure that the Turkish manufacturer that certified the parts adequately measured, tested, or inspected them consistent with contractual requirements and applicable specifications.

222.    Further, the inspection did not occur at the place of manufacture or "origin" because Robinson did nothing to manufacture these parts, violating DLAD 46.503(c).

223.    Because Robinson did not conduct any testing at all, Robinson and Maven did not tender for acceptance to the Government DCMA inspectors (1) parts that were inspected in accordance with all contractual requirements and (2) parts that were manufactured in conformity with applicable contract requirements, as required per FAR 52.246-2.

224.    As a result of its fraudulent conduct, Robinson knowingly submitted false certifications, which resulted in the payment of false claims. Maven and Robinson knew that the parts they supplied to DoD did not comply with the Nonmanufacturer Rule. Moreover, Maven and Robinson failed to disclose the true origins of the components and parts used in manufacturing the parts.

225.    Robinson also knowingly submitted false Certifications of Conformance because the supplies did not meet the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15.

### G. Robinson and Maven Wrongfully Terminated Relator Because He Refused to Commit Fraud.

226. Relator learned that Robinson's president, Don Robinson, acted at the behest of Maven's president, Kavita Dawson, the true mastermind. Robinson was acting as the most recent in a line of "middlemen" that Maven could utilize to supply the Government with substandard parts and to launder the true origin and state of the Turkish parts. Maven had a longstanding business relationship with Faymer, and Maven bid on DLA contracts with the intent to deliver Faymer-procured parts in knowing violation of the law and its contract.

227. Further evidence that Maven was the scheme's ringleader is that at several points during his employment, Dawson, and not Robinson, directed Relator to sign and submit false Certificates of Conformance to the Government during inspection to obtain Government acceptance of Robinson's manufactured parts.

228. Dawson repeatedly asked Relator to find methods for gaining approval of the substandard parts by Government DCMA inspectors instead of asking Relator to re-manufacture the parts to contract specifications, which he could have done with the right equipment in some instances. Under this directive, there was not anything that Relator could do to make the Government inspectors accept the parts. All Relator could do was present the inspection report and certifications to the inspectors. It was ultimately up to the Government inspectors to accept or reject the parts. Only a few parts were accepted by DCMA inspectors during Relator's tenure.

229. One product that DCMA rejected when Cavic was working for Robinson was a tank wheel about two feet in diameter. DCMA later subjected the tank wheels to a battery of tests. Despite a certificate of conformance from Robinson and various certifications by Turkish suppliers, the parts failed all tests, including material and dimensional tests, Magnetic Particle Inspection tests, and others.

230.    Dawson directed Relator to "clean" the certifications that accompanied the Turkish parts when they arrived in the United States and Robinson's facility to trick DoD into accepting non-compliant parts. To "clean" a certification meant that Dawson was asking Relator, the Quality Control Manager, to "correct" the certifications from Turkey if there were errors or other problems with the paperwork. Relator refused to follow this directive.

231.    After expressing concerns over the quality of Robinson's military parts, Relator received a letter dated March 31, 2014, from Dawson requesting that Relator not submit any more parts for Government inspection. The letter purports to require Relator to find qualified shops to manufacture the parts according to contractual specifications. In reality, Maven and Robinson's goal was to blame Relator for not succeeding in furthering their fraudulent scheme.

232.    Relator later learned from Mario Hurtado and Mike Zare, the previous and successor Quality Control manager for Robinson, respectively, that he was the sixth Quality Control Manager hired that year. The previous Quality Control managers encountered the same problems as Relator and could not obtain Government acceptance of Robinson's parts.

233.    During this timeframe, in February 2014, DCMA issued three "corrective action reports" (CARs") to Robinson regarding quality problems, which Relator answered under Maven's direction. DCMA issued another two CARs in early March 2014, one related to a CMM report. DCMA inspectors called Robinson to task not only for quality issues but also stressed the need to hold inspections at the place of manufacture, which they apparently suspected was not Robinson. Cavic answered those, too, again under Maven's direction. Finally, due to Robinson's continued poor performance under Maven's supply contracts, in early April 2014, the DLA decided to suspend and disqualify Robinson from performing under any Government contract.

234.    Robinson fired Relator on April 4, 2014. When he was fired, Relator had been working on at least 50 contracts that Robinson had with Maven to supply military parts to the DoD. At Robinson, Relator learned that Maven had longstanding relationships with Faymer and other unknown Turkish manufacturers and dealers.

**VIII.    Previous Litigation Between Relator and Robinson**

235.    Around July 2014, Relator filed a small claims complaint against Robinson for breach of contract. A trial date for the small claim was set for November 10, 2014.

236.    In retaliation for Relator's actions, on November 10, 2014, Robinson filed a complaint against Relator in the Superior Court of California, County of Orange, Case No. 30-2014-00755345. Robinson brought causes of action against Cavic for (1) negligence, (2) breach of contract, (3) fraud, and (4) Intentional Tort. On May 2, 2015, Relator filed a cross-complaint against Robinson and Maven for (1) breach of contract, (2) malicious prosecution, and (3) fraud. Maven was later dismissed from the cross-complaint and awarded attorney's costs. On May 22, 2017, the court dismissed the action.

237.    Relator served a subpoena to the DCMA around mid-2015, when this litigation was ongoing, to obtain more information about Maven's government contracts. DCMA did not respond to the litigation, but the subpoena did spur a government investigation. A month after serving the subpoena, Relator spoke to a DLA Fraud Investigator and the FBI to report Maven and Robinson's fraud.

IX.    **ACTIONABLE CONDUCT BY DEFENDANTS**

A.    **The False Claims Act**

238.    This is an action to recover damages and civil penalties on behalf of the United States and Relator Cavic arising from the false and fraudulent statements, claims, and acts by Defendants in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

239.    The FCA provides, in pertinent part, that any person who

(A)    knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false and/or fraudulent claim;

(C)    conspires to commit a violation of [the FCA]; . . .

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government;

is liable to the Government for a civil penalty of not less than $13,508 and not more than $27,018 for each such claim,[25] plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

240.    The FCA defines "claim" as:

(A)    mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)    is presented to an officer, employee, or agent of the United States; or

---

[25]    *See* Civil Monetary Penalties Inflation Adjustment, 85 FR 37004-01 (June 19, 2020); 28 C.F.R. § 85.5.

      (ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

          (I)     provides or has provided any portion of the money or property requested or demanded; or

          (II)     will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. §3729(b)(2).

241.    The FCA imposes liability even when a company does not directly submit a claim to the government. A company may be liable for causing a false claim to be presented or made. *See* 31 U.S.C. § 3729(a)(1)(A).

242.    A "claim" that may impose FCA liability includes any request or demand for money or property made to a contractor, grantee, or other recipient if the money or property is to be spent or used on the government's behalf or to advance a government program or interest; or paid for or reimbursed by the government. 31 U.S.C. § 3729(b)(2)(A)(ii).

243.    The FCA allows any person with knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for himself and the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

244.    Based on these provisions, Relator Cavic, on his behalf and on behalf of the United States, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**B.**    **Defendants' Violations of the False Claims Act**

    ***1.***    ***Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A))***

245.    From at least 2012 to the present, Maven knowingly presented or caused to be presented false and fraudulent claims for payment or approval to DoD.

246.    From at least 2012 to 2014, Robinson knowingly presented or caused to be presented false and fraudulent claims for payment or approval to DoD.

247.    The claims that Defendants submitted to the Government under Maven's supply contracts were false and fraudulent because, contrary to Maven's certifications and representations, and as Defendants knew or should have known:

- Maven and Dawson misrepresented Maven's status as a small business concern that was qualified to receive small business set-aside supply contracts;

- Defendants received small business set-asides but did not furnish an end product manufactured or produced in the United States, as required by FAR 19.102(f) and DLAD 19.102(f);

- Defendants received small business set-aside supply contracts that were not excluded from the Nonmanufacturer Rule and did not manufacture the products, did not supply the product manufactured by another domestic small business, and did not obtain waivers for the products in question, as required by FAR 19.102(f) and DLAD 19.102(f);

- Defendants misrepresented that products they supplied to DLA pursuant to various set-aside supply contracts were manufactured in the United States;

- Defendants misrepresented that a domestic small business manufacturer, Robinson Manufacturing, was the "source" or "origin" of the products that Maven supplied and that the manufacturing and primary performance occurred at Robinson's facility in Placentia, California;

- Defendants failed to disclose the true foreign origins of parts that Maven supplied to DLA under various set-aside supply contracts;

- Maven and Robinson failed to ensure that the parts were manufactured, produced, and subjected to all required testing to ensure they met material specifications, as required by DLAD 52.246-9004(b);

- Maven and Robinson failed to ensure that their measuring and testing equipment was properly calibrated to ensure the supplies presented to the Government for acceptance fully conformed to specified technical requirements, as required by DLAD 52.246-9003;

- Robinson did not furnish to the Government DCMA Inspectors supplies that had been inspected per contractual requirements, as required by FAR 52.246-2;

- Defendants did not furnish the parts for inspection and acceptance to the Government at the source, as required under Maven's contracts, FAR 46.405(b)(1), DLAD 46.503 (which defines the source as the "place of manufacture"), because the actual place of manufacture was in Turkey, not at Robinson's facility in Placentia, California;

- Defendants falsely certified that the parts they supplied DLA met the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a);

248.    Maven included these false statements, false records, and certifications in its claims for payment, rendering the claims false. Among the certifications were false Certificates of Conformance in the electronic Material Inspection and Receiving Reports that Maven and Robinson are required to furnish to the Government per DFARS 252.246-7000(a), false Certificates of Conformance required to be included in the claims for payment under DFARS 252.232-7006(f)(4), false Certificates of Conformance under FAR 52.26-15(a), and false self-certifications of its small business status under FAR 52.219-1)b)(1) and FAR 4.120(b)(1), which were incorporated into its contracts under FAR 4.120(d).

249.    Defendants also failed to disclose to the Government that the parts they furnished were not manufactured in the United States, were not the product of a domestic small business, were not and could not be inspected at source, and did not conform to contractual specifications—all material omissions. These omissions created actionable half-truths under *Universal Health Services v. Escobar*, 579 U.S. 176 (2016).

250.    These claims were materially false and fraudulent in that they could influence the Government's decision to pay the claims, and they did influence that decision. Defendants caused the United States to make payments for military parts that it would not have made had it known about Defendants' violation of the applicable statutory, regulatory, and contractual requirements.

251.    When DCMA detected repeated quality problems with Robinson's parts, it suspended Robinson as a government subcontractor. What DCMA and the Government at large did not know was that the quality issues with Robinson's parts were part of Maven's larger intentional scheme to buy and deliver nonconforming spare parts manufactured entirely in Turkey to the United States, with Robinson and a line of similar subcontractors before Robinson, set up as the manufacturer delivering the final products.

252.    Indeed, Maven concealed that intent when it bid on the spare parts contracts at issue, fraudulently inducing the Government to enter contracts it would not have entered had it been known. Under *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), each claim submitted under a contract procured by fraudulent inducement is tainted and false.

253.    Defendants' violations of the applicable statutes, regulations, program instructions, and subsequent misrepresentations regarding their compliance were material because they went to the very essence of the bargain for which the United States contracted.

254.    The United States only pays for parts that meet military specifications and applicable material statutory, regulatory, and contractual requirements. The FAR, DFARS, and DLAD regulations and clauses support the materiality of these requirements.

255.    Had the Government known that Defendants did not comply with applicable statutes, regulations, and program instructions, which resulted in the submission of ineligible claims for reimbursement, the Government would not have paid the claims.

256.    Defendants' presentment, or causation of presentment, of false and fraudulent claims to DoD was a foreseeable factor in the United States' loss and a consequence of the scheme. Because of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### 2. *Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))*

257.    From at least 2012 to the present, Maven and Dawson knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

258.    From at least 2009 to 2014, Robinson made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

259.    These false statements or false records consist of solicitations, bids, Certificates of Conformance, Small Business Program Representations, Balance of Payments Program Certificates, other certifications, Material Inspection and Receiving Reports (either in paper or the electronic equivalent WAWF RR form), invoices, omissions, half-truths, and all other statements or records that falsely represented that:

- Maven's status as a small business concern entitled Maven to receive small business set-aside supply contracts;

- Defendants furnished DLA end products manufactured or produced in the United States, as required by FAR 19.102(f) and DLAD 19.102(f);

- Maven was entitled to receive small business set-aside supply contracts because Defendants complied with the Nonmanufacturer Rule, as required by FAR 19.102(f) and DLAD 19.102(f);

- A domestic small business manufacturer, Robinson Manufacturing, was the "source" or "origin" of the products that Maven supplied;

- Manufacturing and primary performance occurred at Robinson's facility in Placentia, California;

- The parts were manufactured, produced, and subjected to all required testing to ensure they met material specifications, as required by DLAD 52.246-9004(b), when they were not;

- Robinson's facility had proper measuring and testing equipment properly calibrated to ensure the supplies presented to the Government for acceptance fully conformed to specified technical requirements, as required by DLAD 52.246-9003, when in fact, Robinson possessed no such equipment;

- The parts that Defendants furnished to the Government DCMA Inspectors had been inspected per contractual requirements, as required by FAR 52.246-2, when they had not been;

- Defendants furnished the parts for inspection and acceptance to the Government at the source, as required under Maven's contracts, FAR 46.405(b)(1), DLAD 46.503, when they did not;

- The parts that Defendants supplied DLA met the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a), when they did not;

- The parts were manufactured in compliance with all applicable statutory, regulatory, and contractual requirements in the Certificate of Conformance in the WAWF RR (Material Inspection and Receiving Report) that is required to be furnished to the Government per DFARS 252.246-7000(a), when they were not; and

- The parts were manufactured in compliance with all applicable statutory, regulatory, and contractual requirements in the Certificates of Conformance that were attached to the claims for payment that were submitted to the Government under Maven's supply contract (as Certificates of Conformance are required to be included in the claims for payment under DFARS 252.232- 7006(f)(4)), when they were not.

260.    Defendants' false statements and false records caused other entities to make false statements and false records as to whether the military parts that Defendants furnished complied with all applicable statutory, regulatory, and contractual requirements.

261.    Defendants made or caused to be made false representations and records regarding Defendants' compliance with the material statutory, regulatory, and contractual requirements applicable to their supply contracts.

262.    When submitting claims, Defendants expressly certified in Certificates of Conformance and the Small Business Act and Balance of Payments Program Certificates that they complied with all statutory, regulatory, and contractual requirements applicable to its supply contracts. In addition, Maven submitted Representations and Certifications at least once

annually. Dawson certified on behalf of Maven that she was attesting to the accuracy of the representations and certifications contained therein, including the Small Business Program Representations.

263.    Defendants' violations of the applicable statutes, regulations, program instructions, and subsequent misrepresentations regarding their compliance were material because they went to the very essence of the bargain for which the United States contracted. The United States only pays for parts that meet military specifications and applicable material statutory, regulatory, and contractual requirements. Moreover, small business set-aside contracts are only awarded to qualifying small business concerns. Had the Government known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the Government would not have paid the claims.

264.    Defendants' creation of false records or false statements and their causation of same were a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### 3.    *Conspiracy (31 U.S.C. § 3729(a)(1)(C))*

265.    Defendants—Maven, Robinson, and Kavita Dawson—and their co-conspirators Faymer and other unknown Turkish manufacturers and suppliers—have conspired in knowingly presenting false and fraudulent claims for payment or approval to the United States Government and knowingly making, using, or causing to be made or used, false records or statements material to false and fraudulent claims.

266.    The United States has suffered substantial damages as a result of Defendants' conspiracies with Faymer and other Turkish suppliers.

267.    During the bidding process and before Maven was awarded a Government supply contract, Defendants agreed and had a scheme to import Turkish parts to fulfill DoD supply contracts.

268.    Defendants agreed that Robinson would deliver these Turkish parts to the Government for acceptance, even though Defendants knew that the parts had not been tested properly.

269.    Defendants agreed to deliver parts to the Government that did not meet the contractual specifications because the parts had dimensional problems, material problems, or other quality defects. Defendants further agreed to furnish "sham" certifications created by Faymer and other unknown Turkish suppliers to the Government so that the Government would accept the products without testing.

270.    Defendants agreed to utilize Robinson as a "sham" manufacturer-subcontractor so that Defendants could falsely represent to the Government that the Turkish parts were manufactured in the United States by a domestic small business and disguise the true origin of the parts. Defendants agreed to submit false claims and create or use false statements and false records to the Government to obtain Government acceptance of the parts at issue and obtain payments from the Government under Maven's DoD supply contracts, as well as to conceal Defendants' possession of wrongfully gained government funds.

271.    Defendants knowingly conspired with Turkish suppliers and dealers, such as Faymer, to defraud the Government as part of this scheme. Faymer and other Turkish entities agreed with Maven and Robinson to send Turkish parts of substandard quality to the United States military. They sent the parts accompanied by certifications that contained false representations regarding the specifications and other characteristics of the parts.

**X.     Causes of Action**

**Count I: Presentation of False Claims under 31 U.S.C. § 3729(a)(1)(A)**

272.     Relator realleges and incorporates each allegation contained in all paragraphs of this Complaint by reference.

273.     From at least 2012 to the present, Dawson and Maven knowingly presented or caused to be presented false and fraudulent claims for payment or approval to the DoD.

274.     From at least 2012 to 2014, Robinson knowingly presented or caused to be presented false and fraudulent claims for payment or approval to the DoD.

275.     The claims submitted to the Government were false or fraudulent because:

- Maven and Dawson misrepresented Maven's status as a small business concern that was qualified to receive small business set-aside supply contracts;

- Defendants received small business set-asides but did not furnish an end product manufactured or produced in the United States, as required by FAR 19.102(f) and DLAD 19.102(f);

- Defendants received small business set-aside supply contracts that were not excluded from the Nonmanufacturer Rule and did not manufacture the products, did not supply the product manufactured by another domestic small business, and did not obtain waivers for the products in question, as required by FAR 19.102(f) and DLAD 19.102(f);

- Defendants misrepresented that products they supplied to DLA pursuant to various set-aside supply contracts were manufactured in the United States;

- Defendants misrepresented that a domestic small business manufacturer, Robinson Manufacturing, was the "source" or "origin" of the products that Maven supplied and that the manufacturing and primary performance occurred at Robinson's facility in Placentia, California;

- Defendants failed to disclose the true foreign origins of parts that Maven supplied to DLA under various set-aside supply contracts;

- Maven and Robinson failed to ensure that the parts were manufactured, produced, and subjected to all required testing to ensure they met material specifications, as required by DLAD 52.246-9004(b);

- Maven and Robinson failed to ensure that their measuring and testing equipment was properly calibrated to ensure the supplies presented to the Government for acceptance fully conformed to specified technical requirements, as required by DLAD 52.246-9003;

- Robinson did not furnish to the Government DCMA Inspectors supplies that had been inspected per contractual requirements, as required by FAR 52.246-2;

- Defendants did not furnish the parts for inspection and acceptance to the Government at the source, as required under Maven's contracts, FAR 46.405(b)(1), DLAD 46.503 (which defines the source as the "place of manufacture"), because the actual place of manufacture was in Turkey, not at Robinson's facility in Placentia, California; and

- Defendants falsely certified that the parts they supplied DLA met the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a).

276.    Maven, Kavita Dawson, and Robinson knew the claims were false. Maven and Kavita Dawson directed Robinson to import Turkish parts from an other-than-small business, to furnish the parts to the government for inspection and acceptance, and to tender false certifications to the inspectors. Robinson knowingly participated in this scheme with Dawson, as evidenced by its conduct and Maven's continued interference with Robinson's quality control managers to get the parts accepted by the Government.

277.    These claims were materially false and fraudulent in that they could influence the Government's decision to pay the claims and did influence that decision. The United States only pays for parts that meet the material statutory, regulatory, and contractual requirements. The FAR, DFARS, and DLAD regulations and clauses support the materiality of these requirements, as they demonstrate they went to the very essence of the bargain. Had the Government known that Defendants did not comply with applicable statutes, regulations, and clauses, which resulted in the submission of ineligible claims for reimbursement, the Government would not have paid

the claims. When DCMA detected repeated quality problems with Robinson's parts, it suspended Robinson as a government subcontractor.

278.    Defendants' presentment, or causation of presentment, of false and fraudulent claims to the United States was a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**Count II: Making or Using False Records or Statements**
**Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

279.    Relator realleges and incorporates each allegation contained in all paragraphs of this Complaint by reference.

280.    From at least 2012 to the present, Maven and Dawson knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

281.    From at least 2012 to 2014, Robinson made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

282.    Defendants falsely represented that:

- Maven's status as a small business concern entitled Maven to receive small business set-aside supply contracts;

- Defendants furnished DLA end products manufactured or produced in the United States, as required by FAR 19.102(f) and DLAD 19.102(f);

- Maven was entitled to receive small business set-aside supply contracts because Defendants complied with the Nonmanufacturer Rule, as required by FAR 19.102(f) and DLAD 19.102(f);

- A domestic small business manufacturer, Robinson Manufacturing, was the "source" or "origin" of the products that Maven supplied;

- Manufacturing and primary performance occurred at Robinson's facility in Placentia, California;

- The parts were manufactured, produced, and subjected to all required testing to ensure they met material specifications, as required by DLAD 52.246-9004(b), when they were not;

- Robinson's facility had proper measuring and testing equipment properly calibrated to ensure the supplies presented to the Government for acceptance fully conformed to specified technical requirements, as required by DLAD 52.246-9003, when in fact, Robinson possessed no such equipment;

- The parts that Defendants furnished to the Government DCMA Inspectors had been inspected per contractual requirements, as required by FAR 52.246-2, when they had not been;

- Defendants furnished the parts for inspection and acceptance to the Government at the source, as required under Maven's contracts, FAR 46.405(b)(1), DLAD 46.503, when they did not;

- The parts that Defendants supplied DLA met the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a), when they did not;

- The parts were manufactured in compliance with all applicable statutory, regulatory, and contractual requirements in the Certificate of Conformance in the WAWF RR (Material Inspection and Receiving Report) that is required to be furnished to the Government per DFARS 252.246-7000(a), when they were not; and

- The parts were manufactured in compliance with all applicable statutory, regulatory, and contractual requirements in the Certificates of Conformance that were attached to the claims for payment that were submitted to the Government under Maven's supply contract (as Certificates of Conformance are required to be included in the claims for payment under DFARS 252.232- 7006(f)(4)), when they were not.

283.    Maven, Dawson, and Robinson's false statements and false records were included or encapsulated in, among other verbal statements or documents, the following: the Material Inspection and Receiving Report, Small Business certifications, and Certificates of Conformance. At Maven's direction, Robinson used false statements and false records, including sham Turkey certifications, during the inspection process to obtain Government acceptance of its nonconforming parts.

284.     Defendants' creation or use of false records or false statements and their causation to the creation or use of false records or false were material to false claims because they could influence the Government's decision to pay the claims and did influence that decision.

285.     The United States only pays for parts that meet the material statutory, regulatory, and contractual requirements. The FAR, DFARS, and DLAD regulations and clauses support the materiality of these requirements, as they demonstrate they went to the very essence of the bargain.

286.     Had the Government known that Defendants did not comply with applicable statutes, regulations, and clauses, which resulted in the submission of ineligible claims for reimbursement, the Government would not have paid the claims. When DCMA detected repeated quality problems with Robinson's parts, it suspended Robinson as a government subcontractor.

287.     Defendants' creation or use of false records or false statements, and its causation to the creation or use of false records or false statements, was a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### Count III: Conspiracy under 31 U.S.C. § 3729(a)(1)(C) to Violate 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(C)

288.     Relator realleges and incorporates each allegation contained in all paragraphs of this Complaint by reference.

289.     Defendants Maven, Kavita Dawson, and Robinson, along with Faymer and other unknown Turkish manufacturers and suppliers (collectively, "Conspirators"), entered into an

unlawful agreement to violate 31 U.S.C. § 3729(a)(1)(C) to Violate 31 U.S.C. § 3729(a)(1)(A),

(a)(1)(B), and (a)(1)(C).

290.   The Conspirators agreed:

- To import Turkish parts from an other-than-small business to fulfill DoD supply contracts;

- To deliver these Turkish parts to the Government for acceptance even though the parties knew the parts had not been properly tested and did not meet the contractual specifications because the parts had dimensional problems, material problems, or other quality defects;

- Robinson would furnish "sham" certifications created by Faymer and other unknown Turkish suppliers to the Government so that the Government would accept the products without testing; and

- To utilize Robinson as a "sham" manufacturer-subcontractor to falsely represent that the Turkish parts were manufactured in the United States and manufactured by a domestic small business and to disguise the true origin of the parts.

291.   The Conspirators agreed to present or cause to be presented false claims and

agreed to create or use false statements and false records to the Government to obtain

Government acceptance of the parts at issue and obtain payments from the Government under

Maven's DoD supply contracts, as well as to conceal Defendants' possession of wrongfully

gained government funds.

292.   Defendants committed several acts in furtherance of this scheme:

- Maven, Kavita Dawson, and Robinson imported Turkish parts from Faymer and other unknown Turkish suppliers;

- Faymer and other unknown Turkish suppliers exported parts to the United States and created "sham certifications" containing false representations about the specifications and quality of the parts;

- Maven directed Robinson to furnish false Turkish certifications to Government inspectors, and Robinson obeyed;

- Defendants furnished parts to the Government that did not meet inspection and testing protocols or contractual specifications;

- Defendants furnished parts to the Government that did not comply with place of inspection and acceptance requirements in Maven's contracts, the FAR, and DLAD.

- Maven and Robinson included the false statements and records, as described above, in the Material Inspection and Receiving Report, small business certifications, and Certificates of Conformance, among other documents; and

- Maven and Robinson sent these false claims, false statements, and false records to the Government.

293.    By virtue of the false and fraudulent claims submitted, paid, or approved as a result of the conspiracies to defraud the Government, the United States has suffered substantial monetary damages.

294.    As a direct and proximate result, the United States has suffered substantial monetary damages.

## XI.    Relief

295.    On behalf of the United States, Relator seeks to recover monetary damages equal to three times the damages suffered by the United States. In addition, Relator seeks civil penalties against Defendants equal to the maximum amount authorized by the False Claims Act for each violation of 31 U.S.C. § 3729.

296.    Relator seeks an award in the maximum amount allowed under 31 U.S.C. § 3730(d) of the False Claims Act.

297.    Relator seeks to be awarded all costs and expenses for this action, including attorney's fees and court costs.

298.    Relator seeks pre-judgment interest at the highest rate allowed by law.

299.    Relator seeks all other relief on behalf of Relator and the United States that the Court deems just and proper.

## XII.    Prayer

300.    WHEREFORE, Relator prays that this Court enters a judgment for Relator and

against Defendants for the following:

- Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

- Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

- The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

- All costs and expenses of this action, including attorney's fees and costs of court;

- Pre-judgment interest at the highest rate allowed by law; and

- all other relief on behalf of Relator and the United States to which each may be entitled and that the Court deems to be just and proper.

## XIII.   Demand for Jury Trial

301.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Dated: April 8, 2024                          Respectfully submitted,

By:   _/s/ Daniel P. Schaefer_
      Daniel P. Schaefer
      ESBROOK P.C.
      800 Maine Ave. SW, Suite 200
      Washington, DC 20024
      771-218-7689
      daniel.schaefer@esbrook.com

      *Counsel for Relator Danny Cavic*

**Certificate of Service**

I certify that on April 8, 2024, I served the foregoing Second Amended Complaint on the parties' counsel electronically through the Court's CM/ECF system.

*/s/ Daniel P. Schaefer*
DANIEL P. SCHAEFER

*Counsel for Relator Danny Cavic*

E-FILED
Friday, 28 August, 2025 04:06:33 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A



MAVEN ENGINEERING CORPORATION
INVOICES FROM ROBINSON FOR CONTRACTS DELIVERED FROM:
FEBRUARY 10 - JUNE 30, 2014

| Date Received | Maven PO # | Robinson Invoice # | Invoice Amount | |
|---|---|---|---|---|
| 2/11/2014 | 28510 | 1642 | 3,850.00 | |
| 2/11/2014 | 29916 | 1641 | 527.00 | |
| 2/20/2014 | 29586 | 1655 | 142.28 | |
| 2/25/2014 | 30790 | 1780 | 3,145.00 | |
| 3/6/2014 | 30068 | 1758 | 8,400.00 | |
| 3/7/2014 | 30262 | 1985 | 636.83 | |
| 3/7/2014 | 29707 | 1755 | 8,364.37 | |
| 3/11/2014 | 30590 | 1753 | 134,385.00 | |
| 3/11/2014 | 30590 | 1753 | 184,671.00 | |
| 3/11/2014 | 28332 | 1751 | 300.00 | |
| 3/11/2014 | 30240 | 1750 | 1,791.67 | |
| 3/12/2014 | 025517-0025 | 1756 | 5,758.94 | |
| 3/21/2014 | 27958 | 1986 | 2,772.90 | |
| 4/4/2014 | 30383 | 1897 | 3,540.00 | |
| 4/8/2014 | 31267 | 5275 | 118.00 | |
| 4/16/2014 | 27903 | 1987 | 8,919.55 | VOID |
| 4/16/2014 | 28510 | 1988 | 3,850.00 | |
| 4/23/2014 | 27958 | 1986 | 284.40 | |
| 4/23/2014 | 30186 | 2115 | 195.32 | |
| 5/7/2014 | 30590 | 0023/14 | 287,700.00 | — ??? |
| 5/14/2014 | 28510 | 2211 | 77.00 | |
| 5/15/2014 | 28510 | 2116 | 1,694.00 | |

CAV00001

MAVEN ENGINEERING CORPORATION
CONTRACTS WITH ROBINSON DELIVERED FROM:
FEBRUARY 10 - JUNE 30, 2014

| Maven Receiver | Date Received | Maven PO # |
|---|---|---|
| 29855 | 2/11/2014 | 28510 |
| 29857 | 2/11/2014 | 29916 |
| 29906 | 2/20/2014 | 29586 |
| 29932 | 2/25/2014 | 30790 |
| 30006 | 3/6/2014 | 30068 |
| 30010 | 3/7/2014 | 30262 |
| 30013 | 3/7/2014 | 29707 |
| 30038 | 3/11/2014 | 30590 |
| 30042 | 3/11/2014 | 30590 |
| 30044 | 3/11/2014 | 28332 |
| 30045 | 3/11/2014 | 30240 |
| 30053 | 3/12/2014 | 025517-0025 |
| 30099 | 3/21/2014 | 27958 |
| 30193 | 4/4/2014 | 30383 |
| 30206 | 4/8/2014 | 31267 |
| 30242 | 4/16/2014 | 27903 |
| 30243 | 4/16/2014 | 28510 |
| 30267 | 4/23/2014 | 27958 |
| 30268 | 4/23/2014 | 30186 |
| 30345 | 5/7/2014 | 30590 |
| 30390 | 5/14/2014 | 28510 |
| 30397 | 5/15/2014 | 28510 |

**Maven 00001**

MAVEN ENGINEERING CORPORATION
INVOICES FROM ROBINSON FOR CONTRACTS DELIVERED FROM:
FEBRUARY 10 - JUNE 30, 2014

| Date Received | Maven PO # | Robinson Invoice # |
|---|---|---|
| 2/11/2014 | 28510 | 1642 |
| 2/11/2014 | 29916 | 1641 |
| 2/20/2014 | 29586 | 1655 |
| 2/25/2014 | 30790 | 1780 |
| 3/6/2014 | 30068 | 1758 |
| 3/7/2014 | 30262 | 1985 |
| 3/7/2014 | 29707 | 1755 |
| 3/11/2014 | 30590 | 1753 |
| 3/11/2014 | 30590 | 1753 |
| 3/11/2014 | 28332 | 1751 |
| 3/11/2014 | 30240 | 1750 |
| 3/12/2014 | 025517-0025 | 1756 |
| 3/21/2014 | 27958 | 1986 |
| 4/4/2014 | 30383 | 1897 |
| 4/8/2014 | 31267 | 5275 |
| 4/16/2014 | 27903 | 1987 |
| 4/16/2014 | 28510 | 1988 |
| 4/23/2014 | 27958 | 1986 |
| 4/23/2014 | 30186 | 2115 |
| 5/7/2014 | 30590 | 0023/14 |
| 5/14/2014 | 28510 | 2211 |
| 5/15/2014 | 28510 | 2116 |

**Maven 00002**

CAV00003

MAVEN ENGINEERING CORPORATION
DCMA CONTRACTS WITH ROBINSON
AS OF JULY 20, 2015

| PO. # | Contract Number |
|-------|-----------------|
| 25264 | SPM4A6-11-C-0118 |
| 025517-0006 | SPM7LX-11-D-9025 |
| 26083 | SPM7MC-11-M-6029 |
| 27422 | SPM4A7-12-M-4910 |
| 28223 | SPM4A7-12-M-7621 |
| 29337 | SPM7M3-13-M-3269 |
| 30018 | SPE4A7-13-M-A582 |
| 30836 | SPE4A6-14-M-3955 |
| 30891 | SPE7M4-14-V-0693 |
| 31026 | SPE7L3-14-M-1403 |
| 032335-0004C | SPE4A7-15-D-0053 |
| 032951-02 | SPE7L4-15-M-1931 |
| 033126-01 | SPE8EF-15-M-0536 |
| 033130-02 | SPE4A7-15-M-7111 |

**Maven 00003**

MAVEN ENGINEERING CORPORATION
MATERIAL IMPORTED FROM TURKEY
FOR U.S. GOVERNMENT CONTRACTS

| PO # | Contract # |
|------|-----------|
| 24083 | SPM8E8-10-M-1927 |
| 24716 | SPM4A7-11-M-F628 |
| 24474 | SPM4A7-11-M-C766 |
| 24604 | SPM5L3-11-M-0354 |
| 25153 | SPM7L5-11-M-1091 |
| 25303 | SPM7L2-11-M-4365 |
| 24935 | SPM7L2-11-M-3021 |
| 24083 | SPM8E8-10-M-1927 |
| 25621 | SPM4A7-11-M-L724 |
| 25786 | SPM7L1-11-M-D333 |
| 25907 | SPM5L3-11-M-1434 |
| 25937 | SPM7L2-11-M-6418 |
| 26185 | SPM4A6-11-M-PG02 |
| 25520 | SPM7L2-11-M-5093 |
| 26324 | SPM7L4-11-M-2564 |
| 26216 | SPM7L3-11-M-8692 |
| 25774 | SPM7L4-11-M-2243 |
| 26417 | SPM5L3-11-M-1814 |
| 25621 | SPM4A7-11-M-L724 |
| 26403 | SPM7L3-11-M-9540 |
| 26692 | SPM7M3-12-M-0435 |
| 27652 | SPM7L2-12-M-2935 |
| 27586 | SPM7L5-12-M-1125 |
| 27912 | SPM7L2-12-M-3627 |
| 28059 | SPM8EF-12-M-0531 |
| 27912 | SPM7L2-12-M-3627 |
| 027920-01 | SPM4A7-12-M-7216 |
| 028325-01 | SPM7L4-12-M-1944 |
| 28768 | SPM7M3-12-M-7932 |
| 28803 | SPM7M1-12-M-1721 |
| 028496-01 | SPM7L5-12-M-1974 |
| 28743 | SPM7M3-12-M-7746 |
| 28699 | SPM4A7-12-M-7888 |
| 028289-01 | SPM7M5-12-M-2425 |
| 026808-0001-0002 | SPM4A6-12-D-5028 |
| 028332-01 | SPM7MC-12-C-0012 |
| 028510-01 | SPM7M3-12-M-6771 |
| 29112 | SPM7L5-13-M-0566 |
| 29266 | SPM7M3-13-M-2789 |
| 028382-01 | SPM7M3-12-M-6337 |
| 028457-01 | SPM7L2-12-M-5109 |

**Maven 00004**

CAV00005

| | |
|---|---|
| 028171-01 | SPM8EE-12-M-0799 |
| 026808-0003 | SPM4A6-12-D-5028 |
| 026808-0004 | SPM4A6-12-D-5028 |
| 29327 | SPM7L0-13-M-1994 |
| 29146 | SPM7L2-13-M-1351 |
| 028325-01 | SPM7L4-12-M-1944 |
| 028457-01 | SPM7L2-12-M-5109 |
| 28781 | SPM7L2-12-M-6403 |
| 028332-01 | SPM7MC-12-C-0012 |
| 29956 | SPE7M3-13-M-0863 |
| 29605 | SPE4A6-13-M-B032 |
| 29542 | SPM7M3-13-M-4360 |
| 29272 | SPM7L2-13-M-2058 |
| 30378 | SPM7L3-13-M-6340 |
| 28743 | SPM7M3-12-M-7746 |
| 030487-01 | SPE4A7-13-D-0125 |
| 028332-01 | SPM7MC-12-C-0012 |
| 028332-01 | SPM7MC-12-C-0012 |
| 31005 | SPE7M3-14-M-1498 |
| 028332-01 | SPM7MC-12-C-0012 |
| 31321 | SPE7L3-14-V-4616 |
| 030891-01 | SPE7M4-14-V-0693 |
| 028332-01 | SPM7MC-12-C-0012 |
| 028332-01 | SPM7MC-12-C-0012 |
| 030487-01 | SPE4A7-13-D-0125 |
| 31144 | SPE7MC-14-M-3602 |
| 31942 | SPE7L3-14-M-8743 |
| 31747 | SPE4A7-14-M-A523 |
| 31725 | SPE7M3-14-M-4763 |
| 31890 | SPE7M0-14-V-F294 |
| 31714 | SPE8EE-14-M-0817 |
| 32288 | SPE7L5-15-M-0223 |
| 31483 | SPE4A4-14-V-D161 |
| 32472 | SPE7L3-15-V-2780 |
| 31432 | SPE7L3-14-M-5188 |
| 32432 | SPE4A4-15-V-3620 |
| 32441 | SPE7MC-15-M-1676 |
| 32516 | SPE7L2-15-M-0583 |
| 32893 | SPE5E4-15-M-1528 |
| 026808-0005 | SPM4A6-12-D-5028 |
| 026808-0006 | SPM4A6-12-D-5028 |
| 026808-0007 | SPM4A6-12-D-5028 |
| 32508 | SPE4A7-15-M-2491 |
| 32694 | SPE4A6-15-M-5626 |
| 32866 | SPE4A6-15-M-7586 |

**Maven 00005**

CAV00006

MAVEN ENGINEERING CORPORATION
MATERIAL IMPORTED FROM GREECE
FOR U.S. GOVERNMENT CONTRACTS

| PO # | Contract # |
|------|------------|
| 24418 | SPM7M9-11-M-0691 |
| 24408 | SPM5L2-11-M-0204 |
| 25067 | SPM5L2-11-M-0824 |
| 25003 | SPM5L2-11-M-0767 |
| 26884 | SPM7M9-12-M-0973 |
| 27032 | SPM7M3-12-M-1544 |
| 28250 | SPM4A6-12-M-LE31 |
| 29045 | SPM7L0-13-M-0703 |
| 28683 | SPM7M3-12-M-7506 |
| 29045 | SPM7L0-13-M-0703 |
| 28637 | SPM7M9-12-M-6349 |
| 29198 | SPM7M9-13-M-V042 |
| 28905 | SPE4A6-13-M-0538 |
| 29963 | SPE4A6-13-V-C429 |
| 29868 | SPE7M3-13-M-0490 |
| 28732 | SPE4A6-12-M-6371 |
| 29695 | SPE4A4-13-V-7083 |
| 29903 | SPE4A6-13-M-F298 |
| 28905 | SPE4A6-13-M-0538 |
| 29626 | SPE4A6-13-M-B245 |
| 30178 | SPE4A6-13-V-G195 |
| 29883 | SPE4A4-13-V-9825 |
| 29446 | SPM7M8-13-M-2380 |
| 29868 | SPE7M3-13-M-0490 |
| 30207 | SPM7M9-13-M-2850 |
| 30184 | SPM5E7-13-M-4176 |
| 30297 | SPM5EK-13-M-4690 |
| 30796 | SPE4A4-14-V-2883 |
| 30888 | SPE4A6-14-M-4986 |
| 30522 | SPM5EK-13-M-4965 |
| 30564 | SPM7L2-13-M-8122 |
| 31273 | SPE7M4-14-M-2572 |
| 31327 | SPE4A4-14-V-3338 |
| 31158 | SPE4A6-14-M-9238 |
| 31664 | SPE7M8-14-M-3060 |
| 31427 | SPE7M7-14-M-0265 |
| 31396 | SPE7M4-14-M-3041 |
| 31670 | SPE7M5-14-M-7814 |
| 32091 | SPE4A6-14-V-N323 |
| 31829 | SPE7M8-14-M-3401 |

**Maven 00006**

CAV00007

```
31980 SPE7MC-14-M-9735
31971 SPE4A6-14-M-J539
31941 SPE5EK-14-M-1169
31941 SPE5EK-14-M-1169
31941 SPE5EK-14-M-1169
32617 SPE4A6-15-M-4428
31971 SPE4A6-14-M-J539
32971 SPE4A6-15-M-8712
```

**Maven 00007**

CAV00008

MAVEN ENGINEERING CORPORATION
MATERIAL IMPORTED FROM TURKEY

| PO # | Contract # |
|------|------------|
| 24083 | SPM8E8-10-M-1927 |
| 24716 | SPM4A7-11-M-F628 |
| 24474 | SPM4A7-11-M-C766 |
| 24730 | 57960-46YF5-1 |
| 24604 | SPM5L3-11-M-0354 |
| 25153 | SPM7L5-11-M-1091 |
| 25740 | PIQ8041-00 |
| 25303 | SPM7L2-11-M-4365 |
| 24935 | SPM7L2-11-M-3021 |
| 24083 | SPM8E8-10-M-1927 |
| 25621 | SPM4A7-11-M-L724 |
| 25786 | SPM7L1-11-M-D333 |
| 25907 | SPM5L3-11-M-1434 |
| 25937 | SPM7L2-11-M-6418 |
| 26185 | SPM4A6-11-M-PG02 |
| 25520 | SPM7L2-11-M-5093 |
| 26324 | SPM7L4-11-M-2564 |
| 26216 | SPM7L3-11-M-8692 |
| 25774 | SPM7L4-11-M-2243 |
| 26417 | SPM5L3-11-M-1814 |
| 26869 | SPT10113 |
| 25621 | SPM4A7-11-M-L724 |
| 26403 | SPM7L3-11-M-9540 |
| 26692 | SPM7M3-12-M-0435 |
| 26464 | 14946 |
| 27652 | SPM7L2-12-M-2935 |
| 27586 | SPM7L5-12-M-1125 |
| 27249 | 025217-01 |
| 27912 | SPM7L2-12-M-3627 |
| 28059 | SPM8EF-12-M-0531 |
| 27912 | SPM7L2-12-M-3627 |
| 027920-01 | SPM4A7-12-M-7216 |
| 028325-01 | SPM7L4-12-M-1944 |
| 28768 | SPM7M3-12-M-7932 |
| 28803 | SPM7M1-12-M-1721 |
| 028496-01 | SPM7L5-12-M-1974 |
| 28743 | SPM7M3-12-M-7746 |
| 28699 | SPM4A7-12-M-7888 |
| 028289-01 | SPM7M5-12-M-2425 |
| 026808-0001-0002 | SPM4A6-12-D-5028 |
| 028332-01 | SPM7MC-12-C-0012 |
| 028510-01 | SPM7M3-12-M-6771 |

**Maven 00008**

CAV00009

| | |
|---|---|
| 29112 | SPM7L5-13-M-0566 |
| 29266 | SPM7M3-13-M-2789 |
| 028382-01 | SPM7M3-12-M-6337 |
| 028457-01 | SPM7L2-12-M-5109 |
| 028171-01 | SPM8EE-12-M-0799 |
| 026808-0003 | SPM4A6-12-D-5028 |
| 026808-0004 | SPM4A6-12-D-5028 |
| 29327 | SPM7L0-13-M-1994 |
| 29146 | SPM7L2-13-M-1351 |
| 028325-01 | SPM7L4-12-M-1944 |
| 29820 | 21832 |
| 30077 | 1-029036-26830 |
| 30077 | 1-029036-26830 |
| 028457-01 | 28457 |
| 28781 | SPM7L2-12-M-6403 |
| 29702 | P129328 |
| 028332-01 | SPM7MC-12-C-0012 |
| 29956 | SPE7M3-13-M-0863 |
| 29605 | SPE4A6-13-M-B032 |
| 29542 | SPM7M3-13-M-4360 |
| 29820 | 21832 |
| 29571 | 1359774 |
| 29272 | SPM7L2-13-M-2058 |
| 30378 | SPM7L3-13-M-6340 |
| 28743 | SPM7M3-12-M-7746 |
| 30651 | 20949 |
| 030487-01 | SPE4A7-13-D-0125 |
| 028332-01 | SPM7MC-12-C-0012 |
| 028332-01 | SPM7MC-12-C-0012 |
| 31005 | SPE7M3-14-M-1498 |
| 028332-01 | SPM7MC-12-C-0012 |
| 31037 | 4101192927 |
| 31159 | 3002499 |
| 31321 | SPE7L3-14-V-4616 |
| 31451 | 4101350359 |
| 030891-01 | SPE7M4-14-V-0693 |
| 028332-01 | SPM7MC-12-C-0012 |
| 028332-01 | SPM7MC-12-C-0012 |
| 030487-01 | SPE4A7-13-D-0125 |
| 31144 | SPE7MC-14-M-3602 |
| 31948 | 39529 |
| 31826 | CPO-R14-02423 |
| 31942 | SPE7L3-14-M-8743 |
| 31747 | SPE4A7-14-M-A523 |
| 31725 | SPE7M3-14-M-4763 |
| 31890 | SPE7M0-14-V-F294 |
| 31714 | SPE8EE-14-M-0817 |

**Maven 00009**

CAV00010

| | |
|---|---|
| 32288 | SPE7L5-15-M-0223 |
| 32403 | T1-8566 |
| 31483 | SPE4A4-14-V-D161 |
| 32472 | SPE7L3-15-V-2780 |
| 31432 | SPE7L3-14-M-5188 |
| 32432 | SPE4A4-15-V-3620 |
| 32825 | 16917 |
| 32998 | 60257 |
| 32441 | SPE7MC-15-M-1676 |
| 32516 | SPE7L2-15-M-0583 |
| 032808-01 | 2749/15 |
| 32893 | SPE5E4-15-M-1528 |
| 026808-0005 | SPM4A6-12-D-5028 |
| 026808-0006 | SPM4A6-12-D-5028 |
| 026808-0007 | SPM4A6-12-D-5028 |
| 32508 | SPE4A7-15-M-2491 |
| 32694 | SPE4A6-15-M-5626 |
| 32866 | SPE4A6-15-M-7586 |

**Maven 00010**

CAV00011

# Exhibit B

| AWARD/CONTRACT    J | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | ▶ | RATING | PAGE 1 | OF | PAGES 21 |
|---|---|---|---|---|---|---|

| 2. CONTRACT (Proc. Inst. Ident.) NO. SPE4A7-13-D-0125 | 3. EFFECTIVE DATE 2013 SEP 03 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. |
|---|---|---|

| 5. ISSUED BY    CODE | SPE4A7 | 6. ADMINISTERED BY (If other than Item 5)    CODE | S2101A |
|---|---|---|---|
| DLA AVIATION<br>ASC SUPPLIER OPER AE AND AF DIV<br>8000 JEFFERSON DAVIS HWY<br>RICHMOND VA  23297<br>USA<br>Local Admin: Dashia Chandler PARWA51 Tel: 804-279-2017<br>Email: Dashia.Chandler@dla.mil | | DCMA BALTIMORE<br>217 E REDWOOD ST<br>SUITE 1800<br>BALTIMORE MD  21202-5299<br>USA<br>Criticality:  PAS: None | |

**7. NAME AND ADDRESS OF CONTRACTOR** (No., street, city, county, State and ZIP Code)

MAVEN ENGINEERING CORPORATION DBA
15946 DERWOOD RD
ROCKVILLE MD  20855-2123
USA

CODE   46YF5          FACILITY CODE

**8. DELIVERY**

☐ FOB ORIGIN    ☒ OTHER (See below)

**9. DISCOUNT FOR PROMPT PAYMENT**

Net 30 days

**10. SUBMIT INVOICES** (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN    ▶    ITEM    12

| 11. SHIP TO/MARK FOR    CODE | 12. PAYMENT WILL BE MADE BY    CODE | SL4701 |
|---|---|---|
| SEE SCHEDULE, DO NOT SHIP TO ADDRESS ON THIS PAGE | DEF FIN AND ACCOUNTING SVC<br>BSM<br>P O BOX 369031<br>COLUMBUS OH  43236-9031<br>USA | |

| 13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: | 14. ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| ☐ 10 U.S.C. 2304(c)    ☐ 41 U.S.C. 253(c) | |

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | See Schedule | 343.000 | | | |
| | | | | **15G. TOTAL AMOUNT OF CONTRACT** ▶ | $452,292.00 |

**16. TABLE OF CONTENTS**

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 15 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| | C | DESCRIPTION/SPECS./WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | 21 |
| X | D | PACKAGING AND MARKING | 13 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 14 | | | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 15 | | K | | |
| | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return  1  copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ SEALED-BID AWARD (Contractor is not required to sign this document.) Your bid on Solicitation Number _____ , including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the terms listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your bid, and (b) this award/contract. No further contractual document is necessary. (Block 18 should be checked only when awarding a sealed-bid contract.) |
|---|---|
| 19A. NAME AND TITLE OF SIGNER (Type or Print) | 20A. NAME OF CONTRACTING OFFICER |
| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
| BY _____<br>( Signature of person authorized to sign) | | BY _____<br>(Signature of Contracting Officer) | 2013 AUG 23 |

| AUTHORIZED FOR LOCAL REPRODUCTION<br>Previous edition is usable | **STANDARD FORM 26** (REV. 5 /2011 )<br>Prescribed by GSA - FAR (48 CFR) 53.214(a) |
|---|---|

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 2 OF 21 PAGES |
|---|---|---|

The base period of this contract is from September 3, 2013 thru September 2, 2014. Delivery orders will be placed by DLA Aviation for a base period of (1) 12-month period with an option to extend for four additional 12-month periods as described at DLA Aviation clause 52.217-9.

The quantity, unit prices, delivery, quality, DPAS rating, criticality designator code, and packaging information will be specified on each delivery order issued under this contract.

All terms and conditions of SPE4A713R0916 and Maven Engineering's proposal are incorporated into this contract.

Contractor correspondence dated August 13, 2013, Subject: Re: Fwd: SPE4A713R0916, is incorporated into this contract by reference.

Contractor is approved for Export Control data under certification number 0049277.

GOVERNMENT FIRST ARTICLE TESTING (FAT) REQUIRED.

LINE 2 FAT: 2 SAMPLES = 1 TE
INSPECTION: ORIGIN   ACCEPTANCE: DESTINATION
DELIVERY FOB: DESTINATION

SHIP FIRST ARTICLE EXHIBITS TO:
FD2060
DLA CENTRAL RECEIVING
DDWG ER
SPECIAL HANDLING, FIRST ARTICLE UNIT
455 BYRON STREET
ROBINS AFB, GA 31098

MARK FOR: FIRST ARTICLES
DO NOT POST, NON-ACCOUNTABLE
DO NOT PUT INTO SUPPLY

Delivery Requirements:
Government First Article Samples: 120 days ARO
Government Test & Evaluation: 75 days after receipt of FAT samples
Production Units: 184 days after FAT approval
Total Delivery with FAT: 379 days ARO

ESTIMATED ANNUAL QUANTITY: 228 each
MAXIMUM ANNUAL QUANTITY: 342 each

GUARANTEED MINIMUM QUANTITY: 57 each  (A guaranteed minimum quantity does not apply for the option periods)

MINIMUM DELIVERY ORDER QUANTITY:  57 each
MAXIMUM DELIVERY ORDER QUANTITY:  228 each

FOB: Destination        Inspection/Acceptance: Origin

The line item locations are as follows: ALL DLA DIRECT CONUS LOCATIONS

Unit Price Schedule:
Base Year   Option 1   Option 2   Option 3   Option 4
$247.00

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SPE4A7-13-D-0125 | PAGE 3 OF 21 PAGES |
|---|---|---|

THE FOLLOWING LOCAL DLA AVIATION CLAUSES APPLY:
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
52.211-9G22     DLA AVIATION PALLETIZATION FOR MIL-STD-2073 IN ACCORDANCE WITH MD00100452
                        REVISION B (JUL 2008)
(a) Palletization.

    (1) When the total number of containers going to the same destination is 250 pounds or greater
(excluding pallet) or a volume of 20 cubic feet or greater, then palletization IAW MIL-STD-147 is required.

    (2) When the total number of containers going to the same destination is less than 250 pounds
(excluding pallet) and is less than 20 cubic feet, then palletization is not required IAW MIL-STD-147.

    (3) Except as otherwise provided in this clause, shipping containers shall be palletized IAW the
guidance cited in MIL-STD-147. Special palletization instructions may be further specified under other
preparation for delivery instructions in this order/contract. In the case of any inconsistency between such
special palletization instructions in the requirements cited in this clause, the special palletization
instructions shall take precedence.

    (4) Pallets required for use, shall comply with ANSI/MH1, Part No. MH1/9-02SW4048. This part number
shall be used for Level A packaging when the total weight is less than 1500 lbs. evenly distributed. This
part number shall be used for Level B packaging when the total weight is greater than 1500 lbs., but less than
3000 lbs. evenly distributed.

***NOTE***Use of nonstandard commercial pallets is forbidden unless cited in the contract/purchase order.

        (i) The following commercial heat treatment process has been approved by the American Lumber
Standards Committee (ALSC) and is required for all Non-Manufactured Wood Packaging Material (NMWPM) entering a
European country or destined for a Container Consolidation Point (CCP) or an aerial or water port of
embarkation: All wooden pallets and wood containers produced entirely or in part of non-manufactured softwood
species shall be constructed from Heat Treated (HT to 56 degrees Centigrade for 30 minutes) coniferous
material and certified accordingly by an accredited agency recognized by the American Lumber Standards
Committee (ALSC) in accordance with Non-manufactured Wood Packing Policy and Non-manufactured Wood Packing
Enforcement Regulations both dated May 30, 2001. All wooden pallets and containers produced entirely of
non-manufactured hardwood species shall be identified by a permanent marking of "NC," 1.25 inches or greater
in height, accompanied by the CAGE code of the contracted manufacturer and the month and year of the contract.
On pallets, the marking shall be applied to the stringer or block on opposite sides and ends of the pallet and
be contrasting and clearly visible. On containers, the marking shall be applied on a side other than the top
or bottom, contrasting and clearly visible.

        (ii) Oak and chestnut wood shall be bark free and square edged so that none of the natural rounded
surface tissues remain, or be bark free and have a moisture content no greater than 20%. The contractor is
responsible for performing an inspection of each shipment to assure compliance with this requirement.

    (5) Unless otherwise specified in the contract or purchase order hazardous material containers, except
cylinders and 55 gallon drums (see paragraph 5(i) thru (iv), shall be palletized IAW Load Type VI of
MIL-STD-147. Pallets used shall be as cited above. "Hazardous Material" for the purpose of this clause, means
any material considered hazardous under the Department of Transportation Hazardous Material Regulations, 49
CFR 171-79, IATA, IACO, IMDG,unless otherwise specified.

***NOTE*** Shrink wrap is not authorized for use with Hazardous Materials.

        (i) 55 gallon drums for domestic delivery shall be palletized 3 per pallet IAW with load type 3a
bonding method G   (stretch wrap) or 4 per pallet IAW load type VI of MIL-STD-147 (placing an inverted wood
cap under and over the
load secured by metal strapping).
        (ii) 55 gallon drums for export delivery shall be palletized 4 per pallet IAW load type VI of

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 4 OF 21 PAGES |
|---|---|---|

MIL-STD-147 (placing
an inverted wood cap under and over the load secured by metal strapping).

    (iii) Cylinders for domestic delivery shall be palletized vertically IAW load type IX of
MIL-STD-147 or horizontally using metal strapping IAW MIL-STD-147 bonding method D (figure 36) and notched
wood spacers (storage aid #25, figure 50) to assure the stability of the load.

    (iv) Cylinders for export delivery shall be Palletized (vertically) IAW load type IX of MIL-STD-147.

  (6) The use of stretch-wrap, shrink film or nonmetallic strapping for bonding is not authorized for
"Export Shipments".

  (7) Stretch-wrap, when utilized, shall be accomplished mechanically with a (machine or hand held tool
that based on the weight of items being palletized, maintains sufficient tension to assure secure bonding of
the items to the pallet during transportation).

  (8) Unless otherwise specified in the contract or Purchase Order, all polyethylene/plastic containers
for domestic delivery with or without fiberboard over pack shall be palletized IAW load type 3a bonding method
G
(stretch wrap) or IAW Load "Type VI of MIL-STD-147 to ensure stacking support during transportation and
storage. All polyethylene/plastic containers for export delivery with or without fiberboard over pack shall
be palletized IAW Load Type VI of MIL-STD-147.

(b) Loading: Five-gallon tight head pails shall be loaded on pallets IAW Load Type III or IIIA of
MIL-STD-147, except that a triple layer or course may be used for a total not to exceed 42 pails.

(c) Unitization: Supplies that do not lend themselves to the use of MIL-STD-147 palletization due to size,
weight, configuration, etc. shall be unitized by securely blocking, bracing, or anchoring the load on a skid
base or commercial type pallet in a manner that assures safe delivery.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
52.211-9G73        PACKAGING AND MARKING AND REQUIREMENTS (MAR 2004)

(a) Unless stated otherwise, commercial packaging in accordance with ASTM-D-3951 is required for CONUS
shipments from the contractor directly to the customer. Commercial packaging and marking is not sufficient
for vendor shipments requiring movement through the Defense Transportation System (also referred to as the
Military Distribution System or DLA Depot) as the shipment could ultimately be moved via Military Air.

(b) Higher level packaging in accordance with MIL-STD-2073 is mandatory for all shipments that meet the
below criteria:
• Movement through the Defense Transportation System including shipments to a Military Distribution facility
or depot.
• OCONUS shipments
• FMS shipments
• Hazardous material, as cited in the AID or in the Quality Requirements Matrix.

(c) Materials not considered as HAZMAT for CONUS or OCONUS commercial air shipments may be considered
HAZMAT for MILAIR shipments OCONUS. As such, contractors/shippers shall ensure that material meeting HAZMAT
definitions in DLAI 4145.3, Preparing Hazardous Materials for Military Air Shipment, is packaged in accordance
with that instruction when the consignee is OCONUS and the shipment will be moved through the Defense
Transportation System.

(d) All items shall be marked in accordance with MIL-STD-129P. Hazardous items and shelf life items, as
cited in the AID or in the Quality Requirements Matrix, shall be marked in accordance with MIL-STD-129P and
the appropriate clauses cited in the appendix to the matrix and the contract. The contractor is required to
package material in accordance with Quantity Unit Pack (QUP), specified in MIL-STD-2073 and the Unit of Issue
(UI), specified in each delivery order. A packing slip shall be located in a plastic pouch on the outside of

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 5 OF 21 PAGES |
|---|---|---|

the package. For HAZMAT destined OCONUS, a hard copy of the Material Safety Data Sheet (MSDS) must also be included.

(e) In the event of deployments, this clause may be invoked when shipments originally destined for a CONUS location are diverted to OCONUS destinations thereby necessitating movement of the material through the Defense Transportation System. In such an event, contractors will be notified by the Contracting Officer and an equitable adjustment will be made in the contract price as deemed appropriate.

NOTE: Applicable to negotiated solicitations. Offers that do not comply with the packaging and marking requirements as specified in Section D of this solicitation may be subject to rejection as being technically unacceptable.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
52.246-9G36              CONFIGURATION CONTROL (JUN 2003)

NOTICE TO CONTRACTORS: The requirements of this clause are identified to MIL-STD-973. DLA Aviation will continue to reference MIL-STD-973 in solicitations and contracts until implementation of DLA configuration control requirements. The full text of MIL-STD-973 is available at:

http://www.aviation.dla.mil/userweb/dscrbat/qaps.htm

(a) When configuration management control is cited in the Procurement Item Description, the furnished item(s) shall conform to the approved configuration requirements/revision specified unless a variation is processed and approved as provided for at (b) below.

(b) Variations shall be identified and approval obtained in accordance with MIL-STD-973 dated 17 APR 92, with Interim Notice 3 dated 12 JAN 95 as follows:

    (1) Process an Engineering Change Proposal for any changes to the approved configuration in accordance with Paragraph 5.4.2 and Subparagraphs thereto and APPENDIX D, except that Subparagraphs 5.4.2.3.1, 5.4.2.3.5.1, and 5.4.2.3.5.2 do not apply.

    (2) Process requests for deviation from the approved configuration in accordance with Paragraph 5.4.3 and Subparagraphs thereto and APPENDIX E.

    (3) Process requests for waiver from the approved configuration in accordance with Paragraph 5.4.4 and Subparagraphs thereto and APPENDIX E.

    (4) Process requests for parts substitution from the approved configuration in accordance with Paragraph 5.4.5 and Subparagraphs thereto.

    (5) Process Specification Change Notices in accordance with Paragraph 5.4.6 and Subparagraphs thereto and APPENDIX F.

    (6) Process Notices of Revision (NORS) in accordance with Paragraph 5.4.7 and APPENDIX G.

    (7) Process configuration control (short form procedure) in accordance with Paragraph 5.4.8 and Subparagraphs thereto and APPENDIX D.

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 6 OF 21 PAGES |
|---|---|---|

# SECTION B

SUPPLIES/SERVICES: 1560-00-571-1295


ITEM DESCRIPTION:

HOOK ASSEMBLY,RAMP

P/N  354016-1


EXCEPTION DATA:
  363173 NOT REQUIRED
  USE DS5025
  USE MIL-STD-130 I/L/O STP63-001 & 0227
  IMPRESSION STAMPING NOT PERMITTED
  USE STP51-400 I/L/O 0701
  USE STP54-006 OR STP54-019 I/L/O 0522
  BEARING INSTALLATION PER STP56-108
  USE STP53-001 I/L/O 0565
  MAGNETIC PARTICLE INSPECTION PER STP53-001
  DWG 200451485 NOTES 1,3,6,12,14 AND 16 APPLY

  FINISH:
  G14 AND ECO 88C0001 APPLY
  "54" USE MIL-PRF 23377, TYPE 1 WITH APPLICATION STP59-204
  "36" USE MIL-PRF-85285 WITH APPLICATION STP59-007
  "C"  USE 0491 - CADMIUM PLATING

MARK IAW MIL-STD-130N, DATED 17 DEC 2007.
CONFIGURATION CONTROL APPLIES
SEE CLAUSE 52.246-9G36 (SECTION I).


1. SAMPLING FOR INSPECTION AND TESTING SHALL BE IAW ANSI/ASQ
Z1.4-2008, DATED JAN 1, 2008. ANY ALTERNATE PLAN MUST BE
APPROVED BY THE PCO.  A SAMPLING PLAN THAT ACCEPTS ON ZERO
DEFECTS IS REQUIRED

2. ANY DEFECTIVE ITEM DISCOVERED DURING INSPECTION MAY BE CAUSE
FOR REJECTION OF THE ENTIRE CONTRACT QUANTITY.


THIS ITEM HAS TECHNICAL DATA SOME OR ALL OF WHICH IS SUBJECT TO
EXPORT-CONTROL REGULATIONS. DISTRIBUTION OF THE TECHNICAL DATA
AND ELIGIBILITY FOR AWARD ARE LIMITED TO THOSE SUPPLIERS QUALIFIED
THROUGH JCP CERTIFICATION, OR TO THOSE LICENSED BY EITHER THE
DEPARTMENTS OF STATE OR COMMERCE; OR TO FOREIGN SUPPLIERS PURSUANT TO
INTERNATIONAL AGREEMENTS.

TO APPLY FOR JCP CERTIFICATION, COMPLETE DD FORM 2345, "MILITARY
CRITICAL TECHNICAL DATA AGREEMENT," FORM IS AVAILABLE AT THE WORLD WIDE
WEB ADDRESS HTTP://WWW.DLIS.DLA.MIL/JCP OR BY WRITING TO:

DLA LOGISTICS INFORMATION SERVICE
FEDERAL CENTER
74 WASHINGTON AVE., NORTH

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 7 OF 21 PAGES |
|---|---|---|

# SECTION B

SUPPLY/SERVICE: 1560-00-571-1295 CONT'D

BATTLE CREEK, MI 49017-3084

TO MANUFACTURE THIS ITEM, NON-JCP CERTIFIED SUPPLIERS MUST SUBMIT A
CURRENT MANUFACTURING LICENSE AGREEMENT, TECHNICAL ASSISTANCE AGREEMENT,
DISTRIBUTION AGREEMENT OR OFF-SHORE PROCUREMENT AGREEMENT APPROVED BY
THE DIRECTORATE OF DEFENSE TRADE CONTROLS WITH THE OFFER, UNLESS AN
EXEMPTION UNDER THE PROVISIONS OF ITAR SECTION, 125.4 "EXEMPTIONS OF
GENERAL APPLICABILITY," AND/OR EAR PART 740 ARE APPLICABLE.

NON-JCP CERTIFIED SUPPLIERS SEEKING EXPORT CONTROLLED TECHNICAL
DATA ARE REQUIRED TO PROVIDE THE CONTRACTING OFFICER WITH AN
APPLICABLE AGREEMENT OR IDENTIFY WHICH ITAR/EAR EXEMPTION APPLIES TO
RECEIVE A COPY OF THE EXPORT CONTROLLED TECHNICAL DATA.

NOTE:  JCP CERTIFIED CONTRACTORS WHO RECEIVE TECHNICAL DATA PURSUANT TO
THEIR DD FORM 2345 CERTIFICATION MAY NOT FURTHER DISSEMINATE SUCH DATA
UNLESS FURTHER DISSEMINATION OF THE TECHNICAL DATA IS EXPRESSLY
PERMITTED BY DODD 5230.25."

Government First Article Preproduction approval required.   Testing
willbe in accordance with applicable drawings,specifications and/or
Engineering instructions. The first article offered shall be
manufactured at the facilities in which production quantities are
procured and produced under this contract. When submitting the first
article(s) for government testing, a copy of the contract and all
applicable drawings, specifications, engineering instructions,
certifications and inspection sheets shall be provided. Upon receipt and
evaluation of the test report from the responsible government testing
location, the contracting officer will provide final notification to the
manufacturer. Any questions or concerns regarding the first article test
requirements must be submitted through the contracting officer.
Additional Wide Area Workflow (WAWF) instructions for government first
article test CLIN:
The contractor shall code the receiving report for government first
article test CLIN in WAWF as Follows: Inspection at origin (Source)-
Enter the DCMA office DODAAC listed on page 1 of the contract.
Acceptance by other-Enter the issue by office DODAAC listed on page 1
ofthe contract.
Ship to code-Enter the DODAAC of the test facility listed for the
government first article test CLIN in the contract. (See FAR Clause
52.209-4).

A forging process was identified as a means to manufacture this item.
  Tooling is required to produce a forging.  For sourcing, tooling,
materials or other information, please contact the appropriate
assistance team: (Aviation, C&E Supply Chains) DSCR.AFCAT@dla.mil;(Land
& Maritime Supply Chains) DSCC.cast.forge@dla.mil

CRITICAL APPLICATION ITEM

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 8 OF 21 PAGES |
|---|---|---|

# SECTION B

SUPPLY/SERVICE: 1560-00-571-1295 CONT'D

IAW BASIC DRAWING NR 98897 354016
REVISION NR G   DTD 10/08/2003
PART PIECE NUMBER: 354016-1

IAW REFERENCE DRAWING NR 98897 0562
REVISION NR G4  DTD 04/15/1983
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 0491
REVISION NR G8  DTD 10/15/1981
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP59-007
REVISION NR E   DTD 08/14/1987
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP59-204
REVISION NR B   DTD 10/14/1983
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP54-006V04K
REVISION NR M   DTD 12/15/1987
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP51-400
REVISION NR D   DTD 10/08/1993
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP53-001
REVISION NR E   DTD 12/04/2000
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP63-001V01J
REVISION NR T   DTD 10/22/1984
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 DS5025
REVISION NR AH  DTD 08/05/2010
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP51-400
REVISION NR D   DTD 05/07/1999
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP63-001
REVISION NR T   DTD 11/13/2008
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 G14
REVISION NR G3  DTD 08/12/2009
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 G14

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 9 OF 21 PAGES |
|---|---|---|

# SECTION B

SUPPLY/SERVICE: 1560-00-571-1295 CONT'D

REVISION NR G3  DTD 11/29/2007
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP54-006
REVISION NR M   DTD 09/12/1995
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP53-001V01B
REVISION NR E   DTD 08/16/1982
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP56-108
REVISION NR E   DTD 02/02/1999
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 STP54-019
REVISION NR L   DTD 07/30/2001
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 0471
REVISION NR G3 DTD 05/20/2008
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98752 200415485
REVISION NR C   DTD 09/05/2008
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98897 354016
REVISION NR G   DTD 08/18/2011
PART PIECE NUMBER:


| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | 1560-00-571-1295<br>HOOK ASSEMBLY,RAMP | 342.000 | EA | $ 247.00000 | $ 85,668.00 |

PRICING TERMS: Firm Fixed Price

BASE PERIOD

SUPPLIES/SERVICES: 1560-00-571-1295

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | $ 247.00 | 379 |

OPTION 01

SUPPLIES/SERVICES: 1560-00-571-1295

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 10 OF 21 PAGES |
|---|---|---|

# SECTION B

SUPPLY/SERVICE: 1560-00-571-1295 CONT'D

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 379 |

OPTION 02

SUPPLIES/SERVICES: 1560-00-571-1295

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 379 |

OPTION 03

SUPPLIES/SERVICES: 1560-00-571-1295

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 379 |

OPTION 04

SUPPLIES/SERVICES: 1560-00-571-1295

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 379 |

QTY VARIANCE: PLUS 0% MINUS 0%

INSPECTION POINT: ORIGIN

ACCEPTANCE POINT: ORIGIN

FOB: DESTINATION   DELIVERY DATE:

PREP FOR DELIVERY:

SHALL BE PACKAGED STANDARD COMMERCIAL IN ACCORDANCE WITH ASTM D 3951.

Markings Paragraph
For all shipments of packaged materiel to the government,
which includes either Depot (DLA-Direct) or DVD (Customer-
Direct) shipments, both DoD linear and two-dimensional (2D)
bar code markings are required on Military Shipping Labels
in accordance with MIL-STD-129, Revision P, dated December
15, 2002 (but see DLAD 52.211-9010(D) for exceptions to the
requirement for MSL and 2D symbols). See the DLA packaging
web site identified in DLAD 52.211-9010(E) for change
notices to MIL-STD-129P that apply. 2D bar coding shall be
in accordance with ISO/IEC 15438, ISO/IEC 15434 (ANSI MH10.8.3)
and DoD 4500.9-R. MSL linear (code 3 of 9 or code 39) bar
coding shall be in accordance with ISO/IEC 16388. Shipping

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 11 OF 21 PAGES |
|---|---|---|

# SECTION B

SUPPLY/SERVICE: 1560-00-571-1295 CONT'D

label stock quality shall meet MIL-PRF-61002. Bar code print
quality shall meet ANSI MH10.8-2000 or ANSI X3.182-1990 (R2000)
for applicable 2D and/or linear bar codes. All DVD shipments
shall meet additional linear bar coding requirements in DLAD
52.211-9010(C). Except for the Transportation Control Number
(TCN), which must always be present on the Military Shipping
Label, when the contract/order omits any other data elements as
defined in MIL-STD-129P and if the information is not available
from the Administrative Contracting Office, then the field is
not required as part of the Military Shipping Label and may be
left blank. If there are inconsistencies between the schedule
and MIL-STD-129P, the schedule takes precedence.

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | 0001 - S00000052 | 1.000 | EA | $ 1,194.00000 | $ 1,194.00 |

PRICING TERMS: Firm Fixed Price

BASE PERIOD

SUPPLIES/SERVICES: 0001-S00000052

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0002 | $ 1,194.00 | 120 |

OPTION 01

SUPPLIES/SERVICES: 0001-S00000052

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0002 | 0.00 | 120 |

OPTION 02

SUPPLIES/SERVICES: 0001-S00000052

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0002 | 0.00 | 120 |

OPTION 03

SUPPLIES/SERVICES: 0001-S00000052

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 12 OF 21 PAGES |
|---|---|---|

## SECTION B

SUPPLY/SERVICE: 0001-S00000052 CONT'D

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0002 | 0.00 | 120 |

OPTION 04

SUPPLIES/SERVICES: 0001-S00000052

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0002 | 0.00 | 120 |

FOB:   DELIVERY DATE:

GOVT USE

| ITEM | PR | PRLI | External<br>PR | External<br>PRLI | External<br>Material | Customer RDD/<br>Need Ship Date |
|---|---|---|---|---|---|---|
| 0001 | N/A | N/A | N/A | N/A | N/A | N/A |
| 0002 | N/A | N/A | N/A | N/A | 9906 | N/A |

*****************************************************************************

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 13 OF 21 PAGES |
|---|---|---|

**SECTION A - SOLICITATION/CONTRACT FORM**

**52.211-9014   CONTRACTOR RETENTION OF TRACEABILITY DOCUMENTATION   (AUG 2012)   DLAD**

**SECTION D - PACKAGING AND MARKING**

**252.211-7006   RADIO FREQUENCY IDENTIFICATION   (SEP 2011)   DFARS**

****
(b)(1) Except as provided in paragraph (b)(2) of this clause, the Contractor shall affix passive RFID tags, at the case- and palletized-unit-load packaging levels, for shipments of items that—
(i) Are in any of the following classes of supply, as defined in DoD 4140.1-R, DoD Supply Chain Materiel Management Regulation, AP1.1.11:
(A) Subclass of Class I – Packaged operational rations.
(B) Class II – Clothing, individual equipment, tentage, organizational tool kits, hand tools, and administrative and housekeeping supplies and equipment.
(C) Class IIIP – Packaged petroleum, lubricants, oils, preservatives, chemicals, and additives.
(D) Class IV – Construction and barrier materials.
(E) Class VI – Personal demand items (non-military sales items).
(F) Subclass of Class VIII – Medical materials (excluding pharmaceuticals, biologicals, and reagents – suppliers should limit the mixing of excluded and non-excluded materials).
(G) Class IX – Repair parts and components including kits, assemblies and subassemblies, reparable and consumable items required for maintenance support of all equipment, excluding medical-peculiar repair parts; and
(ii) Are being shipped to one of the locations listed at http://www.acq.osd.mil/log/rfid/ or to—
(A) A location outside the contiguous United States when the shipment has been assigned Transportation Priority 1, or to—
(B) The following location(s) deemed necessary by the requiring activity:

| Contract Line, Subline, or<br>Exhibit Line Item Number | Location Name | City | State | DoDAAC |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

(2) The following are excluded from the requirements of paragraph (b)(1) of this clause:
(i) Shipments of bulk commodities.
(ii) Shipments to locations other than Defense Distribution Depots when the contract includes the clause at FAR 52.213-1, Fast Payment Procedures.
(c) The Contractor shall—
(1) Ensure that the data encoded on each passive RFID tag are globally unique (i.e., the tag ID is never repeated across two or more RFID tags and conforms to the requirements in paragraph (d) of this clause;
(2) Use passive tags that are readable; and
(3) Ensure that the passive tag is affixed at the appropriate location on the specific level of packaging, in accordance with MIL-STD-129 (Section 4.9.2) tag placement specifications.
(d) Data syntax and standards. The Contractor shall encode an approved RFID tag using the instructions provided in the EPC™ Tag Data Standards in effect at the time of contract award. The EPC™ Tag Data Standards are available at http://www.epcglobalinc.org/standards/.
(1) If the Contractor is an EPCglobal™ subscriber and possesses a unique EPC™ company prefix, the Contractor may use any of the identifiers and encoding instructions described in the most recent EPC™ Tag Data Standards document to encode tags.
(2) If the Contractor chooses to employ the DoD identifier, the Contractor shall use its previously assigned Commercial and Government Entity (CAGE) code and shall encode the tags in accordance with the tag identifier details located at http://www.acq.osd.mil/log/rfid/tag_data.htm. If the Contractor uses a third-party packaging house to encode its tags, the CAGE code of the third-party packaging house is acceptable.

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 14 OF 21 PAGES |
|---|---|---|

(3) Regardless of the selected encoding scheme, the Contractor with which the Department holds the contract is responsible for ensuring that the tag ID encoded on each passive RFID tag is globally unique, per the requirements in paragraph (c)(1).
(e) Advance shipment notice. The Contractor shall use Wide Area WorkFlow (WAWF), as required by DFARS 252.232-7003, Electronic Submission of Payment Requests, to electronically submit advance shipment notice(s) with the RFID tag ID(s) (specified in paragraph (d) of this clause) in advance of the shipment in accordance with the procedures at https://wawf.eb.mil/.
(End of clause)

**52.211-9010   SHIPPING LABEL REQUIREMENTS – MILITARY-STANDARD (MIL-STD) 129P   (MAR 2012)   DLAD**

**52.211-9033   PACKAGING AND MARKING REQUIREMENTS   (APR 2008)   DLAD**

**52.247-9012   REQUIREMENTS FOR TREATMENT OF WOOD PACKAGING MATERIAL (WPM)   (FEB 2007)   DLAD**


**SECTION E - INSPECTION AND ACCEPTANCE**

**52.246-02   INSPECTION OF SUPPLIES FIXED PRICE   (AUG 1996)   FAR**

**52.246-11   HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT   (FEB 1999)   FAR**

The Contractor shall comply with the higher-level quality standard selected below. [If more than one standard is listed, the  offeror shall indicate its selection by checking the appropriate block.]

|  | Title | Number | Date | Tailoring |
|---|---|---|---|---|
| ☐ | MIL-E-45208A |  |  |  |
| ☐ |  |  |  |  |
| ☐ |  |  |  |  |
| ☐ |  |  |  |  |

[Contracting Officer insert the title, number (if any), date, and tailoring (if any) of the higher-level quality standards.]
(End of clause)

**52.246-16   RESPONSIBILITY FOR SUPPLIES   (APR 1984)   FAR**

**252.246-7000   MATERIAL INSPECTION AND RECEIVING REPORT   (MAR 2008)   DFARS**

**52.246-9008   INSPECTION AND ACCEPTANCE AT ORIGIN   (NOV 2011)   DLAD**

(a) Inspection and Acceptance are at Origin.
(b) The point of acceptance will be the point of last inspection before shipment unless otherwise indicated by the offeror.
**(c) The Offeror shall indicate below the location where supplies will be inspected:**
**Supplies:**
**Plant:**
ROBINSON MFG, INC
_____
**Commercial and Government Entity (CAGE) Code: 4E1L3**
_____
**Street: 1136 S RICHFIELD ROAD**
_____
**City/State/Zip: PLACENTIA, CA 92870**
_____
**Applicable to contract line-item(s) (CLIN(s):**
**ALL**
_____
(d)  The Offeror shall indicate below the location where packaging will be inspected:
**Packaging:**
**[ X ] Same as for supplies, or,**
**Plant:**

_____
**Cage Code:**
_____

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 15 OF 21 PAGES |
|---|---|---|

**Street:**
_____

**City/St/Zip:**
_____

**Applicable to clin(s):**
_____

****

**SECTION F - DELIVERIES OR PERFORMANCE**

**52.242-15   STOP-WORK ORDER   (AUG 1989)   FAR**

**52.242-17   GOVERNMENT DELAY OF WORK   (APR 1984)   FAR**

**52.247-34   F.O.B. DESTINATION   (NOV 1991)   FAR**

**52.247-48   F.O.B. DESTINATION - EVIDENCE OF SHIPMENT   (FEB 1999)   FAR**

**52.247-58   LOADING, BLOCKING, AND BRACING OF FREIGHT CAR SHIPMENTS   (APR 1984)  FAR**

**52.247-9016   F.O.B. DESTINATION CONTRACTOR TRANSSHIPMENT   (NOV 2011)   DLAD**

**52.247-9035   SHIPPING INSTRUCTIONS (DOMESTIC)   (NOV 2011)   DLAD**

Mail instructions (not applicable to Army Post Office (APO) or Fleet Post Office (FPO) addresses):
(a) Route domestic shipments within mail limitations as follows based on the transportation priority (TP) reflected in the "mark for" data with each contract line item number (CLIN). Commercial small parcel carrier (e.g., United Parcel Service (UPS) or Federal Express) is an acceptable mode of shipment to domestic addresses.
(1) Ship all NMCS, 777, and 999, regardless of TP or distance, by commercial small parcel carrier.
(2) Ship TP 1 and 2 (IPD 01-08) by priority mail or most economical comparable mode.
(3) Ship TP 3 (IPD 09-15) and all stock locations (not TP coded) by surface parcel post (Fourth Class) or most economical comparable mode.
(4) The cost of parcel post insurance will not be paid by the Government.
(b) Freight instructions (domestic).
(1) Ship all NMCS, 777, and 999, regardless of TP or distance by commercial small parcel carrier.
(2) For TP 1 and 2 (IPD 01-08) weighing under 250 pounds, use air freight and specify air on the invoice. Exceptions: if destination is within 600 miles of origin, use regular surface transportation.
(3) For all other freight shipments, contact the cognizant transportation officer for delivery and carrier routing instructions.
(4) Advance telephonic notice of delivery must be given by the carrier to the consignee's transportation officer (transport control/prelodge desk) at least 24 hours prior to delivery of freight shipments (other than small parcels). Bills of lading must be annotated to reflect this requirement. Addresses for direct shipments within the contiguous United States (CONUS) and Canada are shown "in the clear" with each individual CLIN on schedule continuation sheet(s) in each order. Addresses for stock shipments are shown with each individual CLIN on schedule continuation sheet(s) in each order.
(End of Clause)

**52.247-9038   SHIPPING INSTRUCTION FOR DLA DIRECT ACQUISITIONS   (NOV 2011)   DLAD**

**52.247-9034   POINT OF CONTACT FOR TRANSPORTATION INSTRUCTIONS  (JUN 2013)   DLAD**

**SECTION I - CONTRACT CLAUSES**

**52.202-01   DEFINITIONS   (JAN 2012)   FAR**

**52.203-03   GRATUITIES   (APR 1984)   FAR**

**52.203-05   COVENANT AGAINST CONTINGENT FEES   (APR 1984)   FAR**

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 16 OF 21 PAGES |
|---|---|---|

**52.203-06  RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT   (SEP 2006)   FAR**

**52.203-07  ANTI-KICKBACK PROCEDURES   (OCT 2010)   FAR**

**52.203-08  CANCELLATION, RECISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY   (JAN 1997)   FAR**

**52.203-10  PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY  (JAN 1997)  FAR**

**52.203-12  LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS  (OCT 2010)  FAR**

**252.203-7001  PROHIBITION ON PERSONS CONVICTED OF FRAUD OR OTHER DEFENSE-CONTRACT-RELATED FELONIES (DEC 2004)  DFARS**

**52.204-04  PRINTED OR COPIED DOUBLE-SIDED ON POSTCONSUMER FIBER CONTENT PAPER  (MAY 2011)   FAR**

**52.204-10  REPORTING EXECUTIVE COMPENSATION AND FIRST-TIER SUBCONTRACT AWARDS  (JUN 2013)  FAR**

**252.205-7000  PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS  (DEC 1991)  DFARS**

**52.209-04  FIRST ARTICLE APPROVAL - GOVERNMENT TESTING  (SEP 1989)  FAR**

 (a) The Contractor shall deliver 2 unit(s) of Lot/Item 1560-00-571-1295  within 120  calendar days from the date of this contract to the Government at
SEE PAGE TWO FOR DETAILS


 for first article tests.  The shipping documentation shall contain this contract number and the Lot/Item identification. The characteristics that the first article must meet and the testing requirements are specified elsewhere in this contract.
 (b) Within 75  calendar days after the Government receives the first article, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article.  The notice of conditional approval or approval shall not relieve the Contractor from complying  with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval shall state any further action required of the Contractor. A notice of disapproval shall cite reasons for the disapproval.
****

**52.209-04  FIRST ARTICLE APPROVAL  - GOVERNMENT TESTING  (SEP 1989),  ALT I  (JAN 1997)  FAR**

**52.209-06  PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR SUSPENSION  (DEC 2010)   FAR**

**252.209-7004  SUBCONTRACTING WITH FIRMS THAT ARE OWNED OR CONTROLLED BY THE GOVERNMENT OF A TERRORIST COUNTRY  (DEC 2006)  DFARS**

**52.209-9018  FIRST ARTICLE – GOVERNMENT TEST – ADDITIONAL REQUIREMENTS  (NOV 2011)  DLAD**

(a) For the lots/items identified in this contract as requiring Government first article test (FAT) in accordance with the clause at Federal Acquisition Regulation (FAR) 52.209-4, the Contractor shall—
(1) Conform with technical requirements stated and/or referenced in the solicitation; including number of units to be produced, data required, performance or other characteristics that the first articles shall meet, sequence of processes, tests to which the first articles shall be subjected, and conformance criteria for each requirement specified.
(2) Provide all facilities, equipment and personnel required to perform the examination and evaluation of the first article units when first article testing will be conducted at the Contractor's plant. The Government reserves the right to charge the Contractor for any additional costs of examination and evaluation caused by failure of the Contractor to make available the first article units or the required facilities, equipment or personnel, at the times specified in the above mentioned notice to the Contracting Officer.
(3)(i) At least fourteen (14) calendar days, or as otherwise specified in the contract, prior to the date when the Contractor will present the first articles to the quality assurance representative (QAR) for inspection to determine compliance with specification requirements, provide written notice to:
(A) The Contracting Officer;
(B) The QAR; and
(C) The following:

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 17 OF 21 PAGES |
| --- | --- | --- |

(1) For awards issued by DLA Land and Maritime:
DLA Land and Maritime
FAT Monitor, BPI
Post office (P. O.) box 3990
Columbus, Ohio 43218-3990;
(2) For awards issued by DLA Troop Support:
(i) DLA Troop Support
Attention: First Article Testing Monitor
Building 3
700 Robbins Avenue
Philadelphia, Pennsylvania 19111; or
(ii) For acquisitions of Clothing and Textile (C&T) items; Medical and Subsistence items; and Meal, Ready-To-Eat (MRE) and Tray Pack Items, the Contracting Officer, who acts as FAT/Testing Monitor;
(3) For awards issued by DLA Aviation:
DLA Aviation
Test Coordinator Office
8000 Jefferson Davis Highway
Richmond, Virginia 23297-5516
(4) For awards issued by Naval Surface Warfare Center, Carderock Division:
Commanding Officer
Naval Surface Warfare Center
Code 954, Building 77L
Philadelphia Business Center, Carderock Division
Philadelphia, Pennsylvania 19112-5083
Telephone: (215) 897-1146
(5) For awards issued by Naval Sea Systems Command, Washington Navy Yard:
Commander
Naval Sea Systems Command
Sea 05M3, 1333 ISAAC Hull Avenue, SE Stop 5160
Washington Navy Yard, District of Columbia (DC) 20376-5160
Telephone: (202) 781-3729
(ii) When first article units are presented to the QAR, provide the Contractor's certification that the same processes and facilities used to manufacture the first article units shall be used to manufacture the production units.
(iii) Prior to shipping the first article units to the Government testing facility specified in paragraph (a) of the clause FAR 52.209-4 (or resubmitting any first article units after conditional approval or disapproval by the Government testing facility), obtain a statement from the QAR that the first article units have been inspected and determined to comply with the specification requirements.
(4) Prepare shipping containers for first article units in accordance with the following:
(i) Exterior marking and shipping documentation.
(A) Mark packages containing first article units in bold letters, below and to the left of the address, as follows: "First Article Exhibits: Contract Number [Contractor insert] and Lot/Item Number [Contractor insert];" and
(B) Use a hard copy of the Department of Defense (DD) Form 250 as a packing list on the exterior of the shipping container, in accordance with military standard (MIL-STD) 129, paragraph 5.3, Exterior Container Documentation.
(ii) Interior documentation requirements. Include the following with all shipments of first article units:
(A) Hard copies of the Statement of Inspection and DD Form 250, signed by the QAR;
(B) Copy of the contract, or those portions of the contract that pertain to the Government First Article Test (FAT) requirements;
(C) Copies of test reports, showing actual results;
(D) Material certifications;
(E) Process operations sheets;
(F) Copies of drawings used to manufacture the first article units. (Contractor may mark documents, as appropriate, to restrict from public disclosure and/or from Government use other than for evaluation);
(G) Contractor's certification that the same processes and facilities used to manufacture the first article units shall be used to manufacture the production units;
(H) Documents required under a contract deliverables requirements list, if applicable; and
(I) Any other documentation required by the contract;
(5)(i) Send all first article units by traceable means (e.g., certified or registered mail, United Parcel Service, Federal Express, etc.).
(ii) At the time first article units are shipped, provide copies of the signed DD Form 250, the QAR Statement of Inspection, and transportation tracking information to the—
(A) Contracting Officer; and
(B) Points of contact identified at paragraph (a)(3)(i)(C) of this clause.
(6) Submit first articles to the Government testing facility identified in paragraph (a) of the clause at FAR 52.209-4, within the number of calendar days from date of contract as specified in paragraph (a) of the clause at FAR 52.209-4; and
(7) Pay all costs incurred for transportation of first article units under this contract; and, if applicable -

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 18 OF 21 PAGES |
|---|---|---|

(i) Costs of manufacturing and re-testing additional first articles; and
(ii) Administrative costs for re-procurement by the Government.
(b) The Contractor shall enter an offered price in the contract line-item (CLIN) for "Government First Article Test (FAT)" that includes all costs associated with the production and testing of the first articles. Offers that do not cite a separate price for the "Government First Article Test (FAT)" CLIN, or do not specify there is a separate charge for the "Government First Article Test (FAT)", shall be evaluated under the presumption that there is no separate charge for producing and testing the first article units.
(c) Upon completion of the first article testing, the Government test facility will submit its report of testing in duplicate) to the Contracting Officer and to the points of contact identified at paragraph (a)(3)(i)(C) of this clause.
(d) If first article units are conditionally approved or disapproved, the Government shall take action in accordance with the clause at FAR 52.209-4.
(1) Final disposition of conditionally approved or disapproved first article units is determined at the discretion of the Government.
(2)(A) Disapproved first article units may be returned to the Contractor at the Government's discretion, if the Contractor submitted the following information to the Contracting Officer and to the points of contact identified at paragraph (a)(3)(i)(C) of this clause within fifteen (15) calendar days after receiving notification of disapproval of the first article unit:
(1) Contractor's complete "Ship To" address; DEFENSE LOGISTICS ACQUISITION DIRECTIVE
(2) Name of Contractor's point of contact (POC)/addressee;
(3) Phone number of Contractor's POC; and
(4) Transportation cost codes (e.g., Contractor's FED-EX, DHL, UPS shipping account numbers, etc.).
(B) In the event the Contractor fails to provide the information required above, the Agency may, at its discretion, dispose of the material.
(End of Clause)

**52.211-15  DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS   (APR 2008)   FAR**

**252.211-7005  SUBSTITUTIONS FOR MILITARY OR FEDERAL SPECIFICATIONS AND STANDARDS   (NOV 2005)   DFARS**

****
(4) If the proposed SPI process has been accepted at the facility at which it is proposed for use, but is not yet listed at the Internet site specified in paragraph (b) of this clause, submit documentation of Department of Defense acceptance of the SPI process.
(d) Absent a determination that an SPI process is not acceptable for this procurement, the Contractor shall use the following SPI processes in lieu of military or Federal specifications or standards:
(Offeror insert information for each SPI process)
**SPI Process:**
_____

**Facility:**
_____

**Military or Federal Specification or Standard:**
_____

**Affected Contract Line Item Number, Subline Item Number, Component, or Element:**
_____

****

**52.211-9052  NOTIFICATION TO GOVERNMENT OF AND CONTEMPLATED PRODUCTION PHASE-OUT   (NOV 2011)   DLAD**

**52.215-9016  NOTICE TO CONTRACTORS AND DEFENSE FINANCE ACCOUNTING SERVICES (DFAS)   (NOV 2011)   DLAD**

**52.216-19  ORDER LIMITATIONS   (OCT 1995)   FAR**

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than 57, the Government is not  obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.
(b) Maximum order. The Contractor is not obligated to honor—
(1) Any order for a single item in excess of 228   ;
(2) Any order for a combination of items in excess of   ; or
(3)  A series of orders from the same ordering office within 30 days that together call for quantities exceeding the limitation in paragraph (b)(1) or (2) of this section.
(c)  If  this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 19 OF 21 PAGES |
|---|---|---|

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 10 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.
(End of clause)

**52.216-22   INDEFINITE QUANTITY   (OCT 1995)   FAR**

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.
(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."
(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.
(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period ; provided, that  the Contractor shall not be required to make any deliveries under this contract after 379 DAYS
(End of clause)

**252.216-7006   ORDERING   (MAY 2011)   DFARS**

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the contract schedule.  Such orders may be issued from EFFECTIVE DATE OF CONTRACT through 365 DAYS THEREAFTER [*insert dates*].
****

**52.217-09   OPTION TO EXTEND THE TERM OF THE CONTRACT   (MAR 2000)   FAR**

(a) The Government may extend the term of this contract by written notice to the Contractor within 30  [insert the period of time within which the Contracting Officer may exercise the option]; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days [60 days unless a different number of days is inserted] before the contract expires. The preliminary notice does not commit the Government to an extension.
(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.
(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 60 (months) (years).
(End of clause)

**52.219-06   NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE   (NOV 2011)   FAR**

**52.219-28   POST AWARD SMALL BUSINESS PROGRAM REREPRESENTATION   (APR 2012)   FAR**

****
(g) If the Contractor does not have representations and certifications in ORCA, or does not have a representation in ORCA for the NAICS code applicable to this contract, the Contractor is required to complete the following rerepresentation and submit it to the contracting office, along with the contract number and the date on which the rerepresentation was completed:
**The Contractor represents that it [X ] is, [] is not a small business concern under NAICS Code 336413 assigned to contract number  .**

**[Contractor to sign and date and insert authorized signer's name and title]:**

**Signature:** _____

**Date:** _____

**Title:** _____
(End of clause)

**52.222-19   CHILD LABOR - COOPERATION WITH AUTHORITIES AND REMEDIES   (MAR 2012)   FAR**

**52.222-20   WALSH-HEALEY PUBLIC CONTRACTS ACT   (OCT 2010)   FAR**

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 20 OF 21 PAGES |
|---|---|---|

**52.222-21  PROHIBITION OF SEGREGATED FACILITIES  (FEB 1999)  FAR**

**52.222-26  EQUAL OPPORTUNITY  (MAR 2007)  FAR**

**52.222-35  EQUAL OPPORTUNITY FOR VETERANS  (SEP 2010)  FAR**

**52.222-36  AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES  (OCT 2010)   FAR**

**52.222-37  EMPLOYMENT REPORTS ON VETERANS  (SEP 2010)  FAR**

**52.222-40  NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT  (DEC 2010)   FAR**

**52.222-54  EMPLOYMENT ELIGIBILITY VERIFICATION  (JUL 2012)  FAR**

**52.223-06  DRUG-FREE WORKPLACE  (MAY 2001)  FAR**

**52.229-03  FEDERAL, STATE, AND LOCAL TAXES  (FEB 2013)  FAR**

**52.232-17  INTEREST  (OCT 2010) FAR**

**52.232-23  ASSIGNMENT OF CLAIMS  (JAN 1986)  FAR**

**252.232-7010  LEVIES ON CONTRACT PAYMENTS  (DEC 2006)  DFARS**

**52.242-13  BANKRUPTCY  (JUL 1995)  FAR**

**52.243-01  CHANGES - FIXED PRICE  (AUG 1987)  FAR**

**252.243-7001  PRICING OF CONTRACT MODIFICATIONS  (DEC 1991)  DFARS**

**252.243-7002  REQUESTS FOR EQUITABLE ADJUSTMENTS  (MAR 1998)  DFARS**

****

(b)  In accordance with 10 U.S.C. 2410(a), any request for equitable adjustment to contract terms that exceeds the simplified acquisition threshold shall bear, at the time of submission, the following certificate executed by an individual authorized to cer tify the request on behalf of the Contractor:
 **I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief.**

_____
**(Official's Name)**

_____
 **(Title)**

**52.246-23  LIMITATION OF LIABILITY  (FEB 1997)  FAR**

**252.246-7003  NOTIFICATION OF POTENTIAL SAFETY ISSUES  (JAN 2007)  DFARS**

**52.249-02  TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE)  (APR 2012)  FAR**

**52.249-08  DEFAULT (FIXED-PRICE SUPPLY AND SERVICE)  (APR 1984)  FAR**

**252.225-7048  EXPORT CONTROLLED ITEMS  (JUN 2013)  DFARS**
    (a) *Definition.* "Export-controlled items," as used in this clause, means items subject to the Export Administration Regulations (EAR) (15 CFR Parts 730-774) or the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130). The term includes:
        (1) "Defense items," defined in the Arms Export Control Act, 22 U.S.C. 2778(j)(4)(A), as defense articles, defense services, and related technical data, and further defined in the ITAR, 22 CFR Part 120.
        (2) "Items," defined in the EAR as "commodities", "software", and "technology," terms that are also defined in the EAR, 15 CFR 772.1.
    (b) The Contractor shall comply with all applicable laws and regulations regarding export-controlled items, including, but not limited to, the requirement for contractors to register with the Department of State in accordance with the ITAR. The Contractor

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125 | PAGE 21 OF 21 PAGES |
|---|---|---|

shall consult with the Department of State regarding any questions relating to compliance with the ITAR and shall consult with the Department of Commerce regarding any questions relating to compliance with the EAR.

(c) The Contractor's responsibility to comply with all applicable laws and regulations regarding export-controlled items exists independent of, and is not established or limited by, the information provided by this clause.

(d) Nothing in the terms of this contract adds, changes, supersedes, or waives any of the requirements of applicable Federal laws, Executive orders, and regulations, including but not limited to—

(1) The Export Administration Act of 1979, as amended (50 U.S.C. App. 2401, *et seq.*);

(2) The Arms Export Control Act (22 U.S.C. 2751, *et seq.*);

(3) The International Emergency Economic Powers Act (50 U.S.C. 1701, et seq.);

(4) The Export Administration Regulations (15 CFR Parts 730-774);

(5) The International Traffic in Arms Regulations (22 CFR Parts 120-130); and

(6) Executive Order 13222, as extended.

(e) The Contractor shall include the substance of this clause, including this paragraph (e), in all subcontracts.

(End of clause)

**52.232-39   UNENFORCEABILITY OF UNAUTHORIZED OBLIGATIONS   (JUL 2013)   (FAR)**


**SECTION J - LIST OF ATTACHMENTS**

**List of Attachments**

| Description | File Name |
|---|---|
| ATTACH.SPE4A713D0125 BASIC | SPE4A713D0125.pdf |

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|
| J | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. P00001 | 3. EFFECTIVE DATE See Blk. 16C | 4. REQUISITION/PURCHASE REQ. NO. See Block 14 | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | S2101A |
|---|---|---|---|---|---|

**6. ISSUED BY**

DLA AVIATION
AVIATION SUPPLY CHAIN
8000 JEFFERSON DAVIS HIGHWAY
RICHMOND VA 23297
USA
Initiator: Florence Breedlove
PARFH19 Tel: 804-279-3758 Email: Florence.Breedlove@dla.mil

**7. ADMINISTERED BY**

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD 21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

MAVEN ENGINEERING CORPORATION DBA
15946 DERWOOD RD
ROCKVILLE MD 20855-2123
USA

| | | 9B. DATED *(SEE ITEM 11)* |
|---|---|---|
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO. SPE4A7-13-D-0125 |
| | | 10B. DATED *(SEE ITEM 13)* 2013 SEP 03 |

| CODE | 46YF5 | FACILITY CODE |
|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA *(If required)* |
|---|
| See Continuation Sheet |

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( *such as changes in paying office, appropriation date, etc.* ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* FAR CLAUSE 52.217-9G08, OPTION TO EXTEND THE TERMS OF THE CONTRACT. |

**E. IMPORTANT:** Contractor [X] is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* Jeremy Prince PARFE09 |
|---|---|
| 15B. CONTRACTOR/OFFEROR _____ *(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA *Jeremy Prince* _____ *(Signature of Contracting Officer)* | 16C. DATE SIGNED 2014 SEP 08 |

| NSN 7540-01-152-8070 Previous edition unusable | STANDARD FORM 30 (REV. 10-83) Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SPE4A7-13-D-0125/P00001 | PAGE 2 OF 2 PAGES |
|---|---|---|

NSN:  1560-00-571-1295        ITEM:  HOOK ASSEMBLY, RAMP

The term of Contract SPE4A7-13-D-0125 has been extended an additional 12 months.
Clause 52.216-18, Para. (a) is changed to read "…orders may be issued 3 SEPTEMBER 2014 through 2 SEPTEMBER 2015."

  UNIT PRICE
  $247.00 EACH

All other terms and conditions of the contract remain unchanged.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | J | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| P00002 | See Blk. 16C | See Block 14 | |

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY (If other than Item 6) | CODE | S2101A |
|---|---|---|---|---|---|

DLA AVIATION
AVIATION SUPPLY CHAIN
8000 JEFFERSON DAVIS HIGHWAY
RICHMOND VA 23297
USA
Initiator: William Palmer
PARFH11 Tel: 804-279-1248 Email: William.Palmer@dla.mil

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD 21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| | | |
| MAVEN ENGINEERING CORPORATION | | 9B. DATED (SEE ITEM 11) |
| 15946 DERWOOD RD | | |
| ROCKVILLE MD 20855-2123 | X | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| USA | | SPE4A7-13-D-0125 |
| | | 10B. DATED (SEE ITEM 13) |
| | | 2013 SEP 03 |

| CODE 46YF5 | FACILITY CODE |
|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) by separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( such as changes in paying office,  appropriation date, etc. ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER (Specify type of modification and authority) FAR 52.217-9G08 OPTION TO EXTEND |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| | Jeremy Prince |
| | PARFE09 |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| | | _Jeremy Prince_ | 2015 AUG 27 |
| (Signature of person authorized to sign) | | (Signature of Contracting Officer) | |

| NSN 7540-01-152-8070 | STANDARD FORM 30 (REV. 10-83) |
|---|---|
| Previous edition unusable | Prescribed by GSA FAR (48 CFR) 53.243 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SPE4A7-13-D-0125/P00002 | PAGE 2 OF 2 PAGES |
|---|---|---|

NSN:  1560-00-571-1295        ITEM:  HOOK ASSEMBLY, RAMP

1. THE OPTION TO EXTEND THE INDEFINTE DELIVERY PURCHASE ORDER FOR AN ADDITIONAL TWELVE MONTHS IS HEREBY EXERCISED IN ACCORDANCE WITH FAR 52.217-9G08, "OPTION TO EXTEND THE TERM OF THE CONTRACT".  THE OPTION PERIOD IS EFFECTIVE FROM 9/3/15 TO 9/2/16.  THE UNIT PRICE WILL BE IAW BASIC FOR OPTION YEAR 2.

2. All other terms and conditions of the specified contracts remain the same.

3. This is a unilateral modification.

Option year 2 unit price: $265.00 each.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | J | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| P00003 | See Blk. 16C | See Block 14 | |

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | S2101A |
|---|---|---|---|---|---|

DLA AVIATION
AVIATION SUPPLY CHAIN
8000 JEFFERSON DAVIS HIGHWAY
RICHMOND VA 23297
USA
  Initiator: William Palmer
  PARFH11 Tel: 804-279-1248 Email: William.Palmer@dla.mil

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD 21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

MAVEN ENGINEERING CORPORATION
15946 DERWOOD RD
ROCKVILLE MD 20855-2123
USA

| | 9B. DATED *(SEE ITEM 11)* |
|---|---|
| X | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | SPE4A7-13-D-0125 |
| | 10B. DATED *(SEE ITEM 13)* |
| | 2013 SEP 03 |

| CODE 46YF5 | FACILITY CODE |
|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( *such as changes in paying office, appropriation date, etc.* ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* AR 52.217-9 OPTION TO EXTEND |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* |
|---|---|
| | Jeremy Prince |
| | PARFE09 |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| *(Signature of person authorized to sign)* | | *Jeremy Prince* *(Signature of Contracting Officer)* | 2016 SEP 02 |

| NSN 7540-01-152-8070 | STANDARD FORM 30 (REV. 10-83) |
|---|---|
| Previous edition unusable | Prescribed by GSA FAR (48 CFR) 53.243 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125/P00003 | PAGE 2 OF 2 PAGES |
|---|---|---|

NSN:  1560-00-571-1295        ITEM:  HOOK ASSEMBLY, RAMP

1. THE OPTION TO EXTEND THE INDEFINTE DELIVERY PURCHASE ORDER FOR AN ADDITIONAL TWELVE MONTHS IS HEREBY EXERCISED IN ACCORDANCE WITH FAR 52.217-9., "OPTION TO EXTEND THE TERM OF THE CONTRACT".  THE OPTION PERIOD IS EFFECTIVE FROM 9/3/16 TO 9/2/17.  THE UNIT PRICE WILL BE IAW BASIC FOR OPTION YEAR 3.

2. All other terms and conditions of the specified contracts remain the same.

3. This is a unilateral modification.

Option year 3 unit price: $272.00 each.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | |
|---|---|
| 1. CONTRACT ID CODE | J |

PAGE 1 OF PAGES 2

| 2. AMENDMENT/MODIFICATION NO. P00004 | 3. EFFECTIVE DATE See Blk. 16C | 4. REQUISITION/PURCHASE REQ. NO. See Block 14 | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | S2101A |
|---|---|---|---|---|---|

DLA AVIATION
ASC SUPPLIER OPER AE AND AF DIV
8000 JEFFERSON DAVIS HWY
RICHMOND VA  23297
USA
 Initiator: Amanda Grietzer
DAG0037 Tel: 804279-6285 Email: Amanda.Grietzer@dla.mil

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD  21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

MAVEN ENGINEERING CORPORATION
15946 DERWOOD RD
ROCKVILLE MD  20855-2123
USA

| | |
|---|---|
| | 9B. DATED *(SEE ITEM 11)* |
| X | 10A. MODIFICATION OF CONTRACT/ORDER NO. SPE4A7-13-D-0125 |
| | 10B. DATED *(SEE ITEM 13)* 2013 SEP 03 |

| CODE 46YF5 | FACILITY CODE |
|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers  ☐ is extended,  ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( *such as changes in paying office, appropriation date, etc.* ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). | |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| X | D. OTHER *(Specify type of modification and authority)* FAR 52.217-9 OPTION TO EXTEND | |

E. IMPORTANT: Contractor ☒ is not,  ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* Jeremy Prince PARFE09 |
|---|---|
| 15B. CONTRACTOR/OFFEROR _____ *(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA _Jeremy Prince_ *(Signature of Contracting Officer)* | 16C. DATE SIGNED 2017 AUG 09 |

| NSN 7540-01-152-8070 Previous edition unusable | STANDARD FORM 30 (REV. 10-83) Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-0125/P00004 | PAGE 2 OF 2 PAGES |
|---|---|---|

NSN:  1560-00-571-1295        ITEM:  HOOK ASSEMBLY, RAMP

1. THE OPTION TO EXTEND THE INDEFINTE DELIVERY PURCHASE ORDER FOR AN ADDITIONAL TWELVE MONTHS IS HEREBY EXERCISED IN ACCORDANCE WITH FAR 52.217-9., "OPTION TO EXTEND THE TERM OF THE CONTRACT".  THE OPTION PERIOD IS EFFECTIVE FROM 9/3/17 TO 9/2/18.  THE UNIT PRICE WILL BE IAW BASIC FOR OPTION YEAR 4.

2. All other terms and conditions of the specified contracts remain the same.

3. This is a unilateral modification.

Option year 4 unit price: $288.00 each.

# Exhibit C

 SAM.GOV®

An official website of the United States government   Here's how you know

Home    Search    Data Bank    Data Services    Help



⬇ **Download**



# IQC MULTIPLE NSN REQUIREMENT; VARIOUS END ITEMS

**Contract Opportunity**

General Information

Classification

Description

Attachments/Links

Contact Information

History

Award Notices

◯ **INACTIVE**                                    Contract Opportunity

Notice ID

SPE4A713R0916

Related Notice

Department/Ind. Agency

## Looking for contract opportunity help?



APEX Accelerators are an official government contracting resource for small businesses. Find your local APEX Accelerator for free government expertise related to contract opportunities.

APEX Accelerators are funded in part through a cooperative agreement with the Department of Defense.

The APEX Accelerators program was formerly known as the Procurement Technical Assistance Program (PTAP).

# General Information

**Contract Opportunity Type:** Presolicitation (Original)

**All Dates/Times are:** (UTC-04:00) EASTERN STANDARD TIME, NEW YORK, USA

**Original Published Date:** May 24, 2013 02:02 pm EDT

**Original Response Date:** Jul 09, 2013 04:00 pm EDT

**Inactive Policy:** 15 days after response date

**Original Inactive Date:** Jul 24, 2013

**Initiative:**

- None

# Classification

**Original Set Aside:** Total Small Business Set-Aside (FAR 19.5)

**Product Service Code:** 16 - AIRCRAFT COMPONENTS/ACCESSORIES

**NAICS Code:**

- 336413 - Other Aircraft Parts and Auxiliary Equipment Manufacturing

**Place of Performance:**

# Description

Purchase Request #: 1000010004

Issue date: June 10, 2013

Closing Date: July 9, 2013

Type of Procurement: Indefinite Quantity Contract

This solicitation is for a base year and four option periods as follows:

100% Small Business Set-Aside

Surge applies for one NSN

Certified cost and pricing data required

Configuration Control

Non Commercial

NSNs are as follows:

1560-00-571-1295 - 1G, Not CSI, I/A Origin, IAW Basic Drawing NR 98897 354016,

Revision NR G, Dated 10/08/2023, Part Piece NR 354016-1, Government FAT required, Export Control, Configuration Control, End Item: C-130 Aircraft, EAQ 228, MAQ 342, Surge applies

1560-00-817-4287 - 1G, Not CSI, I/A Origin, IAW Basic Drawing NR 81205 65-11682, Revision NR G, dated 11/29/1984, Export Control, Configuration Control, Boeing Rights Guard applies, End Item: KC-135 Aircraft, EAQ 12, MAQ 18

The proposed contract is 100% set aside for small business concerns.

Based upon market research, the Government is not using the policies contained in Part 12, Acquisition of Commercial Items, in its solicitation for the described supplies or services. However, interested persons may identify to the contracting officer their interest and capability to satisfy the Government's requirement with a commercial item within 15 days of this notice.
This solicitation will include provision 52.215-9023, Reverse Auction.  Since a reverse auction may be conducted, offerors are encouraged to access the Procurex system and review the reverse auction help tutorials at https//dla.procurexinc.com to learn more about how to participate in an auction.

A copy of the solicitation will be available via the DLA Internet Bid Board System at https://www.dibbs.bsm.dla.mil/RFP on the same issue date cited in the solicitation.  Choose the RFP you wish to download.  Solicitations are in portable document format (PDF).  To download and view these documents you will need the latest version of Adobe Acrobat Reader.  This software is available free at http://www.adobe.com.  A paper copy of the solicitation will not be available to requestors.

All proposals must be submitted to the Bid Custodian via email: dscr.biddesk@dla.mil or fax 804-279-4165 to be considered for an award.  Do not submit proposals directly to contracting officer or contracting specialist.

# Attachments/Links

No attachments or links have been added to this opportunity.

## Contact Information

### Primary Point of Contact

**Holly V Simmons**

✉ holly.simmons@dla.mil

☎ (804)279-2999

🖶 (804)279-4437

Secondary Point of Contact

**Carlos R. Pillot**

✉ carlos.pillot@dla.mil

☎ 8042794446

## History

◉ **Jul 24, 2013 04:44 am EDT**
Presolicitation (Original)



**Feedback**

**Our Website**

About This Site

Our Community

Release Notes

**Our Partners**

Acquisition.gov

USASpending.gov

Grants.gov

System Alerts

More Partners

**Policies**

**Customer Service**

Terms of Use

Help

Privacy Policy

Check Entity Status

Disclaimers

Federal Service Desk

Freedom of Information Act

External Resources

Accessibility

Contact

 ⚠ **WARNING**

This is a U.S. General Services Administration Federal Government computer system that is **"FOR OFFICIAL USE ONLY."** This system is subject to monitoring. Individuals found performing unauthorized activities are subject to disciplinary action including criminal prosecution.

This system contains Controlled Unclassified Information (CUI). All individuals viewing, reproducing or disposing of this information are required to protect it in accordance with 32 CFR Part 2002 and GSA Order CIO 2103.2 CUI Policy.

SAM.gov

An official website of the U.S. General Services Administration

# Exhibit D

## SMALL BUSINESS ADMINISTRATION

[Disaster Declaration # 11290]

### Montana Disaster # MT–00038

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Notice.

**SUMMARY:** This is a Notice of the Presidential declaration of a major disaster for Public Assistance Only for the State of Montana (FEMA–1767–DR), dated 06/13/2008.

*Incident:* Severe Winter Storm.

*Incident Period:* 05/01/2008 through 05/02/2008.

**EFFECTIVE DATE:** 06/13/2008.

*Physical Loan Application Deadline Date:* 08/12/2008.

**ADDRESSES:** Submit completed loan applications to: U.S. Small Business Administration, Processing and Disbursement Center, 14925 Kingsport Road, Fort Worth, TX 76155.

**FOR FURTHER INFORMATION CONTACT:** A. Escobar, Office of Disaster Assistance, U.S. Small Business Administration, 409 3rd Street, SW., Suite 6050, Washington, DC 20416.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that as a result of the President's major disaster declaration on 06/13/2008, Private Non-Profit organizations that provide essential services of a governmental nature may file disaster loan applications at the address listed above or other locally announced locations.

The following areas have been determined to be adversely affected by the disaster:

*Primary Counties:*

Carter, Custer, Fallon, Powder River.

The Interest Rates are:

|  | Percent |
|---|---|
| Other (Including Non-Profit Organizations) With Credit Available Elsewhere .................................. | 5.250 |
| Businesses And Non-Profit Organizations Without Credit Available Elsewhere .......................... | 4.000 |

The number assigned to this disaster for physical damage is 11290.

(Catalog of Federal Domestic Assistance Number 59008)

**James E. Rivera,**

*Acting Associate Administrator for Disaster Assistance.*

[FR Doc. E8–14093 Filed 6–20–08; 8:45 am]

**BILLING CODE 8025–01–P**

## SMALL BUSINESS ADMINISTRATION

[Disaster Declaration #11291]

### Oklahoma Disaster #OK–00021

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Notice.

**SUMMARY:** This is a Notice of the Presidential declaration of a major disaster for Public Assistance Only for the State of Oklahoma (FEMA–1752–DR), dated 05/05/2008.

*Incident:* Severe Storms, Tornadoes, and Flooding.

*Incident Period:* 03/17/2008 through 03/23/2008.

**EFFECTIVE DATE:** 05/05/2008.

*Physical Loan Application Deadline Date:* 07/07/2008.

**ADDRESSES:** Submit completed loan applications to: U.S. Small Business Administration, Processing and Disbursement Center, 14925 Kingsport Road, Fort Worth, TX 76155.

**FOR FURTHER INFORMATION CONTACT:** A. Escobar, Office of Disaster Assistance, U.S. Small Business Administration, 409 3rd Street, SW., Suite 6050, Washington, DC 20416.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that as a result of the President's major disaster declaration on 05/05/2008, Private Non-Profit organizations that provide essential services of a governmental nature may file disaster loan applications at the address listed above or other locally announced locations.

The following areas have been determined to be adversely affected by the disaster:

Primary Counties:

Adair, Haskell, Hughes, Latimer, Le Flore, Mayes, Mccurtain, Mcintosh, Muskogee, Okfuskee, Okmulgee, Pittsburg, Pushmataha, Sequoyah.

The Interest Rates are:

|  | Percent |
|---|---|
| Other (Including Non-Profit Organizations) With Credit Available Elsewhere .................................. | 5.250 |
| Businesses And Non-Profit Organizations Without Credit Available Elsewhere .......................... | 4.000 |

The number assigned to this disaster for physical damage is 11291.

(Catalog of Federal Domestic Assistance Number 59008)

**James E. Rivera,**

*Acting Associate Administrator for Disaster Assistance.*

[FR Doc. E8–14091 Filed 6–20–08; 8:45 am]

**BILLING CODE 8025–01–P**

## SMALL BUSINESS ADMINISTRATION

[Disaster Declaration #11288 and #11289]

### Wisconsin Disaster Number WI–00013

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Amendment 1.

**SUMMARY:** This is an amendment of the Presidential declaration of a major disaster for the State of Wisconsin (FEMA–1768–DR), dated 06/14/2008.

*Incident:* Severe Storms, Tornadoes, and Flooding.

*Incident Period:* 06/05/2008 and continuing.

**EFFECTIVE DATE:** 06/16/2008.

*Physical Loan Application Deadline Date:* 08/13/2008.

*EIDL Loan Application Deadline Date:* 03/13/2009.

**ADDRESSES:** Submit completed loan applications to: U.S. Small Business Administration, Processing and Disbursement Center, 14925 Kingsport Road, Fort Worth, TX 76155.

**FOR FURTHER INFORMATION CONTACT:** A. Escobar, Office of Disaster Assistance, U.S. Small Business Administration, 409 3rd Street, SW., Suite 6050, Washington, DC 20416.

**SUPPLEMENTARY INFORMATION:** The notice of the Presidential disaster declaration for the State of Wisconsin, dated 06/14/2008 is hereby amended to include the following areas as adversely affected by the disaster:

*Primary Counties:* (Physical Damage and Economic Injury Loans):
Racine, Richland.

*Contiguous Counties:* (Economic Injury Loans Only):
Wisconsin: Kenosha, Walworth.

All other information in the original declaration remains unchanged.

(Catalog of Federal Domestic Assistance Numbers 59002 and 59008.)

**James E. Rivera,**

*Acting Associate Administrator for Disaster Assistance.*

[FR Doc. E8–14094 Filed 6–20–08; 8:45 am]

**BILLING CODE 8025–01–P**

## SMALL BUSINESS ADMINISTRATION

### Small Business Size Standards: Waiver of the Nonmanufacturer Rule

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Notice of Waiver of the Nonmanufacturer Rule for Other Aircraft Parts and Auxiliary Equipment Manufacturing (Drones and Aircraft Launching Equipment), Product Service Codes 1550 and 1720.

**SUMMARY:** The U.S. Small Business Administration (SBA) is granting a waiver of the Nonmanufacturer Rule for Other Aircraft Parts and Auxiliary Equipment Manufacturing (Drones and Aircraft Launching Equipment).

The basis for waiver is that no small business manufacturers are supplying this class of product to the Federal government. The effect of a waiver would be to allow otherwise qualified regular dealers to supply the products of any manufacturer on a Federal contract set aside for small businesses; service-disabled veteran-owned small businesses or SBA's 8(a) Business Development Program.

**DATE:** This waiver is effective July 8, 2008.

**FOR FURTHER INFORMATION CONTACT:** Pamela M. McClam, Program Analyst, by telephone at (202) 205–7408; by FAX at (202) 481–4783; or by e-mail at *Pamela.McClam@sba.gov.*

**SUPPLEMENTARY INFORMATION:** Section 8(a)(17) of the Small Business Act (Act), 15 U.S.C. 637(a)(17), requires that recipients of Federal contracts set aside for small businesses, service-disabled veteran-owned small businesses, or SBA's 8(a) Business Development Program provide the product of a small business manufacturer or processor, if the recipient is other than the actual manufacturer or processor of the product. This requirement is commonly referred to as the Nonmanufacturer Rule. The SBA regulations imposing this requirement are found at 13 CFR 121.406(b). Section 8(a)(17)(b)(iv) of the Act authorizes SBA to waive the Nonmanufacturer Rule for any "class of products" for which there are no small business manufacturers or processors available to participate in the Federal market.

As implemented in SBA's regulations at 13 CFR 121.1202(c), in order to be considered available to participate in the Federal market for a class of products, a small business manufacturer must have submitted a proposal for a contract solicitation or received a contract from the Federal government within the last 24 months. The SBA defines "class of products" based on six-digit coding systems. The first coding system is the Office of Management and Budget North American Industry Classification System (NAICS). The second is the Product and Service Code required as a data entry field by the Federal Procurement Data System.

The SBA received a request on May 2, 2008, to waive the Nonmanufacturer Rule for Other Aircraft Parts and Auxiliary Equipment Manufacturing (Drones, Miscellaneous Aircraft Accessories and Components, and Aircraft Launching Equipment).

In response, on May 16, 2008, SBA published in the **Federal Register** a notice of intent to waive the Nonmanufacturer Rule for Other Aircraft Parts and Auxiliary Equipment Manufacturing (Drones and Aircraft Launching Equipment). SBA explained in the notice that it was soliciting comments and sources of small business manufacturers of this class of products. One comment was received regarding our intent to waive Miscellaneous Aircraft Accessories and Components, Product Service Code 1680. Based on the information in that comment, SBA has determined that there are small business manufacturers of Product Service Code 1680 and will not be granting a waiver. No comments were received regarding Product Service Codes 1550 and 1720, therefore SBA is granting the waiver of the Nonmanufacturer Rule for Other Aircraft Parts and Auxiliary Equipment Manufacturing (Drones and Aircraft Launching Equipment) NAICS code 336413, Product Service Codes 1550 and 1720.

**Authority:** 15 U.S.C. 637(a)(17).

**Karen Hontz,**
*Director for Government Contracting.*
[FR Doc. E8–14116 Filed 6–20–08; 8:45 am]
**BILLING CODE 8025–01–P**

---

## DEPARTMENT OF STATE

[Public Notice 6273]

**60-Day Notice of Proposed Information Collection: Form DS–3083, Training Registration (for Non-U.S. Government Persons), OMB Control No. 1405–0145**

**ACTION:** Notice of request for public comments.

---

**SUMMARY:** The Department of State is seeking Office of Management and Budget (OMB) approval for the information collection described below. The purpose of this notice is to allow 60 days for public comment in the **Federal Register** preceding submission to OMB. We are conducting this process in accordance with the Paperwork Reduction Act of 1995.

• *Title of Information Collection:* Training Registration (for Non-U.S. Government Persons).

• *OMB Control Number:* 1405–0145.

• *Type of Request:* Extension of a Currently Approved Collection.

• *Originating Office:* Foreign Service Institute, FSI/EX.

• *Form Number:* DS–3083.

• *Respondents:* Respondents are non-U.S. government persons and/or their eligible family members, authorized by Public Law 105–277 to receive training delivered by the Foreign Service Institute on a reimbursable or advance-of-funds basis.

• *Estimated Number of Respondents:* 100.

• *Estimated Number of Responses:* 100.

• *Average Hours per Response:* 0.5.

• *Total Estimated Burden:* 50.

• *Frequency:* On occasion.

• *Obligation to Respond:* Required to Obtain or Retain a Benefit.

**DATES:** The Department will accept comments from the public up to 60 days from June 23, 2008.

**ADDRESSES:** You may submit comments by any of the following methods:

• E-mail: *oshimawa@state.gov.*

• Mail (paper, disk, or CD–ROM submissions): Foreign Service Institute, Office of Management, U.S. Department of State, Washington, DC 20522–4201.

• Fax: 703–302–7227.

You must include the DS form number (if applicable), information collection title, and OMB control number in any correspondence.

**FOR FURTHER INFORMATION CONTACT:** Direct requests for additional information regarding the collection listed in this notice, including requests for copies of the proposed information collection and supporting documents, to Wayne A. Oshima, Foreign Service Institute, Office of Management, U.S. Department of State, Washington, DC 20522–4201, who may be reached on 703–302–6730 or at *oshimawa@state.gov.*

**SUPPLEMENTARY INFORMATION:** We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper performance of our functions.

• Evaluate the accuracy of our estimate of the burden of the proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of technology.

### Abstract of Proposed Collection

This data collection tool is to be used to obtain information from non-U.S. Government persons so that they can enroll in courses offered by the

# Exhibit E

| **AWARD/CONTRACT** | J | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | ▶ | RATING | | PAGE 1 | OF | PAGES 8 |

| 2. CONTRACT (Proc. Inst. Ident.) NO. SPE4A7-15-D-0053 | 3. EFFECTIVE DATE 2014 NOV 07 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. 1000028096 |

| 5. ISSUED BY | CODE | SPE4A7 | 6. ADMINISTERED BY (If other than Item 5) | CODE | S2101A |

DLA AVIATION
ASC SUPPLIER OPER AE AND AF DIV
8000 JEFFERSON DAVIS HWY
RICHMOND VA 23297
USA
Local Admin: KATRINA WRIGHT PARWB18 Tel: 804-279-5282 Fax: 804-279-3289
Email: KATRINA.WRIGHT@DLA.MIL

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD 21202-5299
USA
Criticality:   PAS: None

**7. NAME AND ADDRESS OF CONTRACTOR** (No., street, city, county, State and ZIP Code)

MAVEN ENGINEERING CORPORATION DBA
15946 DERWOOD RD
ROCKVILLE MD 20855-2123
USA

CODE 46YF5          FACILITY CODE 46YF5

**8. DELIVERY**

☐ FOB ORIGIN    ☒ OTHER (See below)

**9. DISCOUNT FOR PROMPT PAYMENT**

Net 30 days

**10. SUBMIT INVOICES** (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN ▶ | ITEM 12

| 11. SHIP TO/MARK FOR | CODE | 12. PAYMENT WILL BE MADE BY | CODE | SL4701 |

SEE SCHEDULE, DO NOT SHIP TO ADDRESS ON THIS PAGE

DEF FIN AND ACCOUNTING SVC
BSM
P O BOX 369031
COLUMBUS OH 43236-9031
USA

**13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:**

☐ 10 U.S.C. 2304(c)     ☐ 41 U.S.C. 253(c)

**14. ACCOUNTING AND APPROPRIATION DATA**

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | See Schedule | 309.000 | | | |
| | | | | **15G. TOTAL AMOUNT OF CONTRACT** ▶ | $699,999.99 |

**16. TABLE OF CONTENTS**

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 7 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| | C | DESCRIPTION/SPECS./WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | 8 |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 7 | | | | |
| X | F | DELIVERIES OR PERFORMANCE | 7 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return _____ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ SEALED-BID AWARD (Contractor is not required to sign this document.) Your bid on Solicitation Number SPE4A714R2810 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the terms listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your bid, and (b) this award/contract. No further contractual document is necessary. (Block 18 should be checked only when awarding a sealed-bid contract.) |

| 19A. NAME AND TITLE OF SIGNER (Type or Print) | 20A. NAME OF CONTRACTING OFFICER Holly Simmons Holly.Simmons@dla.mil PARFH15 |

| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
|---|---|---|---|
| BY _____ (Signature of person authorized to sign) | | BY *Holly V. Simmons* (Signature of Contracting Officer) | 2014 NOV 07 |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable

**STANDARD FORM 26** (REV. 5 /2011 )
Prescribed by GSA - FAR (48 CFR) 53.214(a)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-15-D-0053 | PAGE 2 OF 8 PAGES |
|---|---|---|

The Government has the right to extend the terms of the contract for an additional 4 years in 12 month increments or when the contract reaches the contract maximum of $699,999.99. The total dollar value of the IQC will not exceed $699,999.99 for all delivery orders placed against it.

THIS CONTRACT HAS PROVISIONS FOR FOUR (4) ONE-YEAR OPTIONS. NOTICE OF INTENT TO EXERCISE THE OPTION MUST BE FURNISHED TO THE CONTRACTOR 60 DAYS PRIOR TO THE EXPIRATION OF THE CONTRACT.

FOB ORIGIN, INSPECTION/ACCEPTANCE ORIGIN.

PAYMENT TERMS: NET 30

MAVEN ENGINEERING CORP'S OFFER FOR SOLICITATION SPE4A714R2810 IS HEREBY INCORPORATED INTO THISCONTRACT.

PRICING IS AS FOLLOWS:

|  | ESTIMATED ANNUAL QUANTITY | UNIT PRICE (FOB ORIGIN) |
|---|---|---|
| BASE YEAR | 48 EACH | $2,265.30 EACH |
| OPTION YEAR 1 | 48 EACH | $ EACH |
| OPTION YEAR 2 | 48 EACH | $ EACH |
| OPTION YEAR 3 | 48 EACH | $ EACH |
| OPTION YEAR 4 | 48 EACH | $ EACH |

|  | BASE YEAR | OPTION YEARS (1-4) |
|---|---|---|
| GUARANTEED CONTRACT QUANTITY | 12 | BASE YEAR ONLY |
| MAXIMUM CONTRACT QUANTITY | 72 | 72 |
| MINIMUM DELIVERY ORDER QUANTITY | 12 | 12 |
| MAXIMUM DELIVERY ORDER QUANTITY | 48 | 48 |

DELIVERY SCHEDULE IS 227 DAYS ARO. PARTIAL AND EARLY SHIPMENTS AT NO ADDITIONAL COST TO THE GOVERNMENT ARE AUTHORIZED AND PREFERREED ON THIS CONTRACT.

PAYMENT TERMS: NET 30

END ITEM APPLICATION: C-130 AIRCRAFT

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-15-D-0053 | PAGE 3 OF 8 PAGES |
|---|---|---|

# SECTION B

SUPPLIES/SERVICES: 1560-00-172-0485


ITEM DESCRIPTION:

FAIRING,AIRCRAFT (VAPOR BARRIER SEAL)

P/N 7225040-10

52.246-11 Higher Level Contract Quality Requirement (Manufacturers)

FAR CLAUSE 52.246-11 APPLIES.  A QUALITY MANAGEMENT PROGRAM MEETING THE
REQUIREMENTS OF ISO 9001:2008; A PROGRAM COMPARABLE TO ISO 9001:2008
(EXAMPLE SAE AS 9100), THE FOLLOWING TAILORED VERSION OF ISO 9001:2008;
OR A PROGRAM COMPARABLE TO THE TAILORED VERSION OF ISO 9001:2008
(EXAMPLE SAE AS 9003) IS REQUIRED. MIL-I-45208 AND MIL-Q-9858 ARE
OBSOLETE AND NO LONGER CONSIDERED SUITABLE WHEN HIGHER LEVEL QUALITY IS
REQUIRED. IN THE TAILORED VERSION OF THE ISO 9001:2008, ANY REFERENCES
WHICH CITE THE ENTIRE INTERNATIONAL STANDARD ARE INTERPRETED AS
EXCLUSIONS TO THIS DOCUMENT.
DLA TAILORED HIGHER LEVEL QUALITY CLAUSE FROM ISO 9001:2008

4.1 General requirements, [excluding reference to 1.2 and excluding NOTE
3 c)]
4.2.1 General, [excluding subparagraph a)]
4.2.2 Quality manual, [excluding subparagraph a)]
4.2.3 Control of documents
4.2.4 Control of records
5.1 Management commitment
5.3 Quality policy
6.2.2 Competence, training and awareness
6.4 Work environment
7.1 Planning of product realization, [excluding NOTE 2]
7.2.1 Determination of requirements related to the product
7.2.2 Review of requirements related to the product
7.2.3 Customer communication
7.3.7 Control of design and development changes
7.4.1 Purchasing process
7.4.3 Verification of purchased product
7.5.1 Control of production and service provision
7.5.3 Identification and traceability
7.5.4 Customer property
7.5.5 Preservation of product
7.6 Control of monitoring and measuring equipment
8.1 General, [excluding subparagraph b) and subparagraph c)]
8.2.2 Internal audit
8.2.4 Monitoring and measurement of product
8.3 Control of nonconforming product
8.5.2 Corrective action
8.5.3 Preventive action

EXCEPTION DATA:

1.  Part marking per MIL-STD-130 method per drawing requirements and BAC
5307.  Marking must include national stock number, part number, current

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-15-D-0053 | PAGE 4 OF 8 PAGES |
| --- | --- | --- |

# SECTION B

SUPPLY/SERVICE: 1560-00-172-0485 CONT'D

design authority code (98748), actual manufacturer's CAGE code (-----),
date of manufacture and "For Military Use Only".  Parts will not be
marked with the original design authority (Boeing) CAGE code.

2.  Delete reference to BAC 5005, D2-5000.

3.  Surface texture per ASME B46.1.

4.  Dimensions and tolerances per ASME Y14.5M.

5.  IUID marking is not required.

6.  Engineering order 2009A0004 is applicable to drawing 7225040.

END OF EXCEPTIONS*****************************

MARK IAW MIL-STD-130N(1), DATED 16 NOV 2012.
CONFIGURATION CONTROL APPLIES

1. SAMPLING FOR INSPECTION AND TESTING SHALL BE IAW ANSI/ASQ
Z1.4-2003 (R2013). ANY ALTERNATE PLAN MUST BE
APPROVED BY THE PCO.  A SAMPLING PLAN THAT ACCEPTS ON ZERO
DEFECTS IS REQUIRED

2. ANY DEFECTIVE ITEM DISCOVERED DURING INSPECTION MAY BE CAUSE
FOR REJECTION OF THE ENTIRE CONTRACT QUANTITY.

IAW BASIC DRAWING NR 98748 7225040
REVISION NR K   DTD 01/20/2009
PART PIECE NUMBER: 7225040-10

IAW REFERENCE DRAWING NR 81205 BACZ10G
REVISION NR N   DTD 01/06/2004
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98748 7225039
REVISION NR D   DTD 07/29/2005
PART PIECE NUMBER:

IAW REFERENCE DRAWING NR 98748 7225040
REVISION NR K   DTD 01/12/2009
PART PIECE NUMBER:

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-15-D-0053 | PAGE 5 OF 8 PAGES |
|---|---|---|

### SECTION B

SUPPLY/SERVICE: 1560-00-172-0485 CONT'D

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | 1560-00-172-0485<br>FAIRING,AIRCRAFT | 309.000 | EA | $ 2,265.30000 | $ 699,999.99 |

PRICING TERMS: Firm Fixed Price

**BASE PERIOD**

SUPPLIES/SERVICES: 1560-00-172-0485

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | $ 2,265.30 | 227 |

OPTION 01

SUPPLIES/SERVICES: 1560-00-172-0485

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 227 |

OPTION 02

SUPPLIES/SERVICES: 1560-00-172-0485

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 227 |

OPTION 03

SUPPLIES/SERVICES: 1560-00-172-0485

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 227 |

OPTION 04

SUPPLIES/SERVICES: 1560-00-172-0485

| CLIN | Price | Delivery<br>(in days) |
|---|---|---|
| 0001 | 0.00 | 227 |

QTY VARIANCE: PLUS 0% MINUS 0%

INSPECTION POINT: ORIGIN

ACCEPTANCE POINT: ORIGIN

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-15-D-0053 | PAGE 6 OF 8 PAGES |
|---|---|---|

## SECTION B

SUPPLY/SERVICE: 1560-00-172-0485 CONT'D

FOB: ORIGIN  DELIVERY DATE:

PREP FOR DELIVERY:

SHALL BE PACKAGED STANDARD COMMERCIAL IN ACCORDANCE WITH ASTM D 3951.

Markings Paragraph
When ASTM D3951, Commercial Packaging is specified, the following apply:
•,,All Section "D" Packaging and Marking Clauses take precedence over
ASTM D3951.
•,,In addition to requirements in MIL-STD-129, when Commercial Packaging
 is used, the Method of Preservation for all MIL-STD-129 marking and labeling shall be "CP" Commercial Pack.
•,,The Unit of Issue (U/I) and Quantity per Unit Pack (QUP) as specified
 in the contract take precedence over QUP in ASTM D3951.

GOVT USE

| ITEM | PR | PRLI | External<br>PR | External<br>PRLI | External<br>Material | Customer RDD/<br>Need Ship Date |
|---|---|---|---|---|---|---|
| 0001 | 1000028096 | 0001 | N/A | N/A | N/A | N/A |

*********************************************************************************

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-15-D-0053 | PAGE 7 OF 8 PAGES |
|---|---|---|

**SECTION E - INSPECTION AND ACCEPTANCE**

**52.246-02  INSPECTION OF SUPPLIES FIXED PRICE (AUG 1996) , ALT I  (JUL 1985)  FAR**

**52.246-11  HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT  (FEB 1999)  FAR**

The Contractor shall comply with the higher-level quality standard selected below. [If more than one standard is listed, the  offeror shall indicate its selection by checking the appropriate block.]

| | Title | Number | Date | Tailoring |
|---|---|---|---|---|
| ☐ | ISO 9001:2008 | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

[Contracting Officer insert the title, number (if any), date, and tailoring (if any) of the higher-level quality standards.]
(End of clause)

**52.246-9008  INSPECTION AND ACCEPTANCE AT ORIGIN  (NOV 2011)  DLAD**

(a) Inspection and Acceptance are at Origin.
(b) The point of acceptance will be the point of last inspection before shipment unless otherwise indicated by the offeror.
**(c) The Offeror shall indicate below the location where supplies will be inspected:**
**Supplies:**
**Plant:**
MAVEN ENGINEERING CORPORATION
_____
**Commercial and Government Entity (CAGE) Code: 46FY5**
_____
**Street: 15946 DERWOOD ROAD**
_____
**City/State/Zip: ROCKVILLE, MD 20855**
_____
**Applicable to contract line-item(s) (CLIN(s):**
**ALL**
_____
**(d)  The Offeror shall indicate below the location where packaging will be inspected:**
**Packaging:**
**[ X ] Same as for supplies, or,**
**Plant:**

_____
**Cage Code:**
_____
**Street:**
_____
**City/St/Zip:**
_____
**Applicable to clin(s):**
_____
****


**SECTION F - DELIVERIES OR PERFORMANCE**

**52.247-29  F.O.B. ORIGIN  (FEB 2006)  FAR**

**52.247-9034  POINT OF CONTACT FOR TRANSPORTATION INSTRUCTIONS  (JUN 2013)  DLAD**


**SECTION I - CONTRACT CLAUSES**

**CONTINUED ON NEXT PAGE**

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SPE4A7-15-D-0053 | PAGE 8 OF 8 PAGES |
|---|---|---|

**252.204-7012   SAFEGUARDING OF UNCLASSIFIED CONTROLLED TECHNICAL INFORMATION   (NOV 2013)   DFARS**

**52.211-15   DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS   (APR 2008)   FAR**

**52.219-06   NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE   (NOV 2011)   FAR**

**SECTION J - LIST OF ATTACHMENTS**

**List of Attachments**

| Description | File Name |
|---|---|
| ATTACH.SPE4A715D0053BLANK | SPE4A715D0053BLANK.pdf |

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|---|
| | J | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. P00001 | 3. EFFECTIVE DATE See Blk. 16C | 4. REQUISITION/PURCHASE REQ. NO. See Block 14 | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | S2101A |
|---|---|---|---|---|---|

DLA AVIATION
ASC SUPPLIER OPER AE AND AF DIV
8000 JEFFERSON DAVIS HWY
RICHMOND VA  23297
USA
  Initiator: William Palmer
  PARFH11 Tel: 804-279-1248 Email: William.Palmer@dla.mil

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD  21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|

MAVEN ENGINEERING CORPORATION
15946 DERWOOD RD
ROCKVILLE MD  20855-2123
USA

9B. DATED *(SEE ITEM 11)*

X  | 10A. MODIFICATION OF CONTRACT/ORDER NO.
      SPE4A7-15-D-0053

10B. DATED *(SEE ITEM 13)*
      2014 NOV 07

| CODE   46YF5 | FACILITY CODE     46YF5 |
|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( *such as changes in paying office, appropriation date, etc.* ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). | |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| X | D. OTHER *(Specify type of modification and authority)* FAR 52.217-9 OPTION TO EXTEND | |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* |
|---|---|
| | Noraida Maldonado-Otero PARFE13 |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| *(Signature of person authorized to sign)* | | *(Signature of Contracting Officer)* | 2015 OCT 07 |

| NSN 7540-01-152-8070 Previous edition unusable | STANDARD FORM 30 (REV. 10-83) Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-00325 P00001 | PAGE / OF / PAGES |
|---|---|---|

1. THE OPTION TO EXTEND THE INDEFINTE DELIVERY PURCHASE ORDER FOR AN ADDITIONAL TWELVE MONTHS IS HEREBY EXERCISED IN ACCORDANCE WITH FAR 52.217-9, "OPTION TO EXTEND THE TERM OF THE CONTRACT". THE OPTION PERIOD IS EFFECTIVE FROM 11/3/15 TO 11/2/16. THE UNIT PRICE WILL BE IAW BASIC FOR OPTION YEAR 1.

2. All other terms and conditions of the specified contracts remain the same.

3. This is a unilateral modification.

Option year 1 unit price: $2265.30 each.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | |
|---|---|---|
| 1. CONTRACT ID CODE<br>J | PAGE<br>1 | OF PAGES<br>2 |

| 2. AMENDMENT/MODIFICATION NO.<br>P00002 | 3. EFFECTIVE DATE<br>See Blk. 16C | 4. REQUISITION/PURCHASE REQ. NO.<br>See Block 14 | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | S2101A |
|---|---|---|---|---|---|

DLA AVIATION
ASC SUPPLIER OPER AE AND AF DIV
8000 JEFFERSON DAVIS HWY
RICHMOND VA  23297
USA
Initiator: William Palmer
PARFH11 Tel: 804-279-1248 Email: William.Palmer@dla.mil

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD  21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| MAVEN ENGINEERING CORPORATION<br>15946 DERWOOD RD<br>ROCKVILLE MD  20855-2123<br>USA | | 9B. DATED *(SEE ITEM 11)* |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>SPE4A7-15-D-0053 |
| | | 10B. DATED *(SEE ITEM 13)*<br>2014 NOV 07 |

| CODE   46YF5 | FACILITY CODE   46YF5 |
|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( *such as changes in paying office, appropriation date, etc.* ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)*<br>AR 52.217-9 OPTION TO EXTEND |

E. **IMPORTANT:** Contractor ☒ is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*<br>Jeremy Prince<br>PARFE09 |
|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>_____<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br><br>_Jeremy Prince_<br>*(Signature of Contracting Officer)* | 16C. DATE SIGNED<br>2016 OCT 30 |

| | |
|---|---|
| NSN 7540-01-152-8070<br>Previous edition unusable | **STANDARD FORM 30** (REV. 10-83)<br>Prescribed by GSA FAR (48 CFR) 53.243 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-00325 P0000/ | PAGE / OF / PAGES |
|---|---|---|

1. THE OPTION TO EXTEND THE INDEFINTE DELIVERY PURCHASE ORDER FOR AN ADDITIONAL TWELVE MONTHS IS HEREBY EXERCISED IN ACCORDANCE WITH FAR 52.217-9, "OPTION TO EXTEND THE TERM OF THE CONTRACT". THE OPTION PERIOD IS EFFECTIVE FROM 11/7/16 TO 11/6/17. THE UNIT PRICE WILL BE IAW BASIC FOR OPTION YEAR 2.

2. All other terms and conditions of the specified contracts remain the same.

3. This is a unilateral modification.

Option year 2 unit price: $2265.30 each.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|
| J | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| P00003 | See Blk. 16C | See Block 14 | |

| 6. ISSUED BY | CODE | SPE4A7 | 7. ADMINISTERED BY *(If other than Item 6)* | CODE | S2101A |
|---|---|---|---|---|---|

DLA AVIATION
ASC SUPPLIER OPER AE AND AF DIV
8000 JEFFERSON DAVIS HWY
RICHMOND VA 23297
USA
  Initiator: Andre Desima
PARFJ69 Tel: 804-279-6806 Email: Andre.Desima@dla.mil

DCMA BALTIMORE
217 E REDWOOD ST
SUITE 1800
BALTIMORE MD 21202-5299
USA

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)* | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

MAVEN ENGINEERING CORPORATION
15946 DERWOOD RD
ROCKVILLE MD 20855-2123
USA

9B. DATED *(SEE ITEM 11)*

| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
|---|---|---|
| | | SPE4A7-15-D-0053 |

10B. DATED *(SEE ITEM 13)*

2014 NOV 07

| CODE | 46YF5 | FACILITY CODE | 46YF5 |
|---|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES ( *such as changes in paying office, appropriation date, etc.* ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). | |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| X | D. OTHER *(Specify type of modification and authority)* FAR 52.217-9 OPTION TO EXTEND | |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Continuation Sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* |
|---|---|
| | Jeremy Prince |
| | PARFE09 |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| | | *Jeremy Prince* | 2017 SEP 25 |
| *(Signature of person authorized to sign)* | | *(Signature of Contracting Officer)* | |

| NSN 7540-01-152-8070 | STANDARD FORM 30 (REV. 10-83) |
|---|---|
| Previous edition unusable | Prescribed by GSA FAR (48 CFR) 53.243 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED:<br>SPE4A7-13-D-00325 P00002 | PAGE / OF / PAGES |
|---|---|---|

1. THE OPTION TO EXTEND THE INDEFINTE DELIVERY PURCHASE ORDER FOR AN ADDITIONAL TWELVE MONTHS IS HEREBY EXERCISED IN ACCORDANCE WITH FAR 52.217-9, "OPTION TO EXTEND THE TERM OF THE CONTRACT". THE OPTION PERIOD IS EFFECTIVE FROM 11/7/17 TO 11/6/18. THE UNIT PRICE WILL BE IAW BASIC FOR OPTION YEAR 3.

2. All other terms and conditions of the specified contracts remain the same.

3. This is a unilateral modification.

Option year 3 unit price: $2378.56 each.


The Local Administrator is changed from Joe Bell to Katrina Wright.

# Exhibit F

 An official website of the United States government    Here's how you know



**SAM**.GOV®

Home    Search    Data Bank    Data Services    Help

⬇ **Download**

# FAIRING, AIRCRAFT; END ITEM AIRCRAFT, STRATOLIFTER C/KC-135

**Contract Opportunity**

General Information

Classification

Description

Attachments/Links

Contact Information

History

Award Notices

◯ **INACTIVE**                                    Contract Opportunity

Notice ID

SPE4A714R2810

Related Notice

Department/Ind. Agency

### Looking for contract opportunity help?     

APEX Accelerators are an official government contracting resource for small businesses. Find your local APEX Accelerator for free government expertise related to contract opportunities.

APEX Accelerators are funded in part through a cooperative agreement with the Department of Defense.

The APEX Accelerators program was formerly known as the Procurement Technical Assistance Program (PTAP).

# General Information

**Contract Opportunity Type:** Presolicitation (Original)

**All Dates/Times are:** (UTC-04:00) EASTERN STANDARD TIME, NEW YORK, USA

**Original Published Date:** Sep 12, 2014 02:18 pm EDT

**Original Response Date:** Oct 29, 2014 03:00 pm EDT

**Inactive Policy:** 15 days after response date

**Original Inactive Date:** Nov 13, 2014

**Initiative:**

- None

# Classification

**Original Set Aside:** Total Small Business Set-Aside (FAR 19.5)

**Product Service Code:** 15 - AIRCRAFT/AIRFRAME STRUCTURE COMPTS

**NAICS Code:**

- 336413 - Other Aircraft Parts and Auxiliary Equipment Manufacturing

**Place of Performance:**

# Description

Solicitation for NSN: 1560-00-172-0485, 1000028096, OPTION TO EXTEND THE TERM OF THE CONTRACT: 48 MONTHS. DELIVERY SCHEDULE 227 DAYS ARO. DURATION OF CONTRACT ORDERING PERIOD: 12 MONTHS. This a critical application item that contains higher level quality requirements. This is an export controlled item. This NSN is a non-commercial item that contains requirements for configuration control. NAICS is **336413**. This is a stock buy with no surge requirements. The FOB point is Origin; Inspection and Acceptance is at Destination. This is a request for proposal for an Indefinite Quantity Contract. Estimated Annual Quantities for the base and four one-year option periods will be 48 each. Solicited as a Small Business Set-aside. Specifications, plans, or drawings relating to the procurement described are available and will be furnished by the Government. Solicitations between $25,000 and over will be made in writing.  Request for a written proposal, please submit offers to fax # (804) 279-4165. OFFERORS MUST COMPLETE A COPY OF THE SOLICITATION IN

ORDER TO BE CONSIDERED FOR AWARD.  A copy of the solicitation will be made available via DLA Internet Bid Board System at https://dibbs.bsm.dla.mil/ issue date cited in the RFP.  From the DIBBS Homepage, select Search RFPs.  Then choose the RFP you wish to download.  RFPs are in portable document format (pdf).  To download and view these documents you will need the lasted version of Adobe Acrobat Reader.  This software is available free at http://www.adobe.com.  A paper copy of this solicitation will not be available to requestors. The solicitation anticipated issue date is September 29, 2014.  All responsible sources may submit an offer, which will be considered.  PPIRS Past Performance Information Retrieval System.  Based upon market research, the Government is not using the policies contained in Part 12, Acquisition of Commercial Items, in its solicitation for the described supplies or services. However, interested persons may identify to the contracting officer their interest and capability to satisfy the Government's requirement with a commercial item within 15 days of this notice. The final contract award decision may be based upon a combination of price, past performance, and other evaluation factors as described in the solicitation.   Email address:  deion.turner@dla.mil

 Emaildesc:  e-mail POC.

# Point of Contact

Deion Turner, Contract Specialist, Phone (804) 279-5486, Fax (804) 279-4439, Email deion.turner@dla.mil

# Attachments/Links

# Contact Information

## Primary Point of Contact

**DEION M. TURNER**

✉ Deion.Turner@dla.mil

📞 8042795486

Secondary Point of Contact

**Holly V Simmons**

✉ holly.simmons@dla.mil

📞 (804)279-2999

📠 (804)279-4437

# History

➡ **Nov 13, 2014 05:54 am EST**
Presolicitation (Original)



**Feedback**

## Our Website

About This Site

Our Community

Release Notes

System Alerts

### Policies

Terms of Use

Privacy Policy

Disclaimers

Freedom of Information Act

## Our Partners

Acquisition.gov

USASpending.gov

Grants.gov

More Partners

### Customer Service

Help

Check Entity Status

Federal Service Desk

External Resources

Accessibility                                              Contact



⚠ **WARNING**

This is a U.S. General Services Administration Federal Government computer system that is **"FOR OFFICIAL USE ONLY."** This system is subject to monitoring. Individuals found performing unauthorized activities are subject to disciplinary action including criminal prosecution.

This system contains Controlled Unclassified Information (CUI). All individuals viewing, reproducing or disposing of this information are required to protect it in accordance with 32 CFR Part 2002 and GSA Order CIO 2103.2 CUI Policy.

SAM.gov

An official website of the U.S. General Services Administration

# Exhibit G

**39448** Federal Register / Vol. 68, No. 127 / Wednesday, July 2, 2003 / Rules and Regulations

**Authority:** 7 U.S.C. 1311 *et seq.*; 7 U.S.C. 1501 *et seq*; 7 U.S.C. 1921 *et seq.*; 7 U.S.C. 7201 *et seq.*; 15 U.S.C. 714b.

## Subpart A—General Provisions

■ 2. Section 718.11 is added to read as follows:

### §718.11   Disqualification due to federal crop insurance fraud.

(a) Section 515(h) of the Federal Crop Insurance Act (FCIA) provides that a person who willfully and intentionally provides any false or inaccurate information to the Federal Crop Insurance Corporation (FCIC) or to an approved insurance provider with respect to a policy or plan of FCIC insurance after notice and an opportunity for a hearing on the record, will be subject to one or more of the sanctions described in section 515(h)(3). In section 515(h)(3), the FCIA specifies that in the case of a violation committed by a producer, the producer may be disqualified for a period of up to 5 years from receiving any monetary or non-monetary benefit under a number of programs. The list includes, but is not limited to, benefits under:

(1) Title V of the FCIA.

(2) The Agricultural Market Transition Act (7 U.S.C. 7201 *et seq.*), including the Noninsured Crop Disaster Assistance Program under section 196 of that Act (7 U.S.C. 7333).

(3) The Agricultural Act of 1949 (7 U.S.C. 1421 *et seq.*).

(4) The Commodity Credit Corporation Charter Act (15 U.S.C. 714 *et seq*).

(5) The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 *et seq.*).

(6) Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 *et seq.*).

(7) Any law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in prices of agricultural commodities.

(b) Violation determinations are made by FCIC. However, upon notice from FCIC to FSA that a producer has been found to have committed a violation to which paragraph (a) of this section applies, that person shall be considered ineligible for payments under the programs specified in paragraph (a) of this section that are funded by FSA for the same period of time for which, as determined by FCIC, the producer will be ineligible for crop insurance benefits of the kind referred to in paragraph (a)(1) of this section. Appeals of the determination of ineligibility will be administered under the rules set by FCIC.

(c) Other sanctions may also apply.

## PART 1405—LOANS, PURCHASES AND OTHER OPERATIONS

■ 3. The authority citation for part 1405 is revised to read as follows:

**Authority:** 7 U.S.C. 1515; 7 U.S.C. 7991(e); 15 U.S.C. 714b and 714c.

■ 4. Section 1405.8 is added to read as follows:

### §1405.8   Disqualification due to Federal crop insurance fraud.

(a) Section 515(h) of the Federal Crop Insurance Act (FCIA) provides that a person who willfully and intentionally provides any false or inaccurate information to the Federal Crop Insurance Corporation (FCIC) or to an approved insurance provider with respect to a policy or plan of FCIC insurance after notice and an opportunity for a hearing on the record, will be subject to one or more of the sanctions described in section 515(h)(3). In section 515(h)(3), the FCIA specifies that in the case of a violation committed by a producer, the producer may be disqualified for a period of up to 5 years from receiving any monetary or non-monetary benefit under a number of programs. The list includes, but is not limited to, benefits under:

(1) Title V of the FCIA.

(2) The Agricultural Market Transition Act (7 U.S.C. 7201 *et seq.*), including the Noninsured Crop Disaster Assistance Program under section 196 of that Act (7 U.S.C. 7333).

(3) The Agricultural Act of 1949 (7 U.S.C. 1421 *et seq.*).

(4) The Commodity Credit Corporation Charter Act (15 U.S.C. 714 *et seq*).

(5) The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 *et seq.*).

(6) Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 *et seq.*).

(7) Any law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in prices of agricultural commodities.

(b) Violation determinations are made by FCIC. However, upon notice from FCIC to CCC that a producer has been found to have committed a violation to which paragraph (a) of this section applies, that person shall be considered ineligible for payments under the programs specified in paragraph (a) of this section that are funded by CCC for the same period of time for which, as determined by FCIC, the producer will be ineligible for crop insurance benefits of the kind referred to in paragraph (a)(1) of this section. Appeals of the determination of ineligibility will be administered under the rules set by FCIC.

(c) Other sanctions may also apply.

Signed in Washington, DC, on June 17, 2003.

**James R. Little,**

*Administrator, Farm Service Agency, Executive Vice President, Commodity Credit Corporation.*

[FR Doc. 03–16663 Filed 7–1–03; 8:45 am]

**BILLING CODE 0341–05–P**

---

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 121

### Small Business Size Standards; Waiver of the Nonmanufacturer Rule

**AGENCY:** Small Business Administration.

**ACTION:** Final decision to waive the nonmanufacturer rule.

**SUMMARY:** This document advises the public that the U.S. Small Business Administration (SBA) is establishing a waiver of the Nonmanufacturer Rule for Other Ordnances and Accessories Manufacturing. The basis for waivers is that no small business manufacturers are supplying these classes of products to the Federal government. The effect of a waiver would be to allow otherwise qualified regular dealers to supply the products of any domestic manufacturer on a Federal contract set aside for small businesses or awarded through the SBA 8(a) Program.

**EFFECTIVE DATE:** July 11, 2003.

**ADDRESS COMMENTS TO:** Edith Butler, Program Analyst, U.S. Small Business Administration, 409 3rd Street, SW., Washington, DC 20416, Tel: (202) 619–0422.

**FOR FURTHER INFORMATION CONTACT:** Edith Butler, Program Analyst, (202) 619–0422, FAX: (202) 205–7280.

**SUPPLEMENTARY INFORMATION:** Pub. L. 100–656, enacted on November 15, 1988, incorporated into the Small Business Act the previously existing regulation that recipients of Federal contracts set aside for small businesses or SBA's 8(a) Program must provide the product of a small business manufacturer or processor, if the recipient is other than the actual manufacturer or processor. This requirement is commonly referred to as the Nonmanufacturer Rule. The SBA regulations imposing this requirement are found at 13 CFR 121.406(b). Section 303(h) of the law provides for waiver of this requirement by SBA for any "class of products" for which there are no small business manufacturers or processors in the Federal market.

To be considered available to participate in the Federal market on

these classes of products, a small business manufacturer must have submitted a proposal for a contract solicitation or received a contract from the Federal government within the last 24 months. The SBA defines "class of products" based on a six digit North American Industry Classification System (NAICS) and the four digit Product and Service Code established by the Federal Procurement Data System.

The U.S. Small Business Administration is currently processing a request to waive the Nonmanufacturer Rule for Other Ordnance and Accessories Manufacturing, NAICS 332995.

**Linda G. Williams,**
*Associate Administrator for Government Contracting.*
[FR Doc. 03–16717 Filed 7–1–03; 8:45 am]
**BILLING CODE 8025–01–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

**14 CFR Part 39**

**[Docket No. 2003–NE–21–AD; Amendment 39–13183; AD 2003–11–23]**

**RIN 2120–AA64**

**Airworthiness Directives; International Aero Engines AG (IAE) V2522–A5, V2524–A5, V2527–A5, V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5 Turbofan Engines; Correction**

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Final rule; correction.

**SUMMARY:** This document makes a correction to Airworthiness Directive (AD) 2003–11–23 applicable to IAE V2522–A5, V2524–A5, V2527–A5, V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5 turbofan engines that was published in the **Federal Register** on June 5, 2003 (68 FR 33621). The lists of engine models in the Airworthiness Directives title, the Summary, the Supplementary Information, and the Applicability section are incorrect. This document corrects those listings. Also, paragraph (c) of the regulatory text was incorrectly printed as run-in with the heading Applicability. In all other respects, the original document remains the same.

**EFFECTIVE DATE:** Effective June 20, 2003.

**FOR FURTHER INFORMATION CONTACT:** Glorianne Niebuhr, Aerospace Engineer, Engine Certification Office, FAA, Engine and Propeller Directorate, 12 New England Executive Park, Burlington, MA 01803; telephone (781) 238–7132; fax (781) 238–7199.

**SUPPLEMENTARY INFORMATION:** A final rule AD, FR Doc. 03–14133 applicable to IAE V2522–A5, V2524–A5, V2527–A5, V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5 turbofan engines, was published in the **Federal Register** on June 5, 2003 (68 FR 33621). The following correction is needed:

**§ 39.13    [Corrected]**

On page 33621, in the third column, in the Heading Section, in the Airworthiness Directives title, "International Aero Engines AG (IAE) V2522–A5, V2524–A5, V2527–A5, V2527E–A5, V2527M–A5, and V2530–A5 Turbofan Engines "is corrected to read" International Aero Engines AG (IAE) V2522–A5, V2524–A5, V2527–A5, V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5 Turbofan Engines". In the same column, in the Summary section, in the fourth and fifth lines, "V2527E–A5, V2527M–A5, and V2530–A5 turbofan engines" is corrected to read "V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5 turbofan engines".

On page 33622, in the first column, in the Supplementary Information section, in third and fourth lines, change "V2527–A5, V2527E–A5, V2527M–A5, and V2530–A5" to "V2527–A5, V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5". In the same column, third paragraph, fourth and fifth lines, change "V2527–A5, V2527E–A5, V2527M–A5, and V2530–A5" to "V2527–A5, V2527E–A5, V2527M–A5, V2530–A5, and V2533–A5".

Issued in Burlington, MA, on June 26, 2003.

**Francis A. Favara,**
*Acting Manager, Engine and Propeller Directorate, Aircraft Certification Service.*
[FR Doc. 03–16690 Filed 7–1–03; 8:45 am]
**BILLING CODE 4910–13–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

**14 CFR Part 39**

**[Docket No. 2003–SW–17–AD; Amendment 39–13215; AD 2003–08–51]**

**RIN 2120–AA64**

**Airworthiness Directives; MD Helicopters, Inc. Model 369A, D, E, H, HE, HM, HS, F, and FF Helicopters**

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This document publishes in the **Federal Register** an amendment adopting Airworthiness Directive (AD) 2003–08–51, which was sent previously to all known U.S. owners and operators of the specified model MD Helicopters, Inc. helicopters by individual letters. This AD requires reducing the retirement life of certain tail rotor blades, performing a one-time visual inspection of each tail rotor blade pitch horn (pitch horn) for a crack or corrosion, and replacing unairworthy tail rotor blades with airworthy tail rotor blades. This AD also requires revising the Airworthiness Limitations section of the helicopter maintenance manual to reflect the reduced retirement life, and reporting information to the FAA within 24 hours following the one-time inspection. The actions specified by this AD are intended to prevent a pitch horn from separating from the tail rotor blade, leading to an unbalanced condition, vibration, loss of tail rotor pitch control, and loss of directional control of the helicopter.

**DATES:** Effective July 17, 2003, to all persons except those persons to whom it was made immediately effective by Emergency AD 2003–08–51, issued on April 15, 2003, which contained the requirements of this amendment.

Comments for inclusion in the Rules Docket must be received on or before September 2, 2003.

**ADDRESSES:** Submit comments in triplicate to the Federal Aviation Administration (FAA), Office of the Regional Counsel, Southwest Region, Attention: Rules Docket No. 2003–SW–17–AD, 2601 Meacham Blvd., Room 663, Fort Worth, Texas 76137. You may also send comments electronically to the Rules Docket at the following address: *9-asw-adcomments@faa.gov*.

**FOR FURTHER INFORMATION CONTACT:** Fred Guerin, Aviation Safety Engineer, FAA, Los Angeles Aircraft Certification Office, Airframe Branch, 3960 Paramount Blvd., Lakewood, California 90712, telephone (562) 627–5232, fax (562) 627–5210.

**SUPPLEMENTARY INFORMATION:** On April 15, 2003, the FAA issued Emergency AD 2003–08–51 for the specified model helicopters, which requires, before further flight, reducing the retirement life of certain tail rotor blades from 5,140, 5,200, or 10,000 hours time-in-service (TIS) to 400 hours TIS, performing a one-time visual inspection of each pitch horn for a crack or corrosion, and replacing unairworthy tail rotor blades with airworthy tail rotor blades. The Emergency AD also requires revising the Airworthiness Limitations section of the helicopter maintenance

# Exhibit H

(202) 205–7280; or by e-mail at *edith.butler@sba.gov.*

**SUPPLEMENTARY INFORMATION:** Section 8(a)(17) of the Small Business Act, (Act), 15 U.S.C. 637(a)(17), requires that recipients of Federal contracts set aside for small businesses or SBA's 8(a) Business Development Program provide the product of a small business manufacturer or processor, if the recipient is other than the actual manufacturer or processor of the product. This requirement is commonly referred to as the Nonmanufacturer Rule. The SBA regulations imposing this requirement are found at 13 CFR 121.406 (b). Section 8(a)(17)(b)(iv) of the Act authorizes SBA to waive the Nonmanufacturer Rule for any "class of products" for which there are no small business manufacturers or processors available to participate in the Federal market.

As implemented in SBA's regulations at 13 CFR 121.1204, in order to be considered available to participate in the Federal market for a class of products, a small business manufacturer must have submitted a proposal for a contract solicitation or received a contract from the Federal government within the last 24 months. The SBA defines "class of products" based on six digit coding systems. The first coding system is the Office of Management and Budget North American Industry Classification System (NAICS). The second is the Product and Service Code established by the Federal Procurement Data System.

The SBA received a request on January 12, 2004 to waive the Nonmanufacturer Rule for General Aviation Turboprop Aircraft. In response, on February 4, 2004, SBA published in the **Federal Register** a notice of intent to grant the waiver of the Nonmanufacturer Rule for General Aviation Turboprop Aircraft. SBA explained in the notice that it was soliciting comments and sources of small business manufacturers of this class of products. In response to this notice, no comments were received from any interested party. SBA has determined that there are no small business manufacturers of this class of products, and is therefore granting the waiver of the Nonmanufacturer Rule for General Aviation Turboprop Aircraft, NAICS 441229.

**Authority:** 15 U.S.C. 637(a)(17).

Dated: March 8, 2004.

**Barry S. Meltz,**
*Acting Associate Administrator for Government Contracting.*
[FR Doc. 04–5705 Filed 3–12–04; 8:45 am]
**BILLING CODE 8025–01–P**

## SMALL BUSINESS ADMINISTRATION

### Small Business Size Standards: Waiver of the Nonmanufacturer Rule

**AGENCY:** Small Business Administration.

**ACTION:** Notice of termination of waiver of the Nonmanufacturer Rule for Small Arms Manufacturing.

**SUMMARY:** The U.S. Small Business Administration (SBA) is terminating the waiver of the Nonmanufacturer Rule for Small Arms Manufacturing based on our recent discovery of small business manufacturers for this class of products. Terminating this waiver will require recipients of contracts set aside for small or 8(a) businesses to provide the products of small business manufacturers or processor on such contracts.

**DATES:** This termination of waiver is effective on March 30, 2004.

**FOR FURTHER INFORMATION CONTACT:** Edith Butler, Program Analyst, by telephone at (202) 619–0422; by FAX (202) 205–7280; or by e-mail at *edith.butler@sba.gov.*

**SUPPLEMENTARY INFORMATION:** Section 8(a)(17) of the Small Business Act (Act), 15 U.S.C. 637(a)(17), requires that recipients of Federal contracts set aside for small businesses or SBA's 8(a) Business Development Program provide the product of a small business manufacturer or processor, if the recipient is other than the actual manufacturer or processor of the product. This requirement is commonly referred to as the Nonmanufacturer Rule. The SBA regulations imposing this requirement are found at 13 CFR 121.406(b). Section 8(a)(17)(b)(iv) of the Act authorizes SBA to waive the Nonmanufacturer Rule for any "class of products" for which there are no small business manufacturers or processors available to participate in the Federal market.

As implemented in SBA's regulations at 13 CFR 121.1204, in order to be considered available to participate in the Federal market for a class of product, a small business manufacturer must have submitted a proposal for a contract solicitation or received a contract from the Federal government within the last 24 months. The SBA defines "class of products" based on the six digit North American Industry Classification System (NAICS) and the four digit Product and Service Code established by the Federal Procurement Data System.

SBA granted a waiver of the Nonmanufacturer Rule for Small Arms Manufacturing, based on its determination that no small business manufacturers were available to participate in the Federal market for this class of products. It was recently brought to SBA's attention by small business manufacturers and a SBA Procurement Center Representative that small business manufacturers exist for items within the Small Arms Manufacturing class of products, identified under the NAICS 332994. In response, on October 29, 2003, SBA published in the **Federal Register** a notice of intent to terminate the waiver of the Nonmanufacturer Rule for Small Arms Manufacturing. SBA explained in the notice that it had discovered the existence of small business manufacturers of that class of products. SBA did not receive any comments in response to the published notice. Accordingly, based on the available information, SBA has determined that there are small business manufacturers of this class of products, and is therefore terminating the class waiver of the Nonmanufacturer Rule for Small Arms Manufacturing, NAICS 332994.

**Authority:** 15 U.S.C. 637(a)(17).

Dated: March 8, 2004.

**Barry S. Meltz,**
*Acting Associate Administrator for Government Contracting.*
[FR Doc. 04–5706 Filed 3–12–04; 8:45 am]
**BILLING CODE 8025–01–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Highway Administration

### Environmental Impact Statement; Cobb and Cherokee Counties, GA

**AGENCY:** Federal Highway Administration (FHWA), DOT.

**ACTION:** Notice of intent.

**SUMMARY:** The FHWA is issuing this notice to advise the public that an Environmental Impact Statement (EIS) will be prepared for a proposed combined highway and Bus Rapid Transit (BRT) project on I–75 and I–575 in Cobb and Cherokee Counties, Georgia.

**FOR FURTHER INFORMATION CONTACT:** Mr. Walter Boyd, Urban Transportation Engineer, FHWA, 61 Forsyth Street, SW., Suite 17T100, Atlanta, Georgia

# Exhibit I


An official website of the United States government
Here's how you know ∨

USA**SPENDING**.gov    ☰

RECIPIENT PROFILE
MAVEN ENGINEERING CORPORATION    ⌁

📅 All Fiscal Years    ∨

**Overview**    Transactions Over Time    Top 5

# MAVEN ENGINEERING CORPORATION

 **Overview**

PARENT RECIPIENT    View child recipients ▸

**Total Awarded Amount**
## $108.5 Million
from 8,056 transactions

View awards to this recipient

**Face Value of Loans** ⓘ
## $18.0 Million
from 11 transactions

**Details**

| | |
|---|---|
| Recipient Identifier | KVZ4SL8QTTF8 (UEI) 📋 609717462 (Legacy DUNS 📋) |
| Address | 15946 DERWOOD RD ROCKVILLE, MD UNITED STATES 20855-2123 |
| Congressional District | MD-08 |
| Business Types | Business Corporate Entity Not Tax Exempt DoT Certified Disadvantaged Business Enterprise Minority Owned Business Self-Certified Small Disadvantaged Business Small Business Special Designations Sub-Chapter S Corporation Subcontinent Asian Indian American Owned Business U.S. Owned Business Women Owned Business Women Owned Small Business |

📊 **Transactions Over Time**

This graph shows trends over time for all transactions to this recipient. Hover over the bars for more detailed information.



● All Transactions   ○ Count of New Awards

## ⊞ Top 5

The set of tables below provide a summary of awards to this recipient through multiple angles. To see more than the top 5, you can visit our Advanced Search page.

### 🏛 Awarding Agencies

| Name | Awarded Amount | % of Total |
|---|---|---|
| 1. Department of Defense (DOD) | $108.16M | 99.72% |
| 2. Department of Homeland Security (DHS) | $123,220 | 0.11% |
| 3. Small Business Administration (SBA) | $93,260 | 0.09% |
| 4. Department of Commerce (DOC) | $84,787 | 0.08% |
| 5. General Services Administration (GSA) | $0 | 0% |

### 🏛 Awarding Sub-Agencies

| Name | Awarded Amount | % of Total |
|---|---|---|
| 1. Defense Logistics Agency (DLA) | $103.66M | 95.58% |
| 2. Department of the Army (USA) | $2.98M | 2.75% |
| 3. Department of the Navy (USN) | $1.48M | 1.37% |
| 4. U.S. Coast Guard (USCG) | $123,220 | 0.11% |
| 5. Small Business Administration (SBA) | $93,260 | 0.09% |

### 💵 Federal Accounts

| Coming Soon |
|---|

## ➕ Assistance Listings (CFDA Programs)

| Name | Awarded Amount | % of Total |
|------|----------------|------------|
| 1. 59.012 – 7(a) Loan Guarantees | $92,960 | 0.09% |
| 2. 59.054 – 7(a)Export Loan Guarantees | $300 | 0% |

## 🏷️ NAICS Codes

| Name | Awarded Amount | % of Total |
|------|----------------|------------|
| 1. 336413 - Other Aircraft Parts and Auxiliary Equipment Manufacturing | $20.02M | 18.46% |
| 2. 332994 - Small Arms, Ordnance, and Ordnance Accessories Manufacturing | $11.54M | 10.64% |
| 3. 336411 - Aircraft Manufacturing | $4.02M | 3.71% |
| 4. 332991 - Ball and Roller Bearing Manufacturing | $3.27M | 3.02% |
| 5. 332722 - Bolt, Nut, Screw, Rivet, and Washer Manufacturing | $3.04M | 2.8% |

## ▥ Product Service Codes

| Name | Awarded Amount | % of Total |
|------|----------------|------------|
| 1. 1560 - AIRFRAME STRUCTURAL COMPONENTS | $11.13M | 10.26% |
| 2. 1005 - GUNS, THROUGH 30MM | $10.32M | 9.51% |
| 3. 5930 - SWITCHES | $4.21M | 3.88% |
| 4. 1650 - AIRCRAFT HYDRAULIC, VACUUM, AND DE-ICING SYSTEM COMPONENTS | $3.56M | 3.28% |
| 5. 6150 - MISCELLANEOUS ELECTRIC POWER AND DISTRIBUTION EQUIPMENT | $3.09M | 2.85% |

## 🏳️ Countries

| Name | Awarded Amount | % of Total |
|------|----------------|------------|
| 1. United States | $106.93M | 98.59% |
| 2. United Kingdom | $810,401 | 0.75% |
| 3. Greece | $341,138 | 0.31% |
| 4. Israel | $297,194 | 0.27% |
| 5. Turkey | $73,617 | 0.07% |

**Note:** *This data is based on Primary Place of Performance.*

## 🗺️ U.S. States or Territories

| Name | Awarded Amount | % of Total |
|------|----------------|------------|
| 1. Maryland | $85.24M | 78.59% |
| 2. California | $8.21M | 7.57% |
| 3. Florida | $7.24M | 6.68% |
| 4. New Mexico | $3.09M | 2.85% |

| Name | Awarded Amount | % of Total |
|------|----------------|------------|
| 5. Texas | $600,340 | 0.55% |

**Note:** *This data is based on Primary Place of Performance.*

## Stay in touch

### Share your story

Love USAspending.gov? Join the "Your Data, Your Story" campaign to share how you use the data!

Share Now →

### Learn how to use USAspending

Access specialized training videos on how to use our tools and data.

Learn More →

### Sign up for release notes

Get release notes to your inbox to keep up with what's new on USAspending.gov.

Sign Up →

---

**Building a more transparent government.**

Providing publicly accessible and searchable data on what the federal government spends each year.

ABOUT

Mission

HELP

FAQs

Community

Email Us

RELATED SITES

Fiscal Data

Bureau of the Fiscal Service

    

Accessibility

Privacy Policy

|

Freedom of Information Act

|

D&B Information

© 2024 USAspending.gov